**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **NO. 12-CR-40026-WGY** |
| | ) | |
| **JOHN J. O'BRIEN, ET AL.** | ) | |

**DEFENDANT TAVARES' MOTION AND**
**INCORPORATED MEMORANDUM OF LAW FOR**
**<u>JUDGMENT OF ACQUITTAL OR NEW TRIAL</u>**

Defendant Elizabeth Tavares, by and through undersigned counsel, hereby respectfully moves this Honorable Court, pursuant to Fed. R. Crim. P. 29(c), to enter a judgment of acquittal on all charges brought against her because the government has failed to carry its burden of persuasion and no reasonable jury could find her guilty of any of the crimes charged.  In the alternative, Tavares respectfully moves this Honorable Court to order a new trial, pursuant to Fed R. Crim. P. 33(a) because the charge to the jury was prejudicially flawed, and the amount of questions the jury was allowed to ask infringed Tavares' right to a fair trial and tainted the decision making process.

**<u>STANDARD</u>**

Rule 29(c) of the Federal Rules of Criminal Procedure allows the defendant to move for a judgment of acquittal if the government cannot or has not proved every element beyond a reasonable doubt, notwithstanding the jury's verdict to the contrary.  *United States v. Marston*, 694 F.3d 131, 134 (1st Cir. 2012).  "In reviewing a Rule 29 motion for judgment of acquittal, a

1

district court must consider the evidence, both direct and circumstantial, 'in the light most favorable to the prosecution' to determine whether the 'body of proof, as a whole, has sufficient bite to ground a reasoned conclusion that the government proved each of the elements of the charged crime beyond a reasonable doubt.'"   *U.S. v. Lopez-Diaz*, 940 F.Supp.2d 39, 44 (D.P.R. 2013) (quoting *United States v. Lara*, 181 F.3d 183, 200 (1st Cir.1999)). A Rule 29 motion, therefore, should be denied only when "the total evidence, including reasonable inferences, when put together is sufficient to warrant a jury to conclude that defendant is guilty beyond a reasonable doubt." *United States v. Doe*, 921 F.2d 340, 343 (1st Cir.1990).

Rule 33(a) of the Federal Rules of Criminal Procedure, on the other hand, bestows a court with the power to "vacate any judgment and grant a new trial if the interest of justice so requires."  "The power is used sparingly. But it may be triggered by a myriad of circumstances." *United States v. Carpenter*, 494 F.3d 13, 29 (1st Cir. 2007) (Lynch, C.J. concurring).  These circumstances include any scenario where a defendant's constitutional right to a fair trial has been denied, such as when a court improperly instructs a jury or allows the jury to repeatedly ask questions of trial witnesses. *See United States v. Pacheco*, 434 F.3d 106 (1st Cir. 2006) (new trial granted in the interests of justice because of erroneous jury instructions); *United States v. Sutton*, 970 F.2d 1001, 1005 (1st Cir. 1992) (noting that while "juror-inspired questions in a criminal case is not prejudicial per se [and] is a matter committed to the sound discretion of the trial court," the practice "should be employed sparingly and with great circumspection" because it may create prejudice to a defendant by "transforming the jurors' role from a purely passive one to a partially interactive one.").

## **ARGUMENT**

**I.**   **Aiding and Abetting Liability**

A.    Insufficient Evidence Was Established for a Rational Jury to Find That Tavares Aided and Abetted Any of the Crimes Charged.[1]

In addition to Tavares' original Rule 29 motion for acquittal, this Court should reconsider its prior ruling and subsequent instruction to the jury regarding what is sufficient to constitute Aiding and Abetting under 18 U.S.C. § 2.  The elements of aider and abetter liability (hereinafter, "A&A liability") are straight forward: "a person is liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. U.S.*, --- U.S. ---, 134 S. Ct. 1240, 1245 (2014).

As a matter of law, the mere fact that her name was stamped on the rejection and/or interview instruction letters is insufficient to satisfy the affirmative act element, even if she held the requisite intent at the times these acts were performed (which the evidence failed to adduce anyways).  To satisfy the aiding and abetting statute, the act must further the *crime*, not merely some attendant circumstance surrounding the crime.  *See U.S. v. Price*, 623 F.2d 587, 591-92 (9th Cir. 1980) (in fraudulent business scheme, defendant had "minimal involvement" for purposes of aider and abetter liability where the defendant "answered the phone, wrote checks

---

[1] Tavares' *Motion for Judgment of Acquittal,* see Dkt. # 536, in its entirety, is hereby incorporated by reference as if fully set forth herein.  To the extent arguments not explicitly made in this filing were made in her original Motion for Judgment of Acquittal, Tavares hereby renews and reasserts them.

Tavares also hereby joins any additional or related arguments filed by co-defendant, John O'Brien, on Rule 29 or Rule 33 grounds.  Given that Tavares' liability is predicated almost entirely on substantive crimes/acts performed by O'Brien via aiding/abetting and *Pinkerton*, any rulings favorable to O'Brien on the mail fraud or RICO charges are likewise applicable to Tavares.  *See U.S. v. Celestin*, 612 F.3d 14, 24 (1st Cir. 2010) (Pinkerton liability requires "another coconspirator [to have] committed the crime in furtherance of [the] conspiracy"); First Circuit Pattern Criminal Instructions, § 4.18.2 (the first element of aiding and abetting is that someone else commit the crime).

and took care of some bookkeeping"); *Abuelhawa v. U.S.*, 556 U.S. 816, 821 (2009) (citing Black's Law Dictionary 76 (8th ed.2004)) ("defining 'aid and abet' as to 'facilitate the commission of a crime'"). The government has made clear since its opening: this case is about "the cover-up." The crime is not the interviews themselves, but the false certifications. Indeed, the interviews were going to occur regardless of whether or not the alleged false certifications were subsequently made. To that end, Tavares' stamped signature on letters, which would be sent out regardless of whether or not a "scheme to defraud" was in place anyways, cannot constitute "assistance" or an act in furtherance of the crime itself.

Additionally, some witnesses who were interview panel members also testified that they had received names ahead of interviews of favored candidates. For the same reason that having her name stamped on the rejection letters is insufficient, so is the passing of names insufficient to establish an affirmative act in furtherance of the particular crime in question. The substantive crime at issue here is mail fraud; its essence is misrepresentation. No evidence was presented that she either made misrepresentations or that she assisted O'Brien in the making of misrepresentations (assuming he made any, which the evidence establishes he did not, *see infra*, Argument Section II.D.i. Importantly, no evidence was presented that she *knew* the particular candidates she was passing along were not actually the top candidates that wouldn't have been passed along to the next round anyways. This arguably establishes, at most, that she was willfully blind to the ultimate qualifications of the candidates in question. Willful blindness, however, is an insufficient mental state to aid and abet mail fraud. Willful blindness only satisfies a *mens rea* of mere knowledge, *see U.S. v. Perez-Melendez*, 599 F.3d 31, 41 (1st Cir. 2010), but mail fraud requires a specific intent to defraud, *see* First Circuit Pattern Criminal Instructions, § 4.18.1341. Likewise, the type of *mens rea* required for aiding and abetting, which

in this case would be a "shared intent to defraud," is a specific intent of a more stringent variety than mere knowledge, and matches the *mens rea* required for mail fraud.  7/15/2014 Jury Charge Tr. at 45 ("She's got to know that he's -- as to the specific person on the specific charge, he's making a fraudulent certification and she's got to share that same criminal intent. She's got to want that to happen.") *See also*, *U.S. v. Bailey*, 444 U.S. 394, 405 (1980) ("In a general sense, 'purpose' corresponds loosely with the common-law concept of specific intent, while 'knowledge' corresponds loosely with the concept of general intent."); *U.S. v. Tobin*, 480 F.3d 53, 61 (1st Cir. 2007) (citing LaFave, Substantive Criminal Law § 5.2(e) (2d ed.2003)) ("But "specific intent"-although often equated with "purpose"-can as easily describe any additional intent requirement (whether knowledge or purpose) beyond the mental state-normally knowledge-required for the actus reus."); First Circuit Pattern Criminal Instructions, § 4.18.02 Aid and Abet, Comment (6) (citing *Perez-Melendez*, 599 F.3d at 40-41 ("willful blindness goes to the knowledge of the underlying crime, not to the aiding and abetting defendant's intention to help or make the endeavor succeed").  Therefore, assuming *arguendo* that the evidence shows, at most, that Tavares may have been willfully blind of the alleged fraud by virtue of the signature stamps, or she may have been willfully blind to the fact that she was not passing along the candidates that would have made it to the next round anyways, any liability or special verdict judgment premised on aiding and abetting must be vacated because it does not satisfy the requisite *mens rea*.

The *actus reus* of aiding and abetting (the affirmative act in furtherance of the substantive crime element) must coincide with the *mens rea* (the shared, specific intent to defraud).  *See U.S. v. Lebron-Cepeda*, 324 F.3d 52, 65 (1st Cir. 2003).  *Compare U.S. v. Broxmeyer*, 616 F. 3d 120, 129-30 (2nd Cir. 2010) (holding that 18 U.S.C. § 2423(a), which prohibits "person[s] who

5

knowingly transports an individual who has not attained the age of 18 years in interstate ... commerce... *with intent* that the individual engage in ... any sexual activity," "requires that the mens rea of intent coincide with the actus reus of crossing state lines.") *with Rosemond*, 134 S. Ct. 1245 (defining requirements of aiding and abetting as "an affirmative act in furtherance of that offense... *with the intent* of facilitating the offense's commission.")  No evidence here was presented that Tavares had the requisite specific intent to defraud at the time she performed any acts that the government alleges satisfy the affirmative act requirement.  Further, the specific acts alleged do not, under any circumstance, constitute significant enough affirmative acts as to establish the *actus reus* element of aiding and abetting as required by *Rosemond*.[2]  Accordingly, all convictions of substantive charges or predicate acts of mail fraud must be vacated.

B. The Jury Instructions on Aiding and Abetting Liability Were Erroneous and Prejudicial thus requiring a new trial

This Court gave the following charge on aiding and abetting liability:

> At this stage in my charge I'm only going to talk about aiding and abetting. This is what "aiding and abetting" means. Now you're considering Ms. Tavares.
>
> Ms. Tavares has got to share the same criminal intent as Mr. O'Brien. That means the government has got to prove beyond a reasonable doubt that she knows there is this scheme or artifice to defraud by this fraudulent hiring mechanism, which is designed to look like it's appropriate. She's got to know that he's -- as to the specific person on the specific charge, he's making a fraudulent certification and she's got to share that same criminal intent. She's got to want that to happen. She doesn't have to have an agreement with Mr. O'Brien, but she's got to want it to happen. An agreement we'll deal with in conspiracy. If she does, then she's got to do something to make it come about. She's got to take some act herself to help it out.

---

[2] To the extent the mail fraud allegations against O'Brien are found deficient, e.g. because there was no act of misrepresentation establishing the deceit element, or because there was no deprivation/obtainment of property, then the aiding and abetting findings against Tavares must axiomatically fail, *see* fn 1, *supra*.

> *Now, the act she takes can be completely -- standing alone can be*
> *completely innocuous*, maybe she sends the files for the interviews
> to the people, maybe she sends out letters, maybe she collates files,
> those things standing alone are not criminal. But if she shares the
> same criminal intent as Mr. O'Brien, who you found guilty, and
> she does something, *even a little thing*, then you may find her
> guilty on the aiding and abetting theory. (emphasis added)

7/15/2014 Jury Charge Tr. at 45-46. *See also Id.* at 60 ("a small thing" would be sufficient).

These instructions unnecessarily trivialized the essential *actus reus* element of aiding and

abetting a mail fraud. The prejudice was intensified by an antecedent instruction essentially

informing the jury that the Court believed her conduct to be "questionable" – a direction that

compromised her presumption of innocence. *Id.* at 24-25, 29; *See also*, *infra* Argument Section

V.B. This charge erroneously described the nature of the act to further the substantive crime.

None of the examples cited by the Court, e.g. sending out letters or collating files, would be

sufficient, of themselves, to establish an "affirmative act in furtherance" of the substantive crime.

The instructions completely trivialize the type of conduct the government must prove before a

person is branded a felon. Moreover, an "affirmative act in furtherance" is more than merely

"help[ing] it out."  The act must be substantial; it must also be in furtherance of the crime itself.

The crime here was not the hiring panels; the crime is the misrepresentation.  Accordingly, the

instructions should have required the jury to find that she performed some affirmative act in

furtherance of the *misrepresentation*; not merely that she performed some act that is merely

incidentally related to the alleged crime.

More importantly, however, is that the instructions themselves were *highly* prejudicial

because they invaded the province of the jury.  The jury was instructed that if it found that Ms.

Tavares "sends the files for the interviews to the people... she sends out letters... [or] she collates

files... then you may find her guilty on the aiding and abetting theory" so long as she shared

O'Brien's intent.  These instructions were far too specific and therefore prejudicial.  The jury listened to 12 weeks of testimony; it was entirely unnecessary to point the jury in the direction of particular evidence aimed *specifically* at Tavares.  *U.S. v. Winter*, 663 F.2d 1120, 1149 (1st Cir. 1981) ("We do not think it the proper function of the trial judge to instruct the jury as to the weight it can or may give to any particular evidence that it believes. Rather, it appears to us to be a usurpation of the jury's special function.").  Additionally, these instructions effectively required the jury to find that the sending of files for interviews or the sending of letters was a sufficient act to satisfy the *actus reus* element of aiding and abetting which reduced the jury's role to determining the *mens rea* requirement of shared intent.  The jury was entitled to determine, on its own, whether the sending out of letters was sufficiently an "affirmative act in furtherance" of the crime.  This was a pure question of fact that the jury should have been allowed to decide.  *See United States v. DiRico*, 78 F.3d 732, 735-37 (1st Cir. 1996) (district court reversed where it instructed a jury that certain information listed on a tax return satisfied the "materiality" element because "[w]hile the trial judge must properly instruct the jury on the legal definition of materiality, only the jury can decide whether the facts proved at trial meet that legal standard.").  Moreover, the "in furtherance" aspect of aiding and abetting was completely uncoupled from the possible acts the court indicated were sufficient.  Based on the final paragraph, all the jury had to find was (1) shared intent and (2) the mailing of letters to find that she aided and abetted mail fraud.  The instructions therefore completely stripped the requirement of aiding and abetting that the "affirmative acts" in question be "in furtherance" of the fraud.  A new trial must therefore be granted.

## II.  Mail Fraud

### A.  Deprivation of Property

     i.  *The Government failed to prove a deprivation of property*

  Tavares hereby reasserts and incorporates, as if fully set forth herein, the arguments presented in Argument Section II.D of the defendants' Memorandum of Law in support of their motion to dismiss. *See* Dkt. # 171 at 33-39. The government was required to prove that the scheme to defraud deprived someone of tangible property. *See McNally v. United States*, 483 U.S. 350, 360 (1987). At worst, the government proved that the applicants were deprived of a fair hiring and selection process, but this is insufficient, as a matter of law, to satisfy the type of property interest the mail fraud statute is designed to protect. *See United States v. Doherty*, 867 F.2d 47, 55 (1st Cir. 1989) (holding that mail fraud indictment cannot be based on deprivation of policeman's "right to have 'promotional examinations, and law enforcement appointments and promotions, conducted honestly'" or applicant's "right to have promotions and examinations 'conducted honestly'"). Each conviction for mail fraud, both standing alone substantive offenses and as RICO predicate acts, must therefore be vacated.

     ii.  *The jury was not instructed that it was required to find a deprivation of money or property*

  The only instruction the jury received regarding money or property is as follows: "[t]hird, reliance by that other person such that money or property go in a manner that it otherwise would not have gone." 7/15/2014 Jury Charge Tr. at 32. This instruction is erroneous and insufficient because the jury must be charged that they must find, beyond a reasonable doubt, that there was a loss of property, and the instruction failed to convey that concept. *See* First Circuit Pattern Criminal Instructions, § 4.18.1341, Comment 8 (citing *Cleveland v. United States*, 531 U.S. 12, 15, 20-25 (2000)) ("Except for honest services fraud, a fraud charge must involve money or

'property.'").[3]  *See also*, *U.S. v. Mittelstaedt*, 31 F.3d 1208 (2nd Cir. 1994) ("To convict, the government had to establish that the omission caused (or was intended to cause) actual harm to the village of a pecuniary nature or that the village could have negotiated a better deal for itself if it had not been deceived. The jury should have been so instructed."); *United States v. Johns*, 742 F.Supp. 196, 202-03 (E.D.Pa. 1990) (and cases cited).  At most, the instructions given were more akin to a diversion of property which is not necessarily the same as a loss or deprivation of property.  A new trial must therefore be granted.

      B.    <u>Rejection Letters</u>

           i.      *The government failed to satisfy the mailing in furtherance requirement of § 1341*

Tavares hereby reasserts and incorporates, as if fully set forth herein, the arguments presented in Argument Section II.A of the defendants' Memorandum of Law in support of their motion to dismiss.  *See* Dkt. # 171 at 25-28.  The government was required to prove, beyond a reasonable doubt, "the use of interstate mail... communications in furtherance of" the alleged scheme to defraud.  *United States v. Cheal*, 389 F.3d 35, 41 (1st Cir. 2004).  Here, the rejection letters were not in furtherance of the scheme to defraud. The rejection letters were merely a perfunctory process that was part of every posted hiring, either within or without the alleged scheme.  They were also required by the Trial Court Policies and Procedures Manual itself.  *See* Tr. Ex. 41 at § 4.302(D) ("Applicants who are not selected for appointment must be notified in writing that they have not been selected for the position.").  The rejection letters would have been sent regardless and in no way caused the interviewing and selection process to appear more legitimate.  Indeed, the "scheme" had already "reached fruition" *before* the rejection letters were

---

[3] Tavares requested, in her proposed jury instructions, for a supplemental instruction "[i]n addition to the standard charge."  Dkt. # 539 at 13.

sent out, because the notices were sent, pursuant to Trial Court Policy, *see* Tr. Ex. 41 at §

4.302(D), *after* the allegedly fraudulent certification was made.  *Kann v. U.S.*, 323 U.S. 88, 94

(1944) (mailings were not in furtherance because when the local banks mailed the checks, "[t]he

scheme in each case had reached fruition. The persons intended to receive the money had

received it irrevocably. It was immaterial to them, or to any consummation of the scheme, how

the bank which paid or credited the check would collect from the drawee bank.").  *See also*,

*Maze v. United States*, 414 U.S. 395, 396-97 (1974).  Likewise, here, it was immaterial that the

rejection letters had been sent out; the candidates had all been screened, interviewed, and

selected.  Simply put, the rejection letters were not "incident to an essential part of the scheme."

*Schmuck v. United States*, 489 U.S. 705, 710-11 (1989).   The charges of mail fraud must

therefore be dismissed.

> ii.    *The instructions regarding use of the mails were erroneous and prejudicial*

The jury was instructed as follows:

> And then there's the last element and that's the element that brings
> us into the courts of the United States. As part of the scheme and
> artifice to defraud, it has to be reasonably understood by each of
> the people you are considering, by each of the people you are
> considering -- and keep them separate, that the mails of the United
> States are going to be used by someone to carry out the scheme.
> Now, that doesn't mean they have to use the mails of the United
> States, but the government, they, the person you're considering, the
> person who's accused, has to use the mails, but it has to be that it's
> reasonable that to carry out this scheme the mails would be used...
>
> And the government's got to be specific about this and so here they
> have been specific and they claim that their specific proof of the
> use of the mails is the rejection letters, the people who weren't
> selected got rejection letters and those rejection letters were mailed
> out. And they say, 'Well, that's part of the scheme and that was
> done by the U.S. Mails.' Even if that wasn't done by Mr. O'Brien,
> he's got to understand -- the government's got to prove beyond a

> reasonable doubt that he does understand that the mails are going
> to be used... all that's required on this element is that Mr. O'Brien
> reasonably understood that to carry out this scheme to defraud,
> where he makes a fraudulent certification, that the mails of the
> United States would be used."

7/15/2014 Jury Charge Tr. at 32. Here, the province of the jury was once again invaded. The jury was instructed that the government "must be specific" and that they were sufficiently "specific" here by pointing to the rejection letters. Since the rejection letters were referred to specifically, the jury should have been instructed that they must find the rejection letters were used "in furtherance" of the scheme or acquit the defendant who was charged with such specific mailings. As a result, a jury hearing these instructions could only assume that, as long as they found that O'Brien knew about the rejection letters, that they were sufficient "to carry out this scheme" because the government was "specific."

Moreover, this instruction was in contravention of circuit precedent. *See United States v. Hebshie,* 549 F.3d 30, 35-36 (1st Cir. 2008). In *Hebshie*, the District Court instructed the jury that,

> the crime of mail fraud does require that the government prove
> beyond a reasonable doubt that the mails were in fact used in some
> manner to further such a scheme for the purposes of obtaining
> money by means of false or fraudulent pretenses *or* that the use of
> the mails would ordinarily follow in the usual course of business or
> events or that the use of the mails was reasonably foreseeable.

*Id.* at 42 (emphasis added). The First Circuit found the use of "or" instead of "and" in the above instruction erroneous because it "conflate[ed] the 'causation' requirement with the 'in furtherance' requirement" because it "allowed the jury to find the mailing element satisfied if "the use of the mails would ordinarily follow in the usual course of business" *or* if "the use of the

mails was reasonably foreseeable."[4]  *Id.*  Similarly, here, the jury was instructed that even if he, himself, did not send out the rejection letters, "all that's required on this element is that Mr. O'Brien reasonably understood that to carry out this scheme to defraud... that the mails of the United States would be used."  This is almost the same exact instruction that the court in *Herbshie* found to be plain error.  It completely elided the "in furtherance" requirement and only required the jury to find causation.  A new trial must therefore be granted.

C.     <u>Good Faith and Intent to Defraud</u>

        i.     *The government failed to prove Tavares' or O'Brien's intent to defraud*

The government was required to prove that the defendants had the "specific intent" to defraud, "which excludes false statements honestly believed to be true and promises or predictions made in good faith."  *United States v. Mueffelman*, 470 F.3d 33, 36 (1st Cir. 2006). A defendant has an "intent to defraud" when she has "act[ed] knowingly with the intent or the purpose to obtain, deceive, or cheat [the government agency] out of money or property."  *U.S. v. Dubon-Otero*, 292 F.3d 1, 12 n. 15 (1st Cir. 2001).  "Good faith is a complete defense and it is the government's burden to disprove it beyond a reasonable doubt."  *United States v. Callipari*, 368 F.3d 22, 33 (1st Cir. 2004).

Ample evidence was presented, and numerous interviewer-witnesses testified, that any of the persons to whom Tavares gave names were considered to be Commissioner O'Brien's designee, or representative, on the interview panel in question.  Indeed the Hiring Policies and Procedures Manual, section 4.302(E), states that the local panel is to consist, in part, "of the

---

[4] Although the court found this erroneous instruction to be plain error, the court affirmed his conviction because he was not prejudiced by it.  *See Hebshie*, 549 F.3d at 45.  Here, on the other hand, given how tenuous the rejection letters were in terms of whether they furthered the scheme, the prejudice here is perfectly clear.  This is made more evident by the fact that the jury asked a *specific question* about the mailing element during deliberations.

Commissioner of Probation (Chair) or his/her designee." Ex. 41.  Tavares acted entirely in good faith when she passed names, at the direction of O'Brien, along to interviewers on the panel because, even in the light most favorable to the government, it is implicit that she would have understood they were O'Brien's designees.  If O'Brien, the Commissioner of Probation who had exclusive appointing authority for the entire agency, wanted his designee to move along a particular candidate, there is no basis to assume that Tavares could not rely, in good faith, on that preference, *especially* where *no* evidence was presented that Tavares was ever aware of so-called sponsor lists or that legislators were backing the Commissioner's preferred candidate(s).[5]

Central to the defendants' argument throughout the trial was that O'Brien believed he had absolute authority to appoint whomever he wanted.  The yearly budget passed by the legislature (which was introduced by the government and discussed on direct examination *ad nauseum*) between 2001 and 2010 stated "notwithstanding the provisions of any general or special law, rule or regulation to the contrary, said commissioner, subject to appropriation, shall have exclusive authority to appoint... probation officers."  O'Brien's view of this language was made crystal clear from the numerous letters that were sent by him to Mulligan (which were introduced as exhibits by the government).  The government introduced no evidence tending to suggest that O'Brien did not, in fact, have this view.  Although O'Brien may have been incorrect about his interpretation, mail fraud cannot be premised upon "false statements honestly believed to be true and promises or predictions made in good faith."  *Mueffelman*, 470 F.3d at 36.  The government failed to rebut, beyond a reasonable doubt, this good faith defense.  *See Callipari*, 368 F.3d at 33.

    *ii.*    *The jury should have been instructed on the good faith of the defendants*

---

[5] Notably, almost all of the evidence related to the legislature was admitted *only* as to O'Brien. Even if such evidence helped substantiate Tavares' knowledge of O'Brien's alleged relationship with the legislature, it was not admissible against her.

Tavares requested the following instruction be given to the jury on good faith:

> Evidence has been presented of Ms. Tavares' good faith. Good faith is a complete defense to the mail fraud charge because such good faith is inconsistent with the specific intent required for the various crimes already discussed. Likewise, if a defendant honestly believes a false statement is true, then that statement cannot be used to satisfy the mail fraud statute. It is the government's burden to prove that the defendants knew the statements were false and to disprove good faith beyond a reasonable doubt. If, after considering the evidence of good faith, together with all the other evidence, you have a reasonable doubt that the Ms. Tavares acted, for example, without the specific intent to defraud required for mail fraud, then you must find Ms. Tavares not guilty of the crimes for which she was acting in good faith.

Dkt. # 538 at 18. Although it is circuit precedent that a court need not instruct specifically on good faith if the jury is sufficiently instructed on intent to defraud, a court must still "convey the substance of the theory to the jury." *United States v. Dockray*, 943 F.2d 152, 155 (1st Cir.1991). Here, the jury was instructed on only one possible theory of good faith, namely that if O'Brien honestly believed that a particular candidate was the most qualified, he must be found not guilty. 7/15/14 Jury Charge Tr. at 36. This, however, was insufficient. First, it is limited *just* to O'Brien and does not identify either Burke or Tavares. A separate instruction should have been given (or a non-limited one) which included Tavares and Burke by stating that if they also honestly believed the candidate whose names they were passing along were the most qualified, they must also be found not guilty. Second, this is not the *only* theory presented to the jury on good faith. In particular, the defendants also presented evidence and argued in their closings that they each believed M.G.L. c. 276, § 83 (version effective 2001 through 2011) gave *exclusive* authority for O'Brien to select whomever he wanted, notwithstanding the Trial Court Manual. *See*, *e.g.*, Tr. Ex. 40.16; Tr. Ex. 40.22 (October 2, 2006 letter from O'Brien to Mulligan stating, "I believe the application of the approval process has served to undermine my statutory authority

15

of appointment..."). The instructions to the jury effectively foreclosed this possibility and were therefore prejudicial. In the interests of justice, a new trial should therefore be granted

D.     <u>Misrepresentations, Materiality and Reliance</u>

           i.        *The government failed to prove that any false statements or misrepresentations were made, or if they were that they were material or that CJAM Mulligan relied on them*

The alleged fraud must include a "misrepresentation or concealment of material fact." *Neder v. United States*, 527 U.S. 1, 22-25 (1999). "In general, a false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decision-making body to which it was addressed.'" *Id*. at 17 (internal citations omitted). In terms of the certifications themselves, it is clear that O'Brien never made a false statement of *fact*. Almost every witness that testified about the hiring process stated that the determination of who was the "most qualified" candidate was entirely subjective. Some witnesses testified that they placed greater weight on whether a candidate would be a "good fit" in the particular court; other witnesses testified that they placed greater weight on how the candidates interviewed; and still other witnesses testified that they placed greater weight on their job and educational experience. For example, the ranking of individual candidates on the interviewers' scoring sheets could be wildly different. There is simply no principled way to determine who the "most qualified" candidate is, especially where the manual itself gives no guidance on how to weigh the various qualifications of any given candidate. Indeed, the manual itself does not even *require* a merit-only based system; it merely states that "the *objective* of the hiring process is to select the most qualified candidate" and "the practice and appearance of... favoritism in the hiring process are to be *avoided*." Ex. 41 at 1, 6 (emphases added). Moreover, the promulgating authority of the manual, *himself*, made non-merit based hires. For example, Elizabeth Cerda was hired to a high

ranking position within his staff without a formal interview process, without a job being posted, and on the same day she applied.   Mulligan also stated he hired one court officer because "he has a soft spot" for Vietnam war veterans.   Simply put, to premise criminal liability on such an amorphous concept as a "merit-based system," especially where the promulgating authority of the manual (and the person to whom the alleged false statements were directed) does not strictly follow it for his own hires, stretches the use of the mail fraud statute well beyond its intended bounds.

Even assuming the certifications were false, they were immaterial to the decision-making body (Mulligan) to whom they were directed.   Substantial evidence was presented, both on direct and cross examination, that Mulligan was aware of problems (at least as Mulligan perceived them) in the hiring process within the Probation Department very early on in his tenure as CJAM, but he did nothing about them.   There was also testimony and other evidence that clearly illustrated that the certifications were virtually meaningless and perfunctory to Mulligan. Mulligan testified that O'Brien had the authority to select from among *any* of the applicants that were sent up from the local round, and that it was not his authority to second-guess O'Brien's decision.   Finally, and perhaps most importantly, no evidence was presented suggesting Tavares' involvement in, or awareness of, the certification process (e.g. the sole point in time that any false statements are alleged to have been made).   To the extent there were any false statements of fact, had Mulligan became aware of them, they presented no "natural tendency to influence, or [was] capable of influencing, the decision of the decision-making body to which it was addressed no."

## III.   *Pinkerton* Instruction

A.    The *Pinkerton* Doctrine, Itself, Runs Afoul of the Central Tenants of Our Tripartite System of Government

The only branch of our federal government that is authorized to create criminal liability for an individual's acts is the legislature.  *See U.S. v. Oakland Cannibis Buyers' Co-op*, 532 U.S. 483, 495 n. 7 (2001) ("[F]ederal courts interpret, rather than author, the federal criminal code, and are not at liberty to rewrite it."); *U.S. v. Lanier*, 520 U.S. 259, 267 n. 6 (1997) ("Federal crimes are defined by Congress, not the courts.").  While courts are entitled to, and indeed are required to, interpret federal law, they are not bestowed with the authority to create federal criminal liability where it otherwise would not exist:

> [Courts] are not "vested with jurisdiction over any particular act done by an individual in supposed violation of the peace and dignity of the sovereign power." Rather, "(t)he legislative authority of the Union must first make an act a crime, affix a punishment to it, and declare the Court that shall have jurisdiction of the offence."
>
> In our judgment one of the great inherent restraints upon this Court's departure from the field of interpretation to enter that of lawmaking has been the fact that its judgments could not be limited to prospective application. *This Court and in fact all departments of the Government have always heretofore realized that prospective lawmaking is the function of Congress rather than of the courts.* We continue to think that this function should be exercised only by Congress under the constitutional system.

*James v. U.S.*, 366 U.S. 213, 225 (1961) (emphasis added).  *See also*, Manning, *A Common Law Crime Analysis of Pinkerton v. United States: Sixty Years of Impermissible Judicially–Created Criminal Liability*, 67 Mont. L.Rev. 89, 99 (Winter 2006).

While aider and abetter liability was created by the legislature, *see* 18 U.S.C. § 2, *Pinkerton* liability was not.  Instead, *Pinkerton* liability appears to be the *only* form of judicially made liability in the federal criminal justice system.  It is liability made entirely out of judicially-made cloth.  Moreover, *Pinkerton* liability falls squarely under the type of federal common law

liability that was abolished by *U.S. v. Hudson & Goodwin*, 11 U.S. (7 Cranch) 32 (1812) (for federal criminal common law) and *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938) (for federal civil common law).   Although *Pinkerton* post-dated *Hudson* (and *Erie*), *Hudson's* holding has been reaffirmed since.   *See Lewis v. U.S.*, 523 U.S. 155, 160 (1998) ("The federal courts lacked the power to supplement... statutory crimes through the use of the common law.) (citing *Hudson*, 7 Cranch 32).   Simply put, the "notion of a common-law crime is utterly anathema today." *Rogers v. Tennessee*, 532 U.S. 451, 476 (2001) (Scalia, J., dissenting).

Liability formed on the basis of such continued unconstitutional action by the judiciary is violative of due process.   Any and all charges premised on such liability should therefore be dismissed.

**B.**   **The Jury Should Not Have Been Instructed on A Pinkerton Theory of Liability Because This is a "Marginal" Case and Because the Mens Rea Required for RICO Conspiracy is an Inappoprite Predicate for a Finding of the Mens Rea Required for the Substantive Offense of Mail Fraud**

Although the government is correct that a *Pinkerton* charge may be appropriate in some cases, it was inappropriate here, and the no *Pinkerton* instruction should have been given.   The comment to the First Circuit's Pattern Jury Instructions states that, as a general matter, "that a Pinkerton instruction 'should not be given as a matter of course.' First Circuit Pattern Jury Instruction § 4.18.371(2), cmt. (5) (quoting *United States v. Vázquez-Castro*, 640 F.3d 19, 25 (1st Cir. 2011)).   In "marginal cases," a district court should refrain from giving a *Pinkerton* charge.   *U.S. v. Hansen*, 434 F.3d 92, 104 (1st Cir. 2006) (citing *United States v. Sanchez*, 917 F.2d 607, 612 n.4 (1st Cir.1990).   This is just such a case; when various substantive offenses are in issue and the government concentrates its proof on the substantive offenses rather than the conspiracy, there is undue risk that the jury will draw the inverse of the Pinkerton inference.

Although the First Circuit has expressed some skepticism with this argument, *see United States v. Wester,* 90 F.3d 592, 597 (1st Cir. 1996), this Court enjoys substantial discretion to decide how to formulate its instructions.  *U.S. v. Colon*, 744 F.3d 752, 758 (1st Cir. 2014).

In terms of forseeability, the appropriateness of a *Pinkerton* instruction is diminished where, as here, the government failed to provide any proof as to when Tavares joined the alleged conspiracy.  *See United States v. O'Campo*, 973 F.2d 1015, 1021 (1st Cir. 1992) ("An individual cannot in any sensible use of the words be held reasonably to have "foreseen" actions which occurred prior to his entrance in the conspiracy and thus are historical in nature.").  No evidence was introduced indicating when she first made this alleged agreement, when she took her first act in furtherance of it, or when she even became aware of its existence.  It was, therefore, *particularly* dangerous giving a *Pinkerton* instruction, because of the high likelihood that the jury inappropriately attributed to her crimes committed before she even joined the alleged conspiracy.

Additionally, by charging under a *Pinkerton* theory, the jury was permitted to convict Tavares for the substantive counts via a less stringent *mens rea* than the substantive charge actually requires.  A substantive mail fraud count requires a *mens rea* of a specific intent to defraud whereas RICO conspiracy merely requires *knowledge* of, and agreement to, the overall criminal purpose of the RICO conspiracy coupled with reasonable foreseeability. *See* First Circuit Pattern Criminal Instructions, § 4.18.1341 (defining the third element as "that [defendant] knowingly and willfully participated in this scheme with the intent to defraud" and defining "willfully" as an act "done voluntarily and intentionally, and with the specific intent to do something the law forbids"); *U.S. v. Shifman*, 124 F.3d 31, 35 (1st Cir. 1997) (defining elements of a RICO conspiracy).  Therefore, substantive liability premised on *Pinkerton* and a RICO conspiracy requires, at worst, a *mens rea* of mere reckleness, and at best, mere knowledge,

neither of which are equal to what is required for a substantive mail fraud charge. Indeed, the requisite intent for aiding and abetting liability, which matches the intent required for a substantive mail fraud charge, is expressly more stringent than what is required for liability premised on *Pinkerton*. *See United States v. Vázquez-Castro*, 640 F.3d 19, 24 (1st Cir. 2012); *United States v. Collazo-Aponte*, 216 F.3d 163, 196 (1st Cir. 2000).

Finally, *Pinkerton* is particularly inappropriate in the RICO conspiracy context as a matter of general fairness to a defendant. "[T]here is a substantial question whether Pinkerton applies to determining guilt when, as here, a RICO conspiracy has been alleged. Indeed, the Department of Justice instructs its prosecutors that: '*[N]o courts have expressly held Pinkerton applicable in connection with a RICO conspiracy ... and the combination of RICO and Pinkerton could lead to unwarranted extensions of criminal liability.*'" *United States v. Patriarca*, 807 F.Supp. 165, 187 n. 1 (D.Mass. 1992) (Wolf, J.) (quoting *Department of Justice Manual* § 9-110A. 100 (1991-1 Supplement) pp. 97-8 (citing *United States v. Neapolitan*, 791 F.2d 489, 504-05 n. 7 (7th Cir. 1986) and *United States v. Cryan*, 490 F.Supp. 1234 (D.N.J.))) (emphasis added). Similarly, the Seventh Circuit has "noted the need for caution in using Pinkerton instructions in RICO conspiracy charges... Jury instructions for RICO conspiracies are challenging enough without Pinkerton." *United States v. Benabe*, 654 F.3d 753 (7th Cir. 2011) (citing *United States v. Neapolitan*, 791 F.2d 489, 505 n. 7 (7th Cir.1986). Since there is no overt act requirement, *Pinkerton* allows a jury to convict a person for not only a conspiracy, but for *all* reasonably foreseeable substantive crimes based merely on a thought. To premise liability, *substantive* liability, on a thought is an extreme proposition and should be handled with the utmost care. Simply put, the *Pinkerton* instruction here, particularly in the RICO context, is dangerous, prejudicial, and unfair to defendants. Predicating substantive felony convictions on a

diffuse RICO conspiracy violates Due Process.  The interests of justice dictate that a new trial be ordered because the *Pinkerton* charge was improper in this type of case.

C.      The Jury Finding Runs Afoul of *Apprendi* and *Alleyne*

"At stake in this case are constitutional protections of surpassing importance: the proscription of any deprivation of liberty without 'due process of law,' Amdt. 14, and the guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury," Amdt. 6.  Taken together, these rights indisputably entitle a criminal defendant to 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.'"  *Apprendi v. New Jersey*, 530 U.S. 466, 476-77 (2000) (*quoting United States v. Gaudin*, 515 U.S. 506, 510 (1995)).  Put another way, "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).

The required elements of mail fraud are well-known: (1) devising or attempting to devise a scheme or artifice to defraud; (2) knowing and willful participation in the scheme with the specific intent to defraud; and (3) the use of the United States mails in furtherance of that scheme." *United States v. Stergios*, 659 F.3d 127, 132-33 (1st Cir. 2011).  The *mens rea* requirement is quite rigorous; a defendant has an "intent to defraud" only when she has "act[ed] knowingly with the intent or the purpose to obtain, deceive, or cheat [the government agency] out of money or property." *U.S. v. Dubon-Otero*, 292 F.3d 1, 12 n. 15 (1st Cir. 2001).  The *Pinkerton* charge this Court gave to the jury requires much less:

> But if you actually agree to be part of the racketeering conspiracy,
> as I've explained it, and if your joining in that agreement is to
> further, to advance that conspiracy and you do that knowing what

you're doing and willfully -- "willfully" means you'll take the consequences, you're going ahead, you're joining it, then, without more, that person is guilty of racketeering conspiracy.

7/15/2014 Jury Charge Tr. at 60.  Comparing the mail fraud elements with the *Pinkerton* charge, the former requires knowing and willful participation in the scheme coupled with a specific intent to defraud, while the latter merely requires knowledge and willful agreement.  In other words, "[w]hile the legislature initially fixes the element of mens rea at [specific] intent... the court's *Pinkerton* instruction re-fixes it by reducing it to [knowledge]..."  Antkowiak, *The Pinkerton Problem*, 115 Penn St. L. Rev. 607, 627 (Winter 2011).  By so instructing, the Court essentially lessens the government's burden of proof with respect to the *mens rea* required. Without question, this runs afoul of *Apprendi's* basic rule that "practice must at least adhere to the basic principles undergirding the requirements of trying to a jury all facts necessary to constitute a statutory offense, and proving those facts beyond reasonable doubt."  530 U.S. at 483-84.  Here, the statutory offense is mail fraud; there is no corollary statutory scheme for co-conspirator liability (e.g., A&A liability under 18 U.S.C. § 2).  It therefore follows that the *Pinkerton* instruction allows the government to elide the *statutory* requirement of proof beyond a reasonable doubt that Tavares had the specific intent to defraud, in place of a lesser mental state.

Additionally, the indictment charges Tavares with substantive mail fraud charges (by way of aider and abetter liability under 18 U.S.C. § 2), but makes no mention of liability premised on *Pinkerton*.  Under one of the many progeny of *Apprendi*, the Supreme Court held, in *Alleyne v. U.S.*, 570 U.S. ---, 133 S.Ct. 2151, 2159 (2013), that "every fact that was a basis for imposing or increasing punishment" must be included in the indictment.  Although *Alleyne* involved the particular issue of whether certain facts that may result in a sentencing enhancement must be included in the indictment, the court made clear that this rule implies to facts that not only may

cause an *increase* in punishment, but facts that *authorize* punishment.  *Id.*  Here, however, the jury found Tavares liable for O'Brien's commission of the substantive crime, not by a theory charged in the indictment, but on a *Pinkerton* theory of liability pursuant to this Court's instructions.  According to the plain language of *Alleyne*, this is not a theory upon which the authorization of punishment can be premised because the government failed to plead it in the indictment.

## IV.   RICO Charge

A.   The Government Failed to Prove all of the Elements of a Substantive RICO Charge or a RICO Conspiracy

"Five elements must coalesce to make out a substantive RICO violation. The government must show: '(1) an enterprise existed; (2) the enterprise participated in or its activities affected interstate commerce; (3) the defendant was employed by or was associated with the enterprise; (4) the defendant conducted or participated in the conduct of the enterprise; (5) through a pattern of racketeering activity.'"  *United States v. Nascimento*, 491 F.3d 25, 31 (1st Cir. 2007) (quoting *United States v. Marino*, 277 F.3d 11, 33 (1st Cir. 2002)).  To satisfy the statute of limitations for a substantive RICO violation, the government must prove at least one Racketeering Act ("RA") that occurred within five years of the indictment.[6] *See United States v. Torres Lopez*, 851 F.2d 520, 525 (1st Cir. 1988).  Both the RICO conspiracy and the substantive RICO count requires the government to prove that the defendants engaged in a "pattern of racketeering activity."  To establish such a pattern, the government must prove "'at least two acts of racketeering activity'

---

[6] The first indictment for this case issued on March 22, 2012.  *See* Dkt. # 2.  If Tavares is acquitted of all of the RA's that occurred within 5 years of March 22, 2012 (i.e., RA's after March 22, 2007), Tavares must also be acquitted of the substantive RICO charge, and all attendant RA's, as well because they would be time-barred by the statute of limitations.  The RA's that occurred after March 22, 2007 are: Patrick Lawton, Melissa Melia, Patricia Mosca, Kelly Manchester, Lisa Martin, Michael White, Kevin O'Brien, Maria-Elena Sanchez, Antonio Mataragas, and all ELMO hires.

over a period of ten years." *U.S. v. Brandao*, 539 F.3d 44, 54 (1st Cir. 2008) (quoting 18 U.S.C. § 1961(5)).

No reasonable jury could find with regard to Tavares that required elements (1), (3), and (4), the failure of any one of which requires a finding of not guilty, of the substantive racketeering charge has been proved beyond a reasonable doubt.  The government alleged in the indictment that the *entire* Probation Department, itself, was the enterprise.  This is incorrect and the government simply failed to prove it:  An enterprise "need only be a group of persons associated together for a common purpose of engaging in a criminal course of conduct." *United States v. Connolly*, 341 F.3d 16, 28 (1st Cir.2003) (citations and internal quotation marks omitted).  However, the "common purpose" of the Probation Department is not to commit crime; it is a law enforcement agency..  It existed long before 2000 when the government alleges the "enterprise" came into existence.  Moreover, the government did *not* prove that each employee of the Massachusetts Probation Department (or even all those working within the Office of the Commissioner of Probation) was a member of the alleged RICO enterprise.  It is, therefore, a misnomer to suggest that the Probation Department, itself, is the "enterprise."    Instead, the enterprise, to the extent there was one, must have been comprised of a smaller subset of the Probation Department as a whole.

To this end, Tavares' mere employment in the Probation Department cannot, in and of itself, satisfy this element.   Instead, Tavares was employed by the Commonwealth of Massachusetts, *not* the "enterprise," and no evidence was presented that she derived any income from the enterprise.[7]  To the extent she was "associated" with the "enterprise," it was merely

---

[7] Importantly, all evidence related to bribery and illegal gratuities were ruled inadmissible against Tavares by this Court.  That leaves only mail fraud and acts that necessarily involve wholly intrastate functions of a *state* official.  In other words, the only conduct at issue here is

incidental due to the fact that she held a legitimate position within the Probation Department, the duties of which occasionally related to the hiring of probation employees.   That incidental association is simply insufficient to establish that Tavares knowingly and intentionally associated herself with the "enterprise."  *See Libertad v. Welch*, 53 F.3d 428 (1st Cir. 1995) (where plaintiff alleged civil-RICO claim, plaintiff failed to prove defendant was a member of the RICO enterprise even where defendant "planned and participated" in one of the alleged RA's and where defendant spoke with other person alleged to be in the enterprise "as often as every other day about their groups' activities").

> B.   The Jury Instruction For What Constitutes a Pattern of Racketeering Activity is Erroneous

The jury was instructed on the 4th element[8] of the substantive RICO charge, a "pattern of racketeering activity" as follows:

> [I]n order for there to be a pattern of racketeering activity, the government has to prove – if you're considering Mr. O'Brien, that he engaged in at least two of those predicate acts, that the two predicate acts are within 10 years of one another

> But it must be a pattern of racketeering activity and that means not disparate acts here. The racketeering activity must, um, however many acts you find, they must constitute a pattern to further the goals of the enterprise. They must be related.

---

conduct that Tavares performed while acting as a state probation officer, which is a wholly intrastate function.   Such conduct does not and should not make up a federal offense.   To prosecute such conduct constitutes substantial overreaching by the federal government into the regulatory matters that should be left to the states to handle.   Massachusetts prosecutors have more than enough legislation to work with to police the wholly intrastate conduct of its public officials.  *See* M.G.L. c. 268A, § 1 *et seq*.  Moreover, RICO counts predicated solely on mail fraud are inappropriate, *see United States v. Patriarca*, 807 F.Supp. 165, 187 n. 1 (D.Mass. 1992) (Wolf, J.), *especially* where the conduct in question allegedly involves wholly intrastate fraud and similar conduct.

[8] The jury instructions appear to have merged the 4th and 5th RICO elements.

This instruction is erroneous because it fails to convey the intricacies of what actually constitutes a "pattern of racketeering activity." According to this instruction, it was sufficient if the jury found (1) two or more predicate acts, and (2) that they were related. This is insufficient because "[i]t is not the number of predicates but the relationship that they bear to each other or to some external organizing principle that renders them a pattern." *United States v. Brandao*, 539 F.3d 44, 54 (1st Cir. 2008) (internal citations omitted). Indeed, relatedness is not sufficient in and of itself; it must also "amount to or pose a threat of continued criminal activity." *Id.* at 55 ("Thus, two or more racketeering predicates constitute a 'pattern' if they are (1) 'related' and (2) 'amount to or pose a threat of continued criminal activity.'). It is error to not charge *both* "relatedness" and "threat of continued criminal activity." *See United States v. Owens*, 167 F.3d 739, 754 (1st Cir. 1999) (where court instructed jury that the "racketeering acts 'are related or that they amount to or pose a threat of continued criminal activity,'" the instructions were erroneous because "the disjunctive should have been conjunctive"). In any event, the court must "recite[] types of 'distinguishing characteristics' on which the jury could rely to show the requisite interrelationship" of the predicate acts. *United States v. Boylan*, 898 F.2d 230, 251 (1st Cir. 1990). Here, the jury was not given any direction whatsoever on how to determine whether the predicate acts were related and the instruction regarding a "threat of continued criminal activity" was entirely absent. Since these instructions were erroneous and failed to include important aspects of a typical RICO charge, new trial must therefore be granted.

## V.     Other Trial Issues and Errors

### A.     Juror Questions

The practice of this court to allow the jury to repeatedly ask questions of witnesses was

highly prejudicial and a new trial must be granted.[9]  Here, the jury submitted a total of 281

questions.  Although substantially fewer were ultimately asked of witnesses, the majority of

them were posed.  In *U.S. v. Sutton*, 970 F.2d 1001, 1005-06 (1st Cir. 1992) held as follows

regarding this practice:

> Allowing jurors to pose questions during a criminal trial is a
> procedure fraught with perils. In most cases, the game will not be
> worth the candle. Nevertheless, we are fully committed to the
> principle that trial judges should be given wide latitude to manage
> trials. We are, moreover, supportive of reasoned efforts by the trial
> bench to improve the truth-seeking attributes of the jury system.
> Consistent with this overall approach, and mindful that the practice
> of allowing jurors to participate in the interrogation of witnesses
> may occasionally be advantageous, especially in complex cases
> and under carefully controlled conditions, we hold that allowing
> juror-inspired questions in a criminal case is not prejudicial per se,
> but is a matter committed to the sound discretion of the trial court.
>
> We hasten to add that the practice, while not forbidden, should be
> employed sparingly and with great circumspection. The dynamics
> of a criminal trial are extremely sensitive. Innovations that carry
> the potential for disrupting those dynamics are risky. Juror
> participation in the examination of witnesses represents a
> significant innovation, transforming the jurors' role from a purely
> passive one to a partially interactive one. The practice also delays
> the pace of trial, creates a certain awkwardness for lawyers
> wishing to object to juror-inspired questions, and runs a risk of
> undermining litigation strategies. We suspect that, in most
> situations, the risks inherent in the practice will outweigh its utility.
> Thus, juror participation in the examination of witnesses should be
> the long-odds exception, not the rule. We will judge the trial
> court's affirmative exercise of its discretion under the totality of the
> circumstances in each case.
>
> To be sure, the balance is not completely one-sided. Juror-inspired
> questions may serve to advance the search for truth by alleviating
> uncertainties in the jurors' minds, clearing up confusion, or alerting
> the attorneys to points that bear further elaboration. Furthermore, it
> is at least arguable that a question-asking juror will be a more
> attentive juror.

---

[9] The defendants objected to this practice at the outset of trial.

> We think it follows that trial courts should rarely employ the praxis... The judge should also include a prophylactic instruction in his final charge to the jury.

(internal citations omitted).

What occurred during trial here went substantially beyond what the First Circuit has referred to as "fraught with perils" and "the long-odds exception, not the rule."  Given the sheer number of questions, and the care with which many of them were written, it is a grave concern that a substantial amount of evidence and testimony was missed throughout the trial.  Moreover, the practice here essentially transformed the petit jury into a grand jury.  It allowed the jury to become emotionally invested in the outcome in a way that eviscerates the defendants' constitutional right to a fair trial.  It provides incentives for one juror to attempt to one-up another juror by asking better questions.  Additionally, to cure these issues, "a prophylactic charge" should have been given in the final charge.  Simply put, it creates a system in which the jurors evolve from the detached arbiters of fact they are constitutionally designated to be, into mini G-Men and Women.  Although the First Circuit has declined to adopt a *per se* rule, it was clear that the practice is to be used carefully and with great circumspection.  That did not happen here and it significantly infringed upon the defendants' constitutional right to a fair trial.  A new trial must be granted on this basis alone.

B.    References to 'Questionable' Conduct

Throughout the instructions to the jury are references to conduct by the defendants, in particular Tavares, that the Court found "questionable."  For example, the Court *instructed* the jury that, although these acts were not criminal, they were "questionable":

- "If you get passing those names around of people who made recommendations and you passed them to the raters to the interviewers, the people that are doing the

hiring or at least doing the initial rounds of the hiring, that's questionable. I mean that is questionable because that suggests that maybe they ought to pay attention to that. Whereas the manual suggests that they're going to be hiring on merit." 7/15/14 Jury Charge Tr. at 29.

- "Even more questionable is a circumstance where a superior, a higher judge, a Chief Justice, or a higher-up in the organization, and we're talking about probation here, the organization of the Department of Probation, a higher-up, a superior, passes names to people who are lower in the organization, names of people who have to do the rating, have to do the interviewing, because that suggests that – more forcefully than if the names were just passed laterally, that maybe you ought to pay attention to those names in, what under the manual, is a merit-based system." *Id.* at 30.

Whether a certain act is "questionable" is neither a legal determination nor a factual determination.  It was simply not something that the jury should be instructed about.  The jury was entitled, on their own, to determine whether such acts were questionable.  Importantly, that they were "questionable," as *instructed* by the Court, tends to fly in the face of the good faith defense Tavares and her co-defendants attempted to put on.  Such commentary from the Court served no function other than usurp the jury of its role in determining the facts of the case and it unfairly tainted Tavares' conduct.  *See United States v. Rosario-Peralta*, 199 F.3d 552, 567 (1st Cir. 1999) ("There are limitations placed on the trial judge's comments to prevent the judge from assuming the role of a witness, misleading the jury, or distorting or adding to the evidence.").  Although the court instructed the jury that his comments and his views are irrelevant for purpose of their deliberation, the instruction about what is and what is not "questionable" was of a completely different character.  A new trial should be granted.

C.   Instruction That the Manual Contemplates a Merit Based System

The defendants argued, through cross-examination of almost every witness, that the manual either does not completely require a merit based system or that the term 'merit' was wholly amorphous.  This Court, however, instructed the jury that "with respect to hiring, which

we're concerned about here, with respect to hiring -- well, I'll tell you straight out, fairly read that policies and procedures manual expects, contemplates merit selection, that the best person, the most qualified person will get a job." 7/15/14 Jury Charge Tr. at 27. This instruction simultaneously stripped the defendants of one of their central defenses and usurped the jury's role as fact finder. Whether the manual "contemplates" or "expects" merit selection is a question of *pure fact*. This instruction mislead the jury that they could not determine, for themselves, what the manual requires or does not require, and how that might impact its determination. This was a source of serious contention throughout the trial by all parties and should not have been determined by the Court. Even if the manual was explicit in its wording, and even if this Court found the issue beyond contention, it was not for this Court to make this determination and remove it from within the jury's own determination. *See, e.g., U.S. v. DiRico*, 78 F.3d 732, 736 (1st Cir. 1996) (although an issue "might appear to be self-evident, or the evidence tending to establish that element might seem overwhelming, does not empower the trial court to remove consideration of that element from the jury.). Since this erroneous instruction effectively removed from consideration one of the main factual defenses presented by the defendants, they were significantly prejudiced by it and inexorably compromises a defendant's presumption of innocence. A new trial must therefore be granted.

## CONCLUSION

For the reasons set forth above, and in the interests of justice, Tavares respectfully requests that this Honorable Court enter a judgment of acquittal on all charges or, in the alternative, order a new trial.

Dated:  September 2, 2014                          Respectfully submitted,

                                                   ELIZABETH TAVARES
                                                   By and through her attorneys,

                                                   */s/ Jeffrey A. Denner*
                                                   R. Bradford Bailey, BBO#549749
                                                   Jeffrey A. Denner, BBO#120520
                                                   Adamo L. Lanza, BBO#689190
                                                   Four Longfellow Place, 35th Floor
                                                   Boston, Massachusetts 02114
                                                   Tel.     617.227.2800
                                                   Fax.     617.973.1562
                                                   bbailey@dennerlaw.com
                                                   jdenner@dennerlaw.com
                                                   alanza@dennerlaw.com


                          <u>CERTIFICATE OF SERVICE</u>

        I certify that this document filed through the ECF system will be sent electronically to the
registered participants as identified on the Notice of Electronic Filing [NEF] and paper copies
will be sent to those indicated as non-registered participants.


                                                   */s/ Jeffrey A. Denner*