1                 UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS

3                                No. 1:12-cr-40026-WGY

4

5

6    UNITED STATES OF AMERICA

7

8    vs.

9

10   JOHN J. O'BRIEN, et al

11

12

13                        * * * * * * * *

14

15                    For Jury Trial Before:
                      Judge William G. Young

16

17

18                    United States District Court
                      District of Massachusetts (Boston)
                      One Courthouse Way
19                    Boston, Massachusetts 02210
                      Friday, May 9, 2014

20

21                        * * * * * * *

22

23              REPORTER: RICHARD H. ROMANOW, RPR
                       Official Court Reporter
                     United States District Court
24         One Courthouse Way, Room 5510, Boston, MA 02210
                      bulldog@richromanow.com

25

1                    A P P E A R A N C E S

2

3    FRED M. WYSHAK, JR., ESQ.
     KARIN M. BELL, ESQ.
4    ROBERT A. FISHER, ESQ.
        United States Attorney's Office
5        J. Joseph Moakley U.S. Courthouse
         1 Courthouse Way, Suite 9200
6        Boston, Massachusetts 02210
         (617) 748-3954
7        Email: Fred.wyshak@usdoj.gov
         For the United States
8

9    STYLIANUS SINNIS, ESQ.
     WILLIAM W. FICK, ESQ.
10   CHRISTINE DeMASO, ESQ.
        Federal Public Defender Office
11       District of Massachusetts
         51 Sleeper Street, 5th Floor
12       Boston, Massachusetts 02210
         Email: stellio_sinnis@fd.org
13       For John J. O'Brien

14
     JEFFREY A. DENNER, ESQ.
15   R. BRADFORD BAILEY, ESQ.
     ADAMO L. LANZA, ESQ.
16       Denner Pellegrino, LLP
         Four Longfellow Place, Suite 3501
17       Boston, Massachusetts 02114
         Email: Jdenner@dennerpellegrino.com
18       For Elizabeth V. Tavares

19
     JOHN A. AMABILE, ESQ.
20   JAMES C. BRADBURY, ESQ.
        Amabile & Burkly, P.C.
21       380 Pleasant Street
         Brockton, Massachusetts 02401
22       Email: John.amabile@amabileburkly.com
         For William H. Burke, III
23

24

25

```
 1                    I N D E X

 2

 3   WITNESS                DIRECT  CROSS  REDIRECT  RECROSS

 4   ELLEN SLANEY (Continued.)

 5       By Ms. Bell:         4

 6       By Mr. Sinnis:             128

 7       By Mr. Bailey:              89

 8

 9                  E X H I B I T S

10

11   EXHIBIT 124.................................. 140

12   EXHIBIT 125.................................. 142

13   EXHIBIT 126.................................. 142

14   EXHIBIT 127.................................. 142

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  P R O C E E D I N G S
 2              (Jury enters, 9:00 a.m.)
 3              THE COURT:  Good morning, ladies and
 4    gentlemen.  Thank you most sincerely.  On your oath as
 5    jurors, since we recessed at 5 minutes to 1:00
 6    yesterday, have any of you heard, read, or seen anything
 7    of substance concerning this case?  Have you discussed
 8    the substance of the case with anyone?  Has the
 9    substance of the case been discussed in your presence?
10              (Silence.)
11              THE COURT:  The 16 jurors are present in the
12    courtroom and they answer in the negative.  And because
13    you're right here ready to go -- and that's the test, if
14    you are, they'll all be ready to go, and they are.
15          And if you'll remind the witness.
16              THE CLERK:  I'd like to remind you that you're
17    still under oath.
18              THE WITNESS:  Thank you.
19              THE COURT:  And, Ms. Bell, you may continue.
20              MS. BELL:  Thank you, your Honor.
21
22    DIRECT EXAMINATION BY MS. BELL:  (Continued.)
23    Q.  Ms. Slaney, where we left off yesterday we had
24    gotten to the top of the organization chart, we had
25    identified the Commissioner of Probation, and I think
```

1    the question before you or the question that I was about

2    to ask was during the years of 1998 to 2010 who was the

3    Commissioner of probation?

4    A.   Jack O'Brien.

5    Q.   And do you see Jack O'Brien in the courtroom today?

6    A.   I do.

7    Q.   Can you point him out and describe something he's

8    wearing for the record?

9    A.   Um, a black suit, a white shirt, he's sitting at the

10   second table there.

11           MS. BELL:  May the record reflect the

12   identification of the defendant Jack O'Brien?

13           THE COURT:  It may.

14   Q.   And who was Mr. O'Brien's first deputy commissioner

15   during those years, 1998 to 2010?

16   A.   Elizabeth Tavares.

17   Q.   Was she the first deputy the entire time or was

18   there someone else who was first deputy prior to her?

19   A.   John Cremens.

20           THE COURT:  I didn't hear the name?

21           THE WITNESS:  John Cremens.

22           THE COURT:  Cremens.  Thank you.

23   Q.   And who was Mr. O'Brien's second deputy commissioner

24   during the years when that position existed?

25   A.   When John was the first, um, Liz Tavares was the

1    second deputy.

2    Q.   Okay.  And do you see the defendant Elizabeth

3    Tavares in the courtroom today?

4    A.   I do.

5    Q.   Could you please point her out, describe something

6    that she's wearing for the record?

7    A.   She is at the left-hand side and dressed in dark

8    clothing, the second person in.

9              MS. BELL:  May the record reflect the

10   identification of Elizabeth Tavares?

11             THE COURT:  It may.

12   Q.   And, Ms. Slaney, what was William Burke's position

13   during the years 1998 to 2009?

14   A.   Bill Burke was a deputy commissioner.

15   Q.   Do you see the defendant William Burke in the

16   courtroom today?

17   A.   I do.

18   Q.   Could you please point him out and describe

19   something that he's wearing for the record?

20   A.   He's in the second table in, the second person in,

21   on the left-hand side.

22   Q.   And what is he wearing?

23   A.   I believe it's a navy blue suit.

24             MS. BELL:  May the record reflect the

25   identification of the defendant William Burke?

1          THE COURT:  It may.

2     Q.  And again who was the CJAM, or the Chief Justice for

3     Administration and Management, at the time that Jack

4     O'Brien began his tenure in 1998?

5     A.  Chief Justice John Irwin.

6     Q.  And who was the CJAM in 2010 when Jack O'Brien was

7     no longer the Commissioner of Probation?

8     A.  Chief Justice Mulligan.

9     Q.  And what is Chief Justice Mulligan's first name, if

10    you know?

11    A.  Um -- I forget.

12    Q.  Okay.  That's all right.

13    A.  A senior moment, sorry.

14    Q.  Do you remember if it's Robert Mulligan?

15    A.  Oh, yes.  Thank you.

16    Q.  If you could take a look at the organizational chart

17    there's just two more pieces I want to discuss with you

18    before we move on.  Look to the right of the chart under

19    the, um, "Deputy Commissioner Paul Lucci."

20    A.  Yes.

21    Q.  Do you see that part of the chart?

22    A.  I do.

23    Q.  All right.  In that part of the chart Paul Lucci is

24    labeled as a "Deputy Commissioner for ELMO."  What is

25    "ELMO"?

```
 1   A.   It stands for "Electronic Monitoring."
 2   Q.   And where was the ELMO division of the probation
 3   department located?
 4   A.   I believe initially there were three sites, there
 5   was one in Boston, one in Springfield, and the one in
 6   the Clinton Academy.
 7   Q.   What does the ELMO division do generally?
 8   A.   They monitor offenders, and on a computer, who have
 9   electronic bracelets attached to their ankle, so that we
10   can monitor their whereabouts 24-7.  It's usually used
11   in lieu of bail.
12   Q.   All right.  And who was the individual who's in
13   charge of the ELMO division?
14   A.   Paul Lucci.
15   Q.   Move now to the top of -- if you were looking at the
16   chart, the top right-hand part of the chart where it's
17   labeled "The Director of the Office of Community
18   Corrections, Steven Price."  Do you see that?
19   A.   I do.
20   Q.   What is the "Office of Community Corrections"?
21   A.   As I indicated yesterday it's similar to a
22   day-treatment program where there are a number of
23   resources that someone would participate in as a
24   condition of their probation, which is set by the judge.
25   Q.   And is it known as "OCC"?
```

1    A.  It is.

2    Q.  Who's in charge of OCC?

3    A.  Um, Stevie Price and he answered to the Commissioner

4    of Probation.

5    Q.  Where -- generally where is the Office of Community

6    Corrections located?

7    A.  Currently it's located in Braintree.  I think

8    initially it was in Boston.

9    Q.  Ms. Slaney, does this chart that you've been looking

10   at contain each and every probation employee during the

11   years 2000 to 2010?

12   A.  No, there are approximately 1600 throughout the

13   system.

14   Q.  Is it, however, a fair and accurate depiction of the

15   general structure and organization of the probation

16   department during those years?

17   A.  It is.

18              MS. BELL:  Your Honor, I would offer what's

19   now identified as Exhibit Q.

20              THE COURT:  Objection?

21              MR. BAILEY:  No objection.

22              MR. SINNIS:  No objection.

23              THE COURT:  Do we hear no objection?

24              MR. AMABILE:  Your Honor, I object.

25              THE COURT:  Yeah, it's sustained.

1          MS. BELL:  Your Honor, may we be seen briefly

2    at sidebar?

3          THE COURT:  Yes.

4

5          AT THE SIDEBAR

6          THE COURT:  The problem is this isn't the

7    table of organization, and there is one, and you can get

8    it in with the name of this actual document.  These are

9    who you want to select out, it's infected with the

10   government's view of who is significant relevant to this

11   case, and as such it's not evidence, it's a chalk, and

12   that's fine.  They can see it and you can use it with

13   other witnesses, but it's not an exhibit.

14         MS. BELL:  And just for the record, your

15   Honor, I think our position is that this was made by

16   someone with knowledge and she would be able to testify

17   that this is a fair and accurate depiction of the

18   organization of the department, and she's telling the

19   jury that it doesn't include every single employee.

20         THE COURT:  It's authenticated, you think?

21         MS. BELL:  I do, I think it's authenticated.

22         THE COURT:  I don't.

23      And it's always weak when you start, "Just for the

24   record."  There may well be an appeal, but I'm not a

25   potted plant, I try to think about these things.

1          Sustained.

2                    MS. BELL:  I won't start that way in the

3      future, your Honor.

4                    THE COURT:  That's a good tactic.

5

6                    (In open court.)

7                    THE COURT:  Go ahead, Ms. Bell.

8      Q.  Ms. Slaney, are there procedures to govern the trial

9      court including the probation department?

10     A.  There are.

11     Q.  What are they called?

12     A.  The "Policies and Procedures Manual" of the trial

13     court.

14     Q.  Is there a section in the Policies and Procedures

15     Manual that governs hiring?

16     A.  There is.

17     Q.  During your tenure at the probation department were

18     you involved in hiring at different times?

19     A.  I was.

20     Q.  And during what years?

21     A.  Um, I believe I started as early on as the chief

22     probation officer in 1990 at the Wrentham court and I

23     participated in hiring, um, as a regional supervisor and

24     later as a first deputy.

25     Q.  And given your role in hiring are you familiar with

1    the Policies and Procedures Manual as it pertains to

2    hiring within the probation department?

3    A.  I am.

4    Q.  Ms. Slaney I would ask you to look to your right on

5    the witness stand, there's a set of documents.  I'd ask

6    you to turn to the first one which is -- it's been

7    identified as Exhibit 41.

8    A.  (Looks.)

9              THE COURT:  And just so the jury can follow,

10   the way you handle a trial, um, some things that they

11   may have some objection to and to save our time going

12   through the case we've given them numbers -- we've given

13   them letters.  Excuse me.  So with a letter we're going

14   to have to listen to the witness and then they may argue

15   to me whether we'll let you see it.

16        But again to save you time there's a whole bunch

17   of exhibits that everybody agrees you can look at.  Now

18   the fact that they agree you can look at them isn't any

19   concession or any statement about the document, it's

20   just -- it's one of the documents that's going to be

21   served up to you upon which you can base your decision.

22   It's an exhibit.  And all of them will go with you to

23   the jury room at the end of the trial and we've got this

24   electronic thing so you can call each one up on a screen

25   in the jury room.

1       But saying it's got a number and it's in evidence

2    simply means you can look at it.  So this is one of them

3    and it's Exhibit 41.

4           Go ahead, Ms. Bell.

5               MS. BELL:  Thank you, your Honor.

6    Q.  Ms. Slaney, can you identify Exhibit 41?

7    A.  It's the personnel Policies and Procedures Manual of

8    the trial court.

9    Q.  Is that the entire manual or just a section of the

10   manual?

11   A.  Just a section of it.

12   Q.  Which section?

13   A.  The hiring policies and procedures.

14   Q.  And what is the number of that section?

15   A.  4.000.

16   Q.  What's the effective date for that version that you

17   have before you that is Exhibit 41?

18   A.  May 6th, 2001.

19               MS. BELL:  Your Honor, I offer Exhibit 41.

20               THE COURT:  You don't have to.  That's why we

21   save the time.  You don't have to do that, it's in

22   evidence.  Anything with a number that we premark is in

23   evidence.

24               MS. BELL:  Perfect.  Thank you, your Honor.

25   Q.  Ms. Slaney, to your knowledge was the Policies and

1    Procedures Manual created before 2001?

2    A.   Yes.

3    Q.   Has it been in effect since at least 1990 when you

4    became involved in hiring?

5    A.   Yes, it was.

6    Q.   I want you to turn, in Exhibit 41, to Page 4-1, it

7    should be the first page right after the cover sheet.

8    And I'm going to wait just a minute so that it can be

9    published for the jury as well -- on the screen.

10              (On screen.)

11   A.   (Turns.)

12   Q.   Ms. Slaney, do you see the first paragraph of Page

13   4-1?

14   A.   I do.

15   Q.   Would you read it, please.

16   A.   "The successful operation of the trial court depends

17   directly on the abilities and contributions of each

18   employee in the organization.   Therefore the objective

19   of the hiring process is to select the most qualified

20   individuals who can carry out their responsibilities in

21   a competent and professional manner."

22   Q.   I want you to turn over now to Section 4.304, it's

23   on Page 4-8 of Exhibit 41.

24   A.   (Turns.)

25   Q.   Do you see that section?

1   A.   I do.

2   Q.   Could you read, please, the title of that section

3   and then the first letter, "A," the paragraph that's

4   titled "A."

5   A.   It's 4.304, "Nepotism," Letter "A," "It is the

6   policy of the trial court that all appointments be made

7   solely on the basis of merit.  The practice and

8   appearance of nepotism or favoritism in the hiring

9   process are to be avoided."

10  Q.   And, Ms. Slaney, as someone involved in the hiring

11  process during your tenure at the probation department,

12  what was your understanding of how the probation

13  department was supposed to appoint employees?

14              MR. BAILEY:  Objection.

15              MR. SINNIS:  Objection.

16              THE COURT:  No, no, she may have that, she may

17  give us her understanding.  But the manual is the

18  regulation apparently if you believe -- I shouldn't over

19  speak.  It's entirely up to you whether you even believe

20  the document is what it purports to be.

21      I'm going to let this witness tell us what she

22  thinks the requirement was.  She had something to do

23  with it if you believe the witness.  And it's always up

24  to you, you can believe every witness, you can

25  disbelieve every witness, you can believe parts of what

1   a witness says.  But you can tell us what you thought.

2        What did you think the requirement was?

3   A.  That we should hire the most qualified person of all

4   the applicants interviewed.

5   Q.  Ms. Slaney, to your knowledge were these policies

6   that you described to us in effect since you began a

7   year ago in hiring back to 1990?

8   A.  Yes, it was.

9   Q.  I want to turn now and talk a little bit in more

10  detail about the actual hiring process for the

11  Department of Probation.

12       Prior to 2001, who had the authority to appoint

13  and promote probation officers?

14  A.  The local judge made the appointment and it had to

15  be approved by the Chief Justice of Administration and

16  Management.

17  Q.  Did that change in 2001?

18  A.  Yes, it did.

19  Q.  After 2001 who had the authority to appoint and

20  promote probation officers?

21  A.  The new legislation made the Commissioner of

22  Probation the sole appointing authority.

23  Q.  And who had to approve those appointments?

24  A.  It had to be approved by the Chief Justice of

25  Administration and Management.

1  Q.  Regardless of who was the final appointment

2  authority, was there an application and interview

3  process that each individual had to go through if they

4  wanted to get a job with probation?

5  A.  Yes, there was.

6         MS. BELL:  Your Honor, may I approach to put

7  up a chalk?

8         THE COURT:  You may.

9         (On easel.)

10         THE COURT:  You heard her refer to that as a

11  "chalk," that's a category of documents and that chart

12  with the picture on it is another.  This is like

13  teaching, so a chalk is like something you'd write on a

14  blackboard.  It's not evidence in the sense that it's

15  not a document that they were actually using back then,

16  it's something the government made up in the sense of a

17  teaching aid in the course of the trial.  You can look

18  at it, but it's not evidence.  If it helps you

19  understand the testimony of the witness, that's why we

20  use chalks, to help you understand the testimony of the

21  witness.

22      Go ahead, Ms. Bell.

23         MS. BELL:  Thank you, your Honor.

24  Q.  Ms. Slaney, before we get to the first stage that's

25  listed on the chart, what's the first step in the hiring

1    process?

2    A.   An individual would apply as an applicant and we

3    would collect a pool of applicants.

4    Q.   And prior to that how would these individuals know

5    that there were jobs available at the Department of

6    Probation?

7    A.   Normally there was a posting on the trial court

8    website.

9    Q.   And once an applicant sees the posting, what's the

10   first thing that they need to do in order to try to get

11   a job?

12   A.   They need to complete an application and submit a

13   resume.

14   Q.   Ms. Slaney, would you turn to the next exhibit that

15   you have in your file, that's labeled Exhibit 1.

16   A.   (Turns.)

17   Q.   Do you have it, Exhibit 1?

18   A.   I do.

19   Q.   What is that document?

20   A.   That's a example of an application for employment.

21   Q.   Whose application is it?

22   A.   Um, Patrick Lawton.

23   Q.   How many pages is the application?

24   A.   (Looks.)   Four.

25   Q.   All right.   Just starting on Page 1, generally what

1    type of information is required on Page 1 of the

2    application?

3    A.   Basically it's identifiers, you need the telephone

4    number, the Social Security number, and the address, et

5    cetera.

6    Q.   All right.   Turn to Page 2.

7    A.   (Turns.)

8    Q.   What type of information is required on Page 2 of

9    the application?

10   A.   Prior employment record, um, and educational

11   qualifications.

12   Q.   Turn to Page 3.

13   A.   (Turns.)

14   Q.   What information is required on Page 3 of the

15   application?

16   A.   Um, it continued with, um, education for any

17   graduate degrees, and background information, which

18   requests information about the criminal record, um --

19   and I think that's pretty much it.

20   Q.   All right.   And turn to Page 4, the final page of

21   the application.

22   A.   (Turns.)   Um, the last page is for references and

23   then there is an opportunity to add anything that may

24   not have been covered in the application that you wanted

25   to highlight.

1          THE COURT:  Let me interrupt with a juror

2    question, if I could.

3        Go back to the period before 2001.  In general,

4    give us the steps before 2001 from the time the person

5    makes an application?

6              THE WITNESS:  They would have been the same --

7              THE COURT:  Tell the jury.

8              THE WITNESS:  They would have been the same at

9    that time.

10             THE COURT:  The same except for what?

11             THE WITNESS:  In terms of the --

12             THE COURT:  No, I want to take it from

13   application up to appointment, just so we can trace it

14   out.  You said the law changed in 2001 as to who made

15   the final appointment subject to what.  I just want to

16   get the steps -- I'm going to ask two questions.

17       What were the steps before 2001?  What were the

18   steps after 2001?

19             THE WITNESS:  The steps were essentially the

20   same with the exception of maybe an additional screening

21   or two committees to whittle down the numbers and, um --

22             THE COURT:  The screening committees to

23   whittle down the numbers came into effect when?

24             THE WITNESS:  I don't know what year that was,

25   I'm sorry.

1              THE COURT:  But was it before 2001 or after?

2              THE WITNESS:  After.

3              THE COURT:  After.

4         And did you have anything else to say?

5              THE WITNESS:  Only that the appointing

6    authorities, as I indicated, was different.

7              THE COURT:  Right.  So the steps were

8    essentially the same, but after 2001 some additional

9    screening committees to whittle down the numbers came

10   into effect.  Before 2001, just so I've got it, the

11   final say was the presiding justice in the particular

12   court.

13        Tell the jury, is that right?

14             THE WITNESS:  That's correct.

15             THE COURT:  After 2001, because the

16   Massachusetts legislature changed the law, the final say

17   was the Commissioner of Probation, but he made --

18        Well, was that right?

19             THE WITNESS:  With the approval of the Chief

20   Justice of Administration and Management.

21             THE COURT:  Thank you.  -- with the approval

22   of the Chief Justice of Administration and Management?

23             THE WITNESS:  Correct.

24             THE COURT:  All right.

25        Go ahead, Ms. Bell.

```
 1            MS. BELL:  Thank you.
 2            MR. SINNIS:  Your Honor, can I be heard at
 3   sidebar on something related to this very topic?  Just
 4   briefly.  Very briefly.
 5            THE COURT:  All right.
 6
 7            AT THE SIDEBAR
 8            MR. SINNIS:  I didn't know we were going to
 9   get a question so early.  I thought we could do this at
10   the break.  But I would like to ask that we be able to
11   make an objection --
12            THE COURT:  But of course you can.
13            MR. SINNIS:  -- but not in front of the jury.
14   I think it creates a dynamic between us and the jury.
15            THE COURT:  I'm sensitive to that and I
16   thought you were aware of that, that's why it's passed
17   around.  If it's passed around, that's the signal I'm
18   going to ask it.  If it's not passed, then obviously you
19   can see it -- and I charged the jury on this, and then
20   Ms. Gaudet will have it out on her bench and you can
21   just come up and see it and the questioning goes on.
22            MR. SINNIS:  But if it's passed --
23            THE COURT:  But if it's passed, I'm asking it,
24   and once you've seen it, if you want to be heard on it
25   before I ask it, in that process, it takes a little
```

1    while, but you say, "Can I approach the sidebar?" and

2    we'll have our little conference and I'll do whatever is

3    appropriate under the law.

4                    MR. SINNIS:  Okay.

5

6                    (In open court.)

7    Q.  Ms. Slaney, and is this application the same for all

8    applications that are necessary for positions within the

9    probation department?

10   A.  It is.

11   Q.  All right.  So turning back to the probation officer

12   hiring process chart.  You mentioned that there was an

13   applicant pool.

14        Once you have a pool of applicants, what happens

15   next in the process?

16   A.  Could that be put up on the screen?

17   Q.  Oh, yes.  I'm sorry.

18                    MS. BELL:  Could we have the hiring process

19   chart back up on the screen.

20                    (On screen.)

21   A.  The next step in the process was that all of the

22   applications were collected at OCP and people assigned

23   to the personnel office would do an initial screening to

24   determine whether or not, for example, a probation

25   officer had two years of human services experience and

1   an undergraduate degree.  And so they would sort them by

2   that.

3   Q.  Are those the minimum qualifications that we

4   discussed yesterday?

5   A.  They are.

6   Q.  And does that process sometimes reduce the total

7   applicant pool?

8   A.  Yes.

9   Q.  Now --

10  A.  But not enough.

11  Q.  So there's still a large pool usually after that?

12  A.  There is.

13  Q.  Okay.  So at some point then after 2001, as you

14  previously testified, did OCP put in a process to

15  further narrow the applicants?

16  A.  Yes, they did.

17  Q.  What was that process?

18  A.  There was a second round of screenings which was

19  normally -- I mean a first round basically was done by

20  two of the regional supervisors for the most part.

21  Q.  Did that process involve an interview with those OCP

22  personnel or was that further --

23  A.  It was an interview.

24  Q.  And again who conducted those interviews?

25  A.  For the most part I believe it was Frank Campbell

1    and Imelda Rios.

2    Q.   Who were those individuals?

3    A.   Regional supervisors.

4              THE COURT:   Could I jump in here again with a

5    juror question.

6              Exhibit 41, the Policy and Procedure Manual, to

7    your knowledge -- and you can only testify to what you

8    know, where did that come from?   Who put that out?

9              THE WITNESS:   That is issued by the Office of

10   the Chief Justice of Administration and Management.

11             THE COURT:   And, I take it, you don't know who

12   in fact wrote those things but it was under the

13   authority of the Chief Justice for Administration and

14   Management?

15             THE WITNESS:   Correct.

16             THE COURT:   And I used the words "It was put

17   out."   Who could have access to that?   Who could see

18   that?

19             THE WITNESS:   I believe every chief probation

20   officer was given a copy of that and there were copies

21   of it at the Office of the Commissioner of Probation.

22             THE COURT:   How about an applicant?

23             THE WITNESS:   Um, I don't know at that time if

24   it was readily available to an applicant.

25             THE COURT:   And how about access on the

 1    website, do the trial courts of Massachusetts have a

 2    website?

 3                 THE WITNESS:  That's a relatively new thing.

 4                 THE COURT:  New when?

 5                 THE WITNESS:  I'm not sure exactly how long.

 6                 THE COURT:  Was it in effect while you were

 7    employed by the Commonwealth?

 8                 THE WITNESS:  Um, part of the time.

 9                 THE COURT:  But you're not sure exactly when

10    it came on?

11                 THE WITNESS:  Yes, correct.

12                 THE COURT:  But relatively new?

13                 THE WITNESS:  Well, I've been involved in

14    probation for 39 years, I guess I should qualify that.

15    Um, new to me would be maybe within the last 10 or 15

16    years as opposed to initially, in the beginning, the

17    process for me.

18                 THE COURT:  Thank you.

19          Go ahead, Ms. Bell.

20    Q.   Ms. Slaney, just to follow up on a question that the

21    judge asked.

22          Do you know whether or not the Policies and

23    Procedures Manual was written pursuant to a statute that

24    the legislature had enacted?

25    A.   Um, yes, I believe some of it is, um -- I believe

1    there's legislation that allows the Chief Justice to

2    determine what the trial court policies and procedures

3    will be.

4    Q.  All right.  I think we stopped on the

5    screening-round interview and I think my last question

6    to you was "Who conducted those interviews?" and you

7    said Frank Campbell and Imelda Rios, is that right?

8    A.  And a few others.  But predominantly that, yes.

9    Q.  Okay.  And what was the next step in the hiring

10   process if an applicant made it through that screening

11   round?

12   A.  Um, the names would then be forwarded to a committee

13   of the chief probation officer, the local judge, and the

14   regional supervisor, to conduct further interviews.

15   Q.  When you say "the local judge," what do you mean by

16   that?

17   A.  Well, usually it's the First Justice.

18   Q.  And in what court?

19   A.  In any local court.

20   Q.  Would it be the court where the position that was

21   available was in?

22   A.  Yes.

23   Q.  So there are three people on that panel.  Can you,

24   um, just tell me who the lead interviewer, if there was

25   one, was on such a panel?

A.   After the 2001 legislation the regional supervisor
was the lead person for the panel.

Q.   Prior to those second-round interviews, what
information if any did you, as the regional supervisor,
receive to prepare you for these interviews?

A.   Normally we would receive a letter thanking the
committee members who were being on the panel and giving
them minimal instructions as to what was expected, and
you would receive an application and a resume.

Q.   For each candidate who had made it to that round?

A.   Yes.  And a scoring sheet.  And the regional
supervisor would have a form that they would tally the
scores up and rank-order them for the three committee
members.

Q.   When you say "scoring sheet," what do you mean by
that?

A.   Well, there was a scoring sheet, there were a set,
um, number of questions that everyone was asked on
employment, education, um, questions like that that you
would make notes of what the answers were for each of
the candidates, and then from that you would choose who
your top 8 candidates were and then rank-order them
according to preference.

Q.   So you indicated the scoring sheets had specific
questions on them.

1          Were the second-round interviews limited to those

2    questions?

3    A.   There were similar questions.   I'm sorry.   I didn't

4    hear your question?

5    Q.   Were the questions the same for every interview in

6    that second round?

7    A.   Oh, yes.

8    Q.   Where did the second-round interviews generally take

9    place?

10   A.   At the local court.

11   Q.   And you mention that you would rank-order the top 8

12   candidates.

13          What was you understanding of how many candidates

14   could move on from the second-round interview to the

15   final interview?

16   A.   Um, I believe the Policies and Procedures indicates

17   that it's 8, but it's definitely in the cover letter,

18   um, giving instructions to the committee telling us that

19   it could be up to 8 candidates.

20   Q.   Was that per position or total?

21   A.   Um, I don't know that it was referenced so much in

22   the trial court procedures.   I'm not quite sure.   But at

23   one point it definitely was, um, and we were told it

24   could be 8 per position.   But we didn't normally know

25   how many positions were going to be available at the

1    time.

2    Q.   Would it refresh your recollection if you look at

3    the Policies and Procedures Manual?

4    A.   Yes.

5    Q.   Would you look at Exhibit 41.

6    A.   (Looks.)

7    Q.   And turn to Section 4.302(e).

8    A.   (Turns.)   Okay.

9    Q.   Do you see that paragraph beginning "In the case of

10   a probation officer," it's on Page 34.7?

11   A.   (Turns.)   Yes, (e).

12   Q.   Could you read the last sentence please of that

13   section.

14   A.   "A list not to exceed 8 names of recommended

15   candidates for each open position shall be forwarded to

16   the First Justice."

17   Q.   Now this particular version of the manual says the

18   "First Justice."   Was it your understanding that in --

19   that since after 2001 the Commissioner of probation was

20   in fact the appointing authority?

21              MR. SINNIS:   Objection.

22              THE COURT:   Yeah, sustained.   You're leading

23   the witness and you ought not to.

24              MS. BELL:   Thank you, your Honor.

25   Q.   If you look at that sentence "Shall be forwarded to

1    the First Justice," who -- based on your understanding

2    who was that list forwarded to after 2001?

3    A.  Um, it was forwarded to the, um, next committee for

4    screening at OCP, the Office of the Commissioner of

5    Probation.

6    Q.  All right.  So moving up to the next step on the

7    chart which indicates "Final-Round Interview OCP Deputy

8    Commissioners."

9         Who conducted the final-round interviews for a

10   probation officer position?

11   A.  Um, I believe it was two deputies, um, for the most

12   part, again, Pat Walsh and Fran Wall.

13   Q.  Where did those interviews take place?

14   A.  At the Office of the Commissioner of Probation.

15   Q.  What was the structure of the second-round interview

16   -- or the final-round of interviews, if you know?

17   A.  I'm not really sure, I never participated in any of

18   them.

19   Q.  If you know, how many names were passed on from the

20   final-round interview up to the Commissioner for his

21   appointment?

22              MR. BAILEY:  Objection.

23              THE COURT:  No, um, do you know?  I think

24   she's asking you for the policy as you understood it or

25   the practice as you understood it.

1      Do you know?

2           THE WITNESS:  I know initially there were

3   several names that were forwarded and I think later on

4   in the process there was only one name.

5           THE COURT:  Okay, that's the answer.

6           MS. BELL:  Thank you, your Honor.

7           THE COURT:  That may stand.

8   Q.  Again referring to the hiring process chart, after

9   the final-round interviews with the deputy

10  commissioners, what's the next step in the process?

11  A.  The applicants, the names that were preferred by

12  that committee were sent to the Commissioner of

13  Probation for his signature.

14  Q.  Do you know whether, during the final interview

15  process, the candidates were assigned scores and ranked

16  the way they were in the second round?

17          MR. DENNER:  I'm going to object.  She's

18  already --

19          THE COURT:  Please.  Please.  If I need

20  argument, I'll ask for it.

21      The simple ground is to sustain it, that she's

22  leading the witness.  You may not lead the witness,

23  Ms. Bell.  Do not do so.

24      Leading the witness is to ask a question which

25  suggests the answer, which says -- "You were wearing a

 1    red hat, weren't you?"  Now, on direct examination when

 2    a lawyer called the witness to the stand, you cannot

 3    lead them.  On cross-examination, you can lead, and

 4    we're probably going to see some leading on cross-

 5    examination.

 6         But I caution you, the questions that are asked,

 7    whoever asks them, the person who called the witness or

 8    the person who cross-examines the witness, the questions

 9    are not evidence of anything, it's the answers that are

10    evidence.

11         So you may inquire, Ms. Bell, but don't lead the

12    witness.

13              MS. BELL:  Thank you, your Honor.

14    Q.  How did the deputy commissioners rank or score the

15    candidates that they interviewed in the final round, if

16    you know?

17              MR. SINNIS:  Objection, basis of knowledge,

18    your Honor.

19              THE COURT:  Yes, I understand.

20         Do you know, from your experience, from your

21    service?

22              THE WITNESS:  I do not.

23              THE COURT:  You do know?

24              THE WITNESS:  I do not.

25              THE COURT:  You do not know.  That's the

1    answer.

2         Go ahead, Ms. Bell.

3              MS. BELL:  Thank you, your Honor.

4    Q.  All right.  After the Commissioner appoints the

5    final candidate, what is the next step in the hiring

6    process?

7    A.  The next step was for the hiring package to be sent

8    over to Human Resources and passed on to the Chief

9    Justice for his signature for final approval.

10   Q.  And generally what do you mean by the "hiring

11   package"?

12             MR. SINNIS:  Objection.  Foundation.

13             THE COURT:  Do you know what the "hiring

14   package" consisted of?

15             THE WITNESS:  I have a general idea, yes.

16             THE COURT:  You may give us your general idea.

17   A.  It would be a copy, for example, of somebody's

18   license to prove citizenship, a copy of their resumes

19   and applications of the applicants, the final

20   applicants.  I believe there was a job posting, an

21   example of that that was put on the trial court website

22   initially.  And the, um -- and at one point I think

23   there would be a criminal record check done at OCP, if

24   it was requested by the Human Resources Department.  And

25   because a number of people, um, had Allied Services, we

1    had to determine whether or not that made them eligible

2    for increased pay when they first began.  Things like

3    that.

4    Q.  Thank you.  I'm going to ask that you look at the

5    documents that are next to you and locate Exhibit 1.37.

6    It should be the next document in the stack.

7    A.  (Looks.)

8    Q.  Tell me when you find it.

9    A.  It's the check-off list for the appointment

10   documentation.

11         MS. BELL:  Your Honor, I'm going to ask that

12   1.37 be put up so that the jury can see it.

13   Q.  And, I'm sorry, what is Exhibit 1.37?

14   A.  It is the check-off list for the hiring package to

15   indicate that all the pieces of the hiring package are

16   included, and it's also signed by the Commissioner of

17   Probation.

18   Q.  To whom was this particular piece of paper labeled

19   "Appointment Documentation" for?

20   A.  This particular one was for the applicant Patrick

21   Lawton.

22   Q.  And who received a copy of this appointment

23   documentation?

24         MR. SINNIS:  Objection, your Honor, she didn't

25   have anything to do with this hire.

1           THE COURT:  Well, do you know, you yourself,

2     of your own knowledge, who received it?

3           THE WITNESS:  Who received it from the Office

4     of the Commissioner of Probation?

5           THE COURT:  Right.

6           THE WITNESS:  It was forwarded to the Human

7     Resources --

8           THE COURT:  Well, how do you know?  How do you

9     know?

10          THE WITNESS:  Um, from experience of seeing

11    it.

12          THE COURT:  Yeah.  You may testify.

13        Tell us where, to whom it was forwarded or

14    received?

15          THE WITNESS:  Um, the appointment packages are

16    then referred to the Human Resources Department at the

17    Office of the Chief Justice of Administration and

18    Management.

19    Q.  Okay.  And could you just, um -- taking a look at

20    1.37, do you see all the "Xs" on the left side of the

21    paper as you're looking at it?

22    A.  I do.

23    Q.  And do you see the sentence starting with "I

24    certify"?

25    A.  "I certify that I have complied with the trial

1   court's personnel standards and that sufficient funding

2   exists in the current fiscal year budget to support this

3   position," and it has the appointing authority

4   underneath that for a signature.

5              THE COURT:  Of these steps that you've been

6   testifying about, which steps were added after the

7   statute changed in the year 2001?

8              THE WITNESS:  Only the ones that I previously

9   indicated to you in terms of the two additional

10  screening committees and the final appointing authority.

11             THE COURT:  All right.  Those are the ones

12  that were added.

13      Did the other steps change in any way after the

14  statute changed in 2001?

15             THE WITNESS:  No, we used the same forms

16  basically, the same process, the same interviewing

17  process.

18             THE COURT:  Go ahead, Ms. Bell.

19  Q.  Ms. Slaney, just to clarify one thing, how many new

20  screening processes were added after 2001, looking at

21  the chart?

22  A.  There was one at OCP and then there was a final one

23  at OCP with the two deputy commissioners.

24  Q.  Did the final interview, the final-round interview

25  as you see it on the hiring process chart, did that

1   exist after 2001 as well as before 2001?

2   A.  (Pause.)  I'm just going to wait until it comes up

3   on the screen so I can refer to it by the right name.

4        The third box up, the screening-round interview,

5   "OCP personnel," that was added.  Those were the two

6   regional supervisors, Frank Campbell and Imelda Rios who

7   did most of the screening at that level.

8   Q.  Was everything else the same pre 2001 and after

9   2001?

10  A.  With the exception of the final-round interview

11  where they inserted two deputy commissioners.  Um,

12  normally there was just one final one, it was either

13  with -- I think for the most part it was with the

14  Commissioner or maybe a first deputy or someone at that

15  point.

16              MR. SINNIS:  Objection, your Honor,

17  speculative.

18              THE COURT:  It may stand.

19  Q.  Now, the process you've been describing was for a

20  probation officer?

21  A.  Yes.

22  Q.  Was the process generally the same for assistant

23  chiefs and first assistant chief probation officers?

24              THE COURT:  The same for the selection of

25  those people?

1    MS. BELL: Yes, your Honor, the same for the

2 selection of an assistant chief and the first assistant

3 chief.

4 A. Um, I don't think that those two screening

5 committees were in play at that point because usually

6 the numbers of applicants were much smaller.

7 Q. When you say the "two screening processes," what do

8 you mean?

9 A. Um, the one with the two regional supervisors and

10 the two deputy commissioners. I think, um -- I think it

11 was approved at that point by the Commissioner, it went

12 directly to the Commissioner.

13    MR. SINNIS: Objection. I just want to make

14 sure she actually knows rather than speculating.

15    THE COURT: Well, you'll have a chance to ask

16 and I'm letting that stand.

17 Q. With respect to the, um --

18    MS. BELL: Strike that, your Honor.

19 Q. All right. I want to talk about your specific role

20 in the hiring process and I want to focus on the years

21 2000 to 2010. All right?

22    What was your role in the hiring process that you

23 just described?

24 A. Um, initially, um, in 2010 I was a --

25 Q. I'm sorry, during the years of 2000 to 2010, during

1    that time which years were you involved in it?

2    A.   All of them, when they were hiring, but there were a

3    number of freezes, and then at one point I was removed

4    from the hiring process in 2005.

5    Q.   So during that time, 2000 to 2005, what was your

6    position within the probation department?

7    A.   Regional supervisor.

8    Q.   As regional supervisor what was your role in that

9    hiring process that you've just described?

10   A.   I would have been involved in the -- if you look at

11   the fourth box, the second-round local interview with

12   the judge and the chief probation officer.

13   Q.   What responsibilities did that entail for you?

14   A.   I would coordinate the interviews at the local

15   level, answer any questions that the judge or chief

16   might have about the interview process, um, I would

17   collect the scores or the interview sheets at the end of

18   the interviews, and I would rank-order the top 8 of each

19   of the candidates and come up with a final 8 candidates.

20   Q.   Where did you send that list of final 8 candidates?

21   A.   I would bring that package into the Office of the

22   Commissioner of Probation.

23   Q.   Ms. Slaney, prior to conducting the second-round

24   interviews, what if any information did you receive from

25   OCP regarding which candidates should be advanced to the

```
 1    final round?

 2               MR. SINNIS:  Objection, your Honor.

 3               MR. BAILEY:  Objection, your Honor.

 4               THE COURT:  No, overruled.  I guess there's a

 5    preliminary question.

 6         Did you ever receive such information?

 7               THE WITNESS:  I did.

 8               THE COURT:  You did?

 9               THE WITNESS:  Yes.

10               THE COURT:  All right.  Now the question is

11    what and you may tell us what information you received?

12               THE WITNESS:  I was given names of applicants

13    who I was told should be advanced to the second round of

14    interviews at OCP.

15               MR. AMABILE:  Your Honor, I object.

16               THE COURT:  No, overruled.

17         Who gave you these names?

18               MR. BAILEY:  The same objection.

19               THE COURT:  Noted, and it's quite appropriate

20    to object when I put a question.

21         Who gave you these names?

22               THE WITNESS:  In the beginning I received a

23    few names from Janet Mucci in the personnel office and

24    later in the process I received names from Elizabeth

25    Tavares.
```

1          (Pause.)

2          MS. BELL:  May I proceed, your Honor?

3          THE COURT:  Yes, you may.

4    Q.  Who is Janet Mucci?

5    A.  Janet Mucci was in charge of the personnel matters

6    at the Office of the Commissioner of Probation.

7    Q.  During what time period did Ms. Mucci provide this

8    list of names to you?

9    A.  Um, I would say around 2000.

10   Q.  During what time period did Elizabeth Tavares

11   provide this list of names to you?

12          MR. AMABILE:  Your Honor, I object.  I object.

13   There's facts not in evidence.

14          THE COURT:  Did she ever provide those names,

15   Ms. Tavares?

16          THE WITNESS:  Yes, she did.

17          THE COURT:  Yeah, during what period?

18      And your rights are saved.

19          THE WITNESS:  Um, I'd say around 2004.

20   Q.  What was Ms. Tavares's position within the

21   Department of Probation in 2004 at the time that she was

22   giving you these names?

23   A.  Um, I'm not sure if she was the first or the second

24   deputy at that time.

25   Q.  All right, let's start with Ms. Mucci since she came

1   earlier in time.

2       Can you describe how Ms. Mucci communicated those

3   names to you?

4   A.  Either in person when I was in the office or by

5   telephone.

6   Q.  And what did she say to you when she gave you those

7   names?

8   A.  That these were individuals that the Commissioner

9   had an interest in having advanced to the second

10  interview.

11  Q.  What did you understand that meant for you as the

12  regional supervisor on the second-round interview panel?

13          MR. BAILEY:  Objection.

14          THE COURT:  No, overruled.  I think she's

15  asking what did you understand you were supposed to do,

16  what did you, after such a communication?

17          THE WITNESS:  Um, my understanding was that I

18  was to put those names on the final list.

19  Q.  Okay.  Who gave Janet Mucci those names to give to

20  you?

21          MR. BAILEY:  Objection.

22          THE COURT:  Sustained on that foundation.

23  Q.  Do you know, um, based on any conversations with

24  Ms. Mucci, who gave her those names to give to you?

25  A.  She told me that Jack O'Brien had given her the

```
 1    names.
 2    Q.   In general how many names did Ms. Mucci pass on to
 3    you prior to the second-round interview?
 4              MR. SINNIS:  Objection.  This is outside the
 5    scope of the indictment, your Honor, or the charges
 6    brought.
 7              THE COURT:  I understand.  I understand the
 8    objection, but it's overruled.
 9         In general, how many names?
10    A.   Um, it could be anywhere between three and nine.
11    Q.   And again how many names were you supposed to rank
12    to pass on to the final-round interview?
13    A.   8.
14    Q.   All right.  Moving on to Ms. Tavares.
15         When Ms. Tavares provided you with those names,
16    how did she communicate them to you?
17    A.   Either in person or over the telephone.
18    Q.   What did she say when she gave you the names?
19              MR. BAILEY:  Objection.
20              THE COURT:  Well, that suggests it was a
21    routine practice.
22         Did she say the same thing?
23              THE WITNESS:  Basically, yes.
24              THE COURT:  All right.
25         And your rights are saved.
```

1      But you may tell us basically what she said.

2  A.   That I should, um -- that the Commissioner had an

3  interest in having these people passed on to the next

4  interview.

5  Q.   When she said that to you, what did you understand

6  you were supposed to do with those names?

7  A.   That I was supposed to put those names on my final

8  list of 8 candidates.

9  Q.   Did Ms. Tavares explain where she was getting those

10  names from?

11  A.   I don't remember her saying that specifically, no.

12  Q.   In general how many names would Ms. Tavares pass on

13  to you?

14  A.   Between 3 and 9.

15  Q.   When Ms. Tavares gave you more than 8 names for a

16  position, how did you respond to her?

17  A.   I indicated that it was my understanding that we

18  were only allowed to submit 8 names, um, and she agreed

19  and reviewed the list again and got back to me and had

20  withdrawn, um, a number of the names, I think it ended

21  up being only 3 instead of 9 that had to make the final

22  list.

23  Q.   Once you got this list of names, what was your

24  understanding of who you were to pass that information

25  on to?

1    A.   It was my understanding that I should pass that

2    information on to the chief probation officer who was

3    assigned, another member of the committee.

4    Q.   Who told you you should do that?

5    A.   I don't remember that.

6    Q.   Did you always comply with that understanding and

7    pass on the information to the chief probation officer?

8    A.   For the most part I think I probably did.  Um, I

9    used to tell them that they had to decide for themselves

10   how they were going to handle this, just as I did.

11   Q.   What about the judges who sat on the panel, what

12   information did you provide them?

13   A.   I never gave them any names of any applicants that

14   had to be on the final list.

15   Q.   Why not?

16   A.   I was uncomfortable doing that.

17   Q.   Why?

18   A.   Um, I thought it was inappropriate.

19   Q.   What was inappropriate?

20   A.   Giving names, um, of people who were going to be

21   chosen before the interviews even occurred.

22              MR. SINNIS:  Objection.

23              THE COURT:  Well, it's not timely.  That may

24   stand.

25              MR. SINNIS:  Well, move to strike.

1           THE COURT:  Motion to strike is denied in the

2     exercise of discretion.

3     Q.  When you received names from Ms. Mucci or

4     Ms. Tavares, did you always put them on the list of

5     people to move to the final round?

6     A.  No.

7     Q.  At the times that you did, were there other

8     candidates who you were forced to pass over?

9           MR. BAILEY:  Objection.

10           THE COURT:  Yeah, sustained.  Don't lead the

11     witness.

12     Q.  What was the impact of that process on some of the

13     other candidates who were interviewed for the position?

14           MR. BAILEY:  Objection.

15           THE COURT:  Well, let me see if I understand.

16       Sometimes you did pass on names and other times

17     you didn't.  And don't take it from me.

18       Is that what you testified to?

19           THE WITNESS:  I would pass those names on to

20     the chief probation officer.  Um, what we did with it

21     was always something else.  That's another issue.

22           THE COURT:  Okay.  So you got directions, you

23     carried them out?

24           THE WITNESS:  Yes.

25           THE COURT:  And I think she's asking what

1   effect did that have on the applicant pool?

2       Is that your question?

3           MS. BELL:  On the candidates who were

4   interviewing, yeah, the other candidates who were

5   interviewing in the second round.

6           THE COURT:  Yeah, you may testify to what you

7   know of your personal knowledge, what you yourself know.

8       So what then happened?

9           THE WITNESS:  I believe that some of the more

10  qualified candidates --

11          THE COURT:  No, no, that's not question.  The

12  question is what happened to them?

13          THE WITNESS:  They were not on the final list.

14          THE COURT:  Yeah.  Thank you.

15  Q.  I believe you testified that sometimes you complied

16  with Ms. Tavares or Ms. Mucci's request and sometimes

17  you didn't to put these individuals on the final round,

18  is that correct?

19  A.  That's correct.

20  Q.  When you didn't comply, why didn't you comply?

21  A.  Um, can I give an example of the hiring --

22  Q.  Can you explain why you didn't comply?

23  A.  For example -- well, first of all I wasn't part of

24  the hiring process initially, I was at the Quincy

25  District Courthouse at the --

1           MR. AMABILE:  Your Honor, your Honor, this

2    is --

3           THE COURT:  Yeah, I think we'd better focus on

4    specific questions.  We'll let Ms. Bell ask another

5    question.

6    Q.  Well, let me try to narrow that down for you.

7           Were there times when you did not move a candidate

8    on as you were told to do?

9    A.  Yes.

10   Q.  And in general, without getting into specifics yet,

11   why didn't you move them on?

12   A.  I thought the person on the list was inappropriate

13   because, um, during his --

14           MR. AMABILE:  Your Honor --

15           THE COURT:  Well, we'll let that stand, what

16   she's testified to thus far, that she didn't do it

17   because she thought the person was inappropriate.

18   Q.  Ms. Slaney, what was your understanding of why

19   Commissioner O'Brien wanted this particular candidate to

20   be moved on to the next round of interviews?

21   A.  My understanding was that they had sponsors that

22   were politically influential.

23   Q.  What was the basis for that understanding?

24   A.  Um, I guess I based that on a discussion I had had

25   with another regional supervisor, Edward Dalton.

1   Q.  What conversation if any did you have with Elizabeth

2   Tavares that gave you that understanding?

3               MR. BAILEY:  Objection.

4               THE COURT:  Sustained.  You're leading the

5   witness.

6   Q.  Did you have any conversations with any defendants

7   that lead you to that conclusion?

8   A.  Yes, when one of the individuals that I thought was

9   the best applicant was bypassed, um, I indicated my

10  objection to Liz Tavares and she told me that sometimes

11  the political thing had to be done, when she was very

12  aware of how qualified that particular candidate was.

13              MR. BAILEY:  Objection, your Honor, to the

14  last part, your Honor.

15              THE COURT:  No, that may stand.

16  Q.  Ms. Slaney, um, based on your experience with the

17  hiring process how did you feel about this process of

18  getting names prior to the interview?

19              MR. SINNIS:  Objection.

20              MR. BAILEY:  Objection.

21              THE COURT:  Sustained.

22  Q.  Did you ever -- you testified that you -- strike

23  that.

24       Did you ever push back on either Ms. Mucci or

25  Ms. Tavares when they provided you this list of names

```
 1   prior to the interviews?
 2              MR. SINNIS:  Objection.
 3              MR. BAILEY:  Objection.
 4              THE COURT:  Wait a minute.
 5         You can answer that "yes" or "no."
 6   A.  Yes.
 7              (Pause.)
 8              THE COURT:  Go ahead, Ms. Bell.
 9              MS. BELL:  I'm sorry, your Honor, I thought
10   you were looking at a --
11              THE COURT:  No, even if I was, I would
12   circulate it.
13              MS. BELL:  Thank you.
14   Q.  When you pushed back on Ms. Tavares, what was her
15   response?
16              MR. BAILEY:  Objection.
17              THE COURT:  Well, did you, to Ms. Tavares,
18   "yes" or "no"?
19              THE WITNESS:  Yes, I did.
20              THE COURT:  What was her response?
21              THE WITNESS:  And to Commissioner O'Brien.
22              THE COURT:  Well, let's start with
23   Ms. Tavares.  What was her response is the question.
24   A.  She indicated, as I just said, that she felt that
25   the political thing needed to be done and this candidate
```

1   would get an opportunity at a later date.

2   Q.   Now, Ms. Slaney, I want to focus your attention now

3   specifically to December of 2000.  All right?

4        Did you sit on a second-round interview panel for

5   a probation officer position at Bristol County --

6             MR. SINNIS:  Can we be heard at sidebar, your

7   Honor?

8             THE COURT:  We may.

9

10             AT THE SIDEBAR

11             THE COURT:  Where is my list?

12             MS. BELL:  We have your list, your Honor.

13             THE COURT:  Well, where is it?  I ask for

14   reasons.

15        Is this one of the 12?

16             MR. SINNIS:  It is not, it is about Doug

17   MacClean, but it's not the time he was hired.

18             MS. BELL:  But he is one of the 12, your

19   Honor, and this is directly relevant to his getting

20   hired.

21             THE COURT:  I'm fine with this witness giving

22   us an overview, but is this one of the 12 counts of mail

23   fraud?

24             MS. BELL:  It is background information for

25   one of the 12 counts.

1          THE COURT:  The 12 counts of mail fraud, they

2     come first.  I make orders for reasons.  The 12 come

3     first, then the predicate acts.

4          MS. BELL:  Can I raise one other thing, your

5     Honor?

6          THE COURT:  Yes.

7          MS. BELL:  She's going to testify about a

8     conversation she had with Jack O'Brien in December of

9     2000 and that conversation related directly to a

10    particular individual.

11         THE COURT:  Then it will come downstream,

12    won't it?  Yeah, it will come.  And I'm not saying it

13    won't come, it's just not coming in today.

14        What about these two questions?  They want to know

15    why she was removed from the hiring process and --

16         MS. BELL:  I'm going to get to that.

17         THE COURT:  And that's what I thought.  But so

18    you know, if we don't get into them in the direct, I'm

19    going to ask these questions.

20         MR. AMABILE:  Your Honor, just to clarify

21    things, I think there are 10 substantive mail fraud

22    counts, there's a racketeering conspiracy, there's a --

23         THE COURT:  And that makes the 12.  Thank you.

24         MR. AMABILE:  And then there are 10

25    substantive counts.

1              THE COURT:  I want the 10 first.

2              MS. BELL:  No, but there's also more

3    racketeering acts.

4              THE COURT:  Of course there is.  And here's my

5    order.  First the independent counts, then the mail

6    fraud predicate acts, and then whatever else you've got

7    on predicate acts.

8              MS. BELL:  That's the way you want the

9    evidence presented, in general, at trial?

10             THE COURT:  Yes.

11             MS. BELL:  Well, I don't think the government

12   is understanding -- that was not the government's

13   understanding.

14             THE COURT:  More specifically I do because I

15   don't think I'm being -- I think I'm pretty transparent.

16   We're going to go for a month now, starting yesterday,

17   and at the end of the month we'll see where we are.  I'd

18   better have these 10 counts in and the 10 counts will of

19   course support the conspiracy on the mail fraud, and

20   then you've got 10 predicate acts of -- as to the

21   racketeering, which also support the conspiracy as to

22   the racketeering, and at about that time I expect the

23   defense is going to say, "We've been at this a month,

24   anything else is cumulative," and I'm going to say, um,

25   "How much longer?"  Because I think in the interests of

1    justice the jury has to understand what's going on.

2         And why, for instance, on your tape -- I like the

3    tape, I ruled that you could get it in, but that's

4    downstream, and that's why I said it was downstream

5    because I want to get those counts to be in there.

6    Obviously you're allowed to put on evidence of all your

7    charged counts.  The grand jury has raised those counts.

8    I can't just say, "I don't want that count," that would

9    be outrageous, but what I can say is "I don't want

10   cumulative evidence."

11        So I want the independent counts that are also

12   predicate acts and then I want the mail fraud predicate

13   acts because they're easier conceptually, candidly, and

14   then I have to face up to the bribery business and we'll

15   see.

16        Can I make anything clearer?

17             MR. WYSHAK:  No, your Honor.

18        But I would like to remind the Court that the two

19   most significant counts in the indictment are

20   racketeering counts and those are substantive offenses,

21   and so we have evidence that is relevant to the

22   racketeering counts.

23             THE COURT:  Then you'd better move

24   expeditiously through the independent counts, because

25   that's my order.

```
 1              MR. WYSHAK:  So you're asking to us to recall
 2   witnesses?
 3              THE COURT:  Yes.  Oh, yes.
 4              MR. WYSHAK:  Okay.
 5
 6              (In open court.)
 7              MS. BELL:  May I proceed?
 8              THE COURT:  Go right ahead, Ms. Bell.
 9              MS. BELL:  Thank you, your Honor.
10   Q.  Did you ever push back on the Commissioner Jack
11   O'Brien with respect to these names you were getting,
12   the names for the interviews?
13   A.  I did.
14   Q.  Tell us about that.
15   A.  I was at a senior staff meeting and I received a
16   phone call and I believe it was from his secretary, um,
17   excuse me, indicating that the Commissioner wanted to
18   speak to me.  So I went up to his office and he was
19   standing behind his desk.  His physical appearance told
20   me that he was upset with me.
21              MR. AMABILE:  Your Honor, your Honor --
22              THE COURT:  Well, the question was "Tell us
23   about that?" and there was no objection, and so I'm
24   going to let that stand.
25              Tell us about that?
```

1    A.   He asked me why a particular name was not on the

2    list?   And I indicated that it was my understanding that

3    this person had a felony on their record and during the

4    interview process he gave indication that he had a

5    substance abuse problem that was, um, not totally

6    resolved yet.

7    Q.   And what was the Commissioner's response to that?

8    A.   Um, I indicated I thought I had discretion to not

9    include people that, in my estimation, were

10   inappropriate applicants and, um, his response was, "Oh,

11   come on, Ellen, everybody has a sponsor," and I

12   indicated that I did not and that that was not my

13   experience.

14   Q.   Did Jack O'Brien use that word, "sponsor"?

15   A.   Yes, he did.

16   Q.   What else did Jack O'Brien say?

17   A.   I just asked him, you know, not to ask me to do

18   this, that I couldn't do it, it didn't seem appropriate

19   to me, and, um, at the end of our conversation he said

20   that I would not be on the hiring process anymore, as I

21   requested, and, um, that he understood my objection.

22   Q.   And approximately when did that conversation take

23   place?

24   A.   What year?

25   Q.   Uh-huh.

1    A.   Um, I believe that was around January of 2001.

2    Q.   And that particular individual, do you know whether

3    he was ever hired?

4                MR. SINNIS:  Objection.

5                THE COURT:  Um, no, and I understand my

6    earlier rulings, but we ought to get context.

7         Who are you talking about, what applicant were you

8    talking about in the conversation with Mr. O'Brien that

9    you just related?

10                THE WITNESS:  Doug MacLean.

11                THE COURT:  A fellow by the name of Doug

12    MacLean.  And the question was, "Was he ever hired?"

13    and you may answer that question and we'll move on.

14    A.   Yes, he was.  He was there --

15                THE COURT:  Yes, he was hired.

16         All right.  Go ahead, Ms. Bell.

17                MS. BELL:  Thank you, your Honor.

18    Q.   When is the next time that you became involved in

19    the hiring process, if at all, after that conversation?

20    A.   Um, there was a hiring, I believe from 2001 to 2004,

21    and I was, um, then involved again at that point.

22    Q.   Why did you become involved again after having that

23    discussion with Jack O'Brien?

24    A.   I really wasn't sure, to be honest with you, because

25    I thought I had made my position clear, however I had

1    felt like I was between a rock and a hard place and it

2    was certainly --

3                    MR. BAILEY:  Objection.

4                    MR. SINNIS:  Objection.

5                    THE COURT:  No, the question was "Why?"  There

6    was on objection.  She may tell us why.

7    A.   It was one of my job responsibilities and I felt

8    that they were asking me to do it and I needed to do the

9    interviews.  I didn't want to be insubordinate.  I never

10   considered myself a difficult employee.  I was trying to

11   do the best I could.

12   Q.   When you got back involved in the interview process,

13   were you still receiving names in advance of the

14   interviews?

15   A.   Yes, I was.

16   Q.   From whom at that point?

17   A.   Liz Tavares.

18   Q.   Approximately how long did you remain involved in

19   the hiring process once you started again in or about

20   2004?

21   A.   Um, probably about three months and then we had more

22   problems.

23                    MR. SINNIS:  Objection to that.  Move to

24   strike that.

25                    THE COURT:  Well, we will strike "and then we

had more problems."  That's stricken.  But move on.

Q.  Can you explain for the jury why you were only

involved in hiring for three months?

MR. SINNIS:  Objection.

THE COURT:  Well, now in light of the

objection we'll allow you to break it down.  You may

direct her attention to something and then go from

there, Ms. Bell.

MS. BELL:  Thank you, your Honor.

Q.  Um, approximately when did you stop being involved

in the hiring process the second time?

A.  Well, I believe it was, um, after the Bristol

Superior Court interviews in -- from March of 2005, I

think it was.

Q.  Okay, and, um, let's talk about those interviews to

start.  Okay?  Let's focus your attention on early March

of 2005.

Did you participate in an interview panel at that

time for a first assistant chief position in the Bristol

Superior Court?

A.  I did.

MR. SINNIS:  I'm going to object, your Honor,

based on your ruling at sidebar.

THE COURT:  Yeah, I mean to adhere to that

ruling, so I'm going to sustain it on that basis.

1              MS. BELL:   Thank you, your Honor, I'll

2      rephrase it and ask a different question.

3              THE COURT:   All right.

4      Q.   You said it was about March when you stopped being

5      involved in the hiring process for the second time, is

6      that right?

7      A.   Um, I was officially notified in April and I think

8      that was the last hire that I was involved in during

9      that time in March in Bristol.

10     Q.   Can you explain what happened -- can you explain

11     what happened that caused you to stop participating in

12     interviews at that time?

13             MR. SINNIS:   Objection.

14             THE COURT:   No, overruled.   She may tell us

15     what she knows herself.

16         You may tell us.

17     A.   I was, um, a participant in the committee that

18     interviewed the applicants for the Bristol Superior

19     first assistant chief probation officer along with chief

20     probation officer Gene Montairo, and Judge Kane, Robert

21     Kane, and, um, there were a small number of applicants

22     and one of the local POs assigned to that particular

23     court, Chris Howak, was going to be on vacation at the

24     time of the interview.   So I asked permission from Liz

25     Tavares if we could interview him separately, um, and

```
 1   she agreed that we could accommodate him.  So we did
 2   that.
 3            MR. AMABILE:  Your Honor -- your Honor, I
 4   object to this narrative.
 5            THE COURT:  I understand, but overruled, so
 6   long as she sticks to what she knows.
 7        Go ahead.
 8   A.  So we interviewed him first.  And then shortly
 9   thereafter, before we started the remainder of the
10   interviews, I had a call one night from Liz Tavares
11   telling me that I was --
12            MR. BAILEY:  Objection.
13            THE COURT:  Overruled.
14   A.  -- off the committee.
15   Q.  Did she explain why you were off the committee?
16            MR. BAILEY:  Objection.
17            THE COURT:  No, overruled.  You may tell us
18   what she said.
19   A.  She indicated that they wanted to be sure that it
20   got done right this time because I asked, "Was this
21   because of the Fall River interviews?"
22            MR. SINNIS:  Objection.
23            THE COURT:  No, overruled, that may stand.
24        And what was the response?
25   A.  She said that they wanted it to be done right and
```

1    she indicated that, um, there was an investigation going

2    on at the administrative office by the District Court

3    Chief Justice Connolly's assistant, um, Mr. McCue, I

4    think it's Phil McCue, um, and that her integrity was

5    being questioned and she was, um -- so basically that

6    was what she said.  And she told me that we could talk

7    about it further at the FSD meeting the following

8    Monday.  I think this was a Friday night that I received

9    the call.

10              THE COURT:  And the "FSD meeting" is what?

11              THE WITNESS:  The "Field Services Division,"

12   the senior staff.  It's a monthly meeting.

13              THE COURT:  Go ahead, Ms. Bell.

14   Q.  Ms. Slaney, when Ms. Tavares said she wanted to be

15   sure it "got done right this time," what was your

16   understanding of what she was referring to?

17              MR. BAILEY:  Objection.

18              THE COURT:  Overruled.  She can give us her

19   understanding.  She cannot testify to what's in somebody

20   else's mind.  But if you believe her testimony that

21   there was this conversation, she can testify to what she

22   made of it, what she thought.

23         And you may answer.

24   A.  Can you repeat the question?  I'm sorry.

25              THE COURT:  What did you make of it?

1          THE WITNESS:  What did I think she --

2          THE COURT:  Specifically the phrase "make sure

3    it gets done right this time."

4    A.  Um, the candidate that they wanted in the Fall River

5    position did not get appointed and they wanted to make

6    sure that the one in the Bristol Superior Court position

7    did, and I don't think that they --

8          THE COURT:  Well, you keep talking about

9    "they," um, is that what you thought Ms. Tavares was

10   telling you?

11         THE WITNESS:  Yes.

12         THE COURT:  All right.  That may stand.

13   Q.  How do you know that that's what Ms. Tavares was

14   telling you?

15         MR. BAILEY:  Objection.

16         MR. SINNIS:  Objection.

17         MS. BELL:  I can ask a different question,

18   your Honor?

19         THE COURT:  Yes.  Sustained.

20   Q.  What conversations did you have with Ms. Tavares

21   that led you to believe that she was referring to the

22   Fall River interviews when she said, "We want it to get

23   done right this time"?

24         MR. BAILEY:  Same objection.

25         THE COURT:  Overruled.  You may tell us the

1    conversations.

2    A.   I asked her specifically if this was about the Fall

3    River appointments and she said "Yes."

4    Q.   Were you involved in the Fall River interviews?

5    A.   Yes, I was.

6    Q.   And who was the candidate who did not get appointed?

7    A.   Um, Probation Officer Lucia Legati.

8    Q.   Why didn't she get appointed?

9            MR. SINNIS:   Objection.

10           THE COURT:   Yeah, sustained.   At this stage,

11   in any event, and it's over broad.   So sustained.

12   Q.   Were you the regional supervisor on the second-round

13   interview panel for the Fall River interviews?

14           MR. SINNIS:   Objection, your Honor.   Again

15   it's based on your order.

16           THE COURT:   Yes.   Let's move on.   I think we

17   have enough.

18   Q.   So I apologize, I got you off track, I think I had

19   asked you what happened to cause you to be removed from

20   the hiring process again.   You were explaining the

21   Bristol Superior Court hire.

22           THE COURT:   Well, that's not a question.   Put

23   a question to her.

24           MS. BELL:   Yes, your Honor, I just wanted to

25   put it in context.

1  Q.  So after Ms. Tavares said to you that she wanted to

2  make sure it got done right this time, did she tell you

3  who would be replacing you on the Bristol interviews?

4  A.  She did, she said that, um, Deputy Commissioner Bill

5  Burke would be replacing me.  However, when I went into

6  Boston on Monday for our meeting, Bill Burke came in and

7  he took the package, and I indicated to him that we had

8  already started the interviews and I thought this could

9  create a potential grievance if they changed the

10 membership of the committee at this point.

11 Q.  Did Ms. Tavares explain why Mr. Burke was going to

12 be taking over for you at this point?

13 A.  Only that she said they wanted it to be done right

14 this time.

15 Q.  So what did, um -- what was her response when you

16 confronted her with a potential grievance issue?

17           MR. BAILEY:  Objection.

18           THE COURT:  Overruled.

19      What did she say?

20 A.  She and Fran Wall came down to my cubicle later on

21 and wanted to confirm whether or not there had in fact,

22 um, been one interview done already and I reminded her

23 that I had asked for permission to do that, and so she

24 said, "Well, this might change things," and they went

25 back to her office.  And I was later called down there

1    and I was told that I was going to be back on the hiring

2    committee again since we had already started it.  And I

3    indicated to her that I really didn't want to be part of

4    this and that I had already made my position clear back

5    in 2000 that I didn't want to be part of these hirings.

6    Q.   And what was her response?

7    A.   Well, she said, um -- she wanted to, um -- I'm

8    trying to remember.

9         She asked about, um, the chief probation officer

10   and what he thought and, um, I indicated that the chief

11   and I were both adamant that Mary Viera was the best

12   candidate and that she should be given the position, and

13   I also indicated that I didn't think I was going to be

14   able to ensure that the candidate that she wanted was

15   going to be the final candidate, and I confirmed it with

16   her prior to the interview and she said it was someone

17   named Joe Dooley.  And, um, she said she had received a

18   call from Gene Montairo indicating that he was very

19   concerned that, um --

20             MR. BAILEY:  Objection.

21             THE COURT:  This is -- Ms. Tavares said this?

22             THE WITNESS:  Yes.

23             THE COURT:  And you may tell us what she said.

24   A.   She said that Gene Montairo was very upset because

25   he --

1          MR. SINNIS:  Object, your Honor, double

2     hearsay.

3          THE COURT:  Well, you're quite right to this

4     extent.

5          Now we're getting -- um, this witness is telling

6     us, again if you believe this witness, what Ms. Tavares

7     said to her, but what she said to her is something that

8     somebody else said to Ms. Tavares.  So you can't take

9     what Ms. Tavares says this Mr. Montairo said to her as

10    true.  We don't know who that person is, is that person

11    going to be a witness?  We don't know enough.  But in

12    the circumstances of this case I'm going to let you hear

13    it only for the purpose of considering that Ms. Tavares

14    was saying it.  If you believe this witness, and that's

15    up to you, you can believe that Ms. Tavares said these

16    things, not that they're true or not.

17         So, go ahead, you may tell us what she said.

18    A.  She indicated that she had received a phone call

19    from Chief Probation Officer Eugene Montairo who

20    indicated that he felt very strongly that Mary Viera was

21    the most-qualified person and, um, she asked me if I

22    thought that Gene was an angry person and I indicated,

23    "No, absolutely not," that I never had any such

24    experience with him.

25    Q.  And when you said to Ms. Tavares that you were

1   worried you wouldn't be able to get her candidate, Joe

2   Dooley --

3           MR. BAILEY:  Objection to the

4   characterization, your Honor.

5           THE COURT:  No, overruled, she may have the

6   question in that form.

7   Q.  What did you mean by that?

8   A.  Um, I didn't know if Gene Montairo would be willing

9   to put Joe Dooley on the list.

10  Q.  Why?

11  A.  Um, Gene told me that he had --

12          MR. SINNIS:  Objection.

13          THE COURT:  Yeah, sustained.  Sustained.

14  Q.  Okay.  So getting back to your conversations with

15  Ms. Tavares.

16      Once you told Ms. Tavares you weren't sure you

17  could get this candidate, Joe Dooley, on the list, what

18  happened next?

19  A.  (Pause.)  Nothing.

20  Q.  Did you participate in --

21          MR. SINNIS:  Objection.

22          MS. BELL:  I'll move to strike the question

23  and ask another, your Honor.

24          THE COURT:  All right.

25  Q.  After that conversation with Ms. Tavares, did you

1    participate in the interview process?

2    A.  I did.

3    Q.  And who is --

4    A.  Actually the day before, I'd like to mention, that I

5    did have a discussion with Joe Dooley --

6              MR. AMABILE:  Objection.

7              MR. SINNIS:  Objection.

8              MR. BAILEY:  Objection, your Honor.

9              THE COURT:  They get to govern what questions,

10   or at least object to questions, so you can't just

11   launch off.  We'll see what the attorneys ask.

12   A.  But having said that, if you've said something

13   wrong, ever, you can always go back and say, "I made a

14   mistake when I said" -- or whatever the reason, "and I

15   need to correct something that has been asked."  You may

16   always do that because you're under oath.

17        Go ahead, Ms. Bell.

18              MS. BELL:  Thank you, your Honor.

19   Q.  Just to put some context on this, who is Gene

20   Montairo?

21   A.  Gene Montairo was the chief probation officer of the

22   Bristol Superior Court.

23   Q.  Was he going to be involved in the interview process

24   along with yourself?

25   A.  Yes, he was.

1    Q.   And who was Joe Dooley?

2    A.   Joe Dooley was the probation officer in charge that

3    was assigned to me in the Taunton Youth Facility of the

4    Office of Community Corrections.

5    Q.   Was he going to be a candidate for this particular

6    position?

7    A.   Correct.

8    Q.   After this conversation that you had with

9    Ms. Tavares regarding being involved in the interviews

10   at all, were you in fact involved in the interview

11   process?

12   A.   Yes, I was.

13   Q.   Who was hired after as a result of that interview

14   process?

15   A.   Joe Dooley.

16   Q.   After that interview process, what happened -- when

17   did you learn that you were going to be removed from

18   hiring?

19   A.   Um, I think it was, um, at the Field Services

20   Division meeting in April of 2005.  After the meeting

21   was over I was told that I --

22           THE COURT:  By whom?

23           THE WITNESS:  Um, I believe it was Fran Wall.

24   A.   He told me that he wanted to meet with me and my

25   regional supervisor Ed Dalton in his office.

1    Q.   Who is Fran Wall?

2    A.   The deputy commissioner.

3    Q.   Did you meet with Fran Wall and Edward Dalton?

4    A.   And Pat Walsh, yes.

5    Q.   And who is Pat Walsh?

6    A.   The deputy commissioner.

7    Q.   And would you describe what happened during that

8    meeting?

9    A.   We were advised that we were being taken off the

10   hiring process and instead of doing hiring we would be

11   assigned 13 overdue audits throughout the state for

12   other regional supervisors.

13   Q.   What are "overdue audits"?

14   A.   Some of them were overdue up to a year, um, each.

15   As I indicated yesterday, regional supervisors are

16   responsible for performing an audit in each of their

17   courts every 18 months, um, and there had been a hiring

18   freeze so really this wasn't related to, you know, their

19   having to do our interviews or anything.

20              MR. SINNIS:   Objection, your Honor.

21              THE COURT:   Yeah, answer the question fully,

22   completely, and of course honestly, but just answer the

23   questions that she's putting to you.

24        Put another question, Ms. Bell.

25   Q.   Did you finish your answer?  I said, "What are

1   "overdue audits?"  Did you finish your answer?

2   A.   They were overdue audits that were assigned to other

3   regional supervisors.

4   Q.   How many were you and Mr. Dalton assigned to do?

5   A.   We were assigned to do 13 for other people.

6   Q.   And in what courts were those audits that you were

7   supposed to do?

8   A.   Those audits were throughout the state.

9   Q.   Was there also, um -- well, when you do an audit, is

10  there a written component to it or a report that has to

11  be created?

12  A.   Yes.  We were told that we should stagger them, that

13  we should both do the audit and that we would write the

14  audit, um, Ed would take one, I would take the next, and

15  that we would stagger them that way.

16  Q.   How did you perceive that task that you were being

17  given?

18                MR. BAILEY:  Objection.

19  A.   I believe --

20                THE COURT:  Wait.

21                MS. BELL:  I'll strike the question, your

22  Honor.

23                THE COURT:  You did nothing wrong.  I'm slow

24  sometimes.

25                MS. BELL:  I'll ask another question, your

1    Honor.

2                   THE COURT:   That's withdrawn.

3    Q.   What was your understanding of why you were being

4    asked to perform the 13 overdue audits?

5    A.   I felt it was retaliation for not participating in

6    the hiring process.

7    Q.   And specifically for what, for not participating

8    how?

9    A.   In a way that I was told that I should.

10   Q.   Which is what?

11   A.   By submitting names that were given to me for the

12   final 8 candidates.

13   Q.   Why were you unwilling to do that?

14   A.   Because it negates the whole process and it's not a

15   fair process for the people in the field who were

16   applying for these very valuable promotional

17   opportunities.

18   Q.   How is it not fair?

19                   MR. SINNIS:   Objection.

20                   THE COURT:   Sustained.

21   Q.   You said that Mr. Dalton was also involved in this

22   meeting and told that he had to perform these audits

23   too.   Who is Mr. Dalton?

24   A.   He is a regional supervisor also.

25   Q.   Do you have any knowledge as to why he was also

1    asked to perform these audits?

2            MR. BAILEY:  Objection.

3            THE COURT:  Well, I take it you think the same

4    with respect to him as with respect to you?

5            THE WITNESS:  I do.

6            THE COURT:  We'll let that stand.  And let's

7    move on.

8    Q.  Ms. Slaney, are you familiar with an individual

9    named Brian Mirasolo?

10   A.  I am.

11   Q.  How?

12   A.  Initially I met him at the Suffolk Superior Court

13   where I was, um, assigned, I believe it was in 2008, to

14   mentor the chief probation officer there.  He's one of

15   the probation officers assigned to that particular

16   court.

17   Q.  And what was your position when you were assigned to

18   mentor the chief in Suffolk?

19   A.  I was still a regional supervisor.

20   Q.  And what were your duties and responsibilities with

21   respect to mentoring his office?

22   A.  Um, I believe I was assigned to be the department

23   head so I was ultimately responsible for whatever was

24   going on in that particular court.  There had been some

25   problems and that's why I was asked to step in.

1    Q.  Can you describe Mr. Mirasolo's performance as a

2    probation officer while you were supervising that

3    office?

4              MR. SINNIS:  Objection.

5              THE COURT:  Yeah, sustained.  Have in mind my

6    order.  Let's move on to matters, if there are matters,

7    in order as I have required it.

8              MS. BELL:  Thank you, your Honor.

9              THE COURT:  I'll give you leave to call this

10   witness back.

11             MS. BELL:  I appreciate it, your Honor.  Thank

12   you.

13             THE COURT:  And this isn't rocket science.

14   I've told them the order in which we're going to hear

15   these various things, and that is my responsibility, and

16   I've set it out best I think it will be understandable

17   for us all.  So nothing's wrong.  We may have to hear a

18   witness more than once.  But that's the order.

19             MS. BELL:  Thank you, your Honor.

20   Q.  Ms. Slaney, do you have any relatives who work now

21   or who used to work for the probation department?

22   A.  Um, yes, I had a, um, a niece who was hired as a

23   probate probation officer, um, a niece by marriage, on

24   my husband's side.

25   Q.  And describe how it is she came to be working for

1    the probation department?

2    A.   Um, knowing me I think she had an interest in

3    probation, um, hearing me talk about it, and, um, she

4    submitted and interviewed in, um, approximately 40

5    interviews for a probation officer position.   She

6    volunteered at the Quincy District Court in order to get

7    some experience and she had also worked in Human

8    Services, and she went back and got a graduate degree in

9    social work so that she could increase her

10   qualifications for the position.

11   Q.   Did you do anything to try to help her get a job at

12   the probation department?

13   A.   No, at one point I went in and talked to my then

14   supervisor, first deputy commissioner John Cremens, to

15   tell him I was concerned that I felt her application,

16   um, was -- that my negative relationship with the

17   Commissioner was being held against her because she was

18   an excellent candidate and she had interviewed so many

19   times without success and had frequently been at the top

20   of the list of the interview committees.

21   Q.   What was Mr. Cremens' response to that?

22              MR. SINNIS:   Objection.

23              THE COURT:   Come to the sidebar.

24

25              AT THE SIDEBAR

```
 1            THE COURT:  I also want a list of the 34

 2    unindicted co-conspirators to keep the players all

 3    aligned.  But my problem here is you're entitled to get

 4    the setting and the ambiance of what's going on in this

 5    organization for a variety of reasons, but at the same

 6    time you've got to understand that I take my

 7    responsibility under 801(d)(2)(E) very seriously and if

 8    we get 6 weeks into this and you finally rest and then I

 9    decide that this or that conversation is not during and

10    in furtherance of the conspiracy, then I've got to think

11    of what I can do, and it may be peripheral and there may

12    be enough independent evidence.  So all I'm saying is

13    that's obviously hearsay and they object, and I don't

14    know whether you really need it.

15            MS. BELL:  I do understand and I don't, your

16    Honor.  I'm going to move on.

17            THE COURT:  Thank you.

18

19            (In open court.)

20    Q.  Ms. Slaney, approximately how many times did your

21    niece apply for a job at probation?

22    A.  She told me approximately 40.

23    Q.  All right.

24            MR. AMABILE:  Your Honor, I object and move to

25    strike.
```

1          THE COURT:  Yeah, "She told me," I've got to

2    strike it for the same reason.  I mean we don't have

3    her.  What she said?  She said whatever, but we don't

4    know whether that's true or not.  So I'm striking it.

5    Q.  Ms. Slaney, did your niece eventually get hired with

6    the probation department based on your knowledge?

7    A.  Um, yes, but I felt that she was hired in spite of

8    --

9          MR. SINNIS:  Objection.

10          MR. AMABILE:  Objection.

11          THE COURT:  No, no, no, I -- I'm sorry I

12    interrupted.  The answer is "Yes" and you launched off

13    to say "I felt."

14          THE WITNESS:  Um-huh.

15          THE COURT:  Just the answers to the questions

16    that they ask you.

17          THE WITNESS:  Yes, your Honor.

18          THE COURT:  So what you felt about it is out.

19    Eventually she was hired.

20    Q.  What if anything did you say to Commissioner O'Brien

21    after she was hired?

22    A.  Um, Liz came down and asked me to --

23          MR. SINNIS:  Objection.  Nonresponsive.

24          THE COURT:  Yeah, the question was, "What if

25    anything did you say to Commissioner O'Brien," I take it

1    about your niece, "after she was hired?"  That you may

2    answer.

3           What did you say?

4    A.  Um, I believe I e-mailed him, um, and indicated my

5    appreciation that she had -- for appointing my niece as

6    a probation officer and I indicated that I thought that

7    she would make an excellent probation officer.

8    Q.  Why did you send that e-mail?

9                MR. SINNIS:  Objection.

10                THE COURT:  Sustained.

11   Q.  What conversations did you have with Ms. Tavares

12   regarding that e-mail?

13                MR. BAILEY:  Objection.

14                MR. SINNIS:  Objection.

15                THE COURT:  Did you have any conversations

16   with Ms. Tavares about that e-mail?

17                THE WITNESS:  I did.

18                THE COURT:  And you may tell us, what?

19   A.  She indicated that I should thank Jennifer for

20   appointing her.

21   Q.  For appointing who?

22   A.  My niece.

23   Q.  Now, Ms. Slaney, after your conversation in 2000

24   with Jack O'Brien when you pushed back on the names you

25   were given, did you ever complain to him directly again

```
 1    about the hiring process?

 2    A.  To Jack O'Brien?

 3    Q.  Yes.

 4    A.  No.

 5    Q.  Why not?

 6              MR. SINNIS:  Objection.

 7              THE COURT:  No, overruled.  I'm going to let

 8    her testify.

 9    A.  At what time period?  I mean --

10              THE COURT:  Did you ever again complain?  Your

11    answer was "No."  The question was "Why?"  You may tell

12    us what was in your mind.

13    A.  I was taken off the hiring.  I had no reason to

14    object at that point.

15    Q.  Aside from being taken off of hiring in 2005 and

16    assigned to the audits, um, did you feel you were

17    retaliated against in any other way?

18              MR. SINNIS:  Objection.

19              MR. BAILEY:  Objection, your Honor.

20              THE COURT:  Sustained.  You're leading the

21    witness.  It's improper.  Don't lead the witness.  You

22    called this witness.

23    Q.  Ms. Slaney, how if at all do you feel you were

24    retaliated against aside from what you've already

25    testified to?
```

```
 1              MR. SINNIS:  Objection.
 2              MR. BAILEY:  Objection.
 3              THE COURT:  No, sustained on that foundation.
 4    Let's move on.
 5    Q.  Ms. Slaney, I just have one other thing.
 6         At a prior point in this investigation were you
 7    asked questions regarding the impact of hiring people
 8    whose names that had been put on lists by the
 9    Commissioner in advance of the interviews?
10              MR. BAILEY:  Objection.
11              THE COURT:  You may answer "Yes" or "No," at a
12    prior point, if you were asked questions about that
13    topic.
14    A.  Yes, I was.
15    Q.  Do you recall making the statement, "I think it was
16    more of a degree of excellence versus, you know, whether
17    or not somebody could handle the job"?
18              MR. BAILEY:  Move to strike, your Honor.
19              THE COURT:  Overruled.
20         Did you make that statement?
21    A.  Yes, I did.
22    Q.  Can you explain the context of that statement and
23    why you made it?
24              MR. SINNIS:  Objection.
25              THE COURT:  Sustained on this foundation, but
```

1    it's opened up.  You may come back to it on redirect.

2            MS. BELL:  Thank you, your Honor.

3        May I just have one moment, your Honor?

4            THE COURT:  Of course you may.

5            (Pause.)

6            MS. BELL:  Thank you.  I don't have anything

7    else.

8            THE COURT:  And I take it, to be fair,

9    reserving your right, given the order I expect the

10   evidence to come in, to recall her if she has evidence

11   downstream.

12           MS. BELL:  That is correct, your Honor.

13           THE COURT:  And that's appropriate.  And you

14   may step -- well, it's almost time for the recess, so I

15   think what we'll do is we'll take the recess at this

16   time.  I know the folks do want to ask her questions as

17   well, defense counsel, and so we'll take the recess.

18       Now, we'll take a shorter recess, I'm only going

19   to give you 15 minutes, and the reason is we've got to

20   stop early because we all have to -- not the lawyers

21   here, but we all have to go out to MIT and hold court

22   this afternoon, so we've got to get ourselves out there,

23   and so we'll stop 12:30, 20 minutes of 1:00.  And we're

24   right on track and you're ensuring it because you're

25   here right on time.  So I'll give you only a 15 minute

1   recess.

2          The jury may stand in recess for 15 minutes.  I'll

3   remain on the bench.

4              THE CLERK:  All rise for the jury.

5              (Jury leaves, 10:40 a.m.)

6              THE COURT:  Please be seated.

7          Mr. Fick, you said you had a matter at the

8   sidebar?

9              MR. FICK:  One at the sidebar and then a

10  couple we can do in open court, if your Honor prefers.

11             THE COURT:  Well, let's do the sidebar first.

12             MR. FICK:  Yes, your Honor.

13             THE COURT:  And briefly, because we need a

14  rest hall.

15

16             AT THE SIDEBAR

17             MR. FICK:  So with regard to what your Honor

18  mentioned yesterday about the Jury Commissioner

19  communication to the e-mail, on further reflection we

20  would like to ask, one, that that e-mail be made part of

21  the record in some form, whether it's sealed or

22  unsealed, but just made part of the record.

23             THE COURT:  That's allowed.

24             MR. FICK:  And second we would request that

25  the Court engage us in further follow-up on that and

1    it's a little bit tough on the jurors to follow up at

2    the other end of the courtroom about whether they heard

3    anything or not, so I think an individual inquiry in a

4    more private setting would be appropriate in the

5    circumstances given the sort of very prejudicial nature

6    of the information and whether they've heard anything

7    about it.

8                   THE COURT:  Denied.  I'm satisfied.

9                   MR. FICK:  That's the only thing I had for

10   sidebar, your Honor.

11                  THE COURT:  And I like to do things in open

12   court, so we will.

13                  MS. DEMASO:  Your Honor?

14                  THE COURT:  Yes.

15                  MS. DEMASO:  I did have one idea about the,

16   um, juror questions.

17       Would it work if we perhaps noted on that sheet if

18   we had an objection and then we could go to sidebar

19   without having to --

20                  THE COURT:  Oh, on the juror questions?

21                  MS. DEMASO:  Yes, if a juror has a question,

22   when Jennifer brings it --

23                  THE COURT:  Oh, if you note it on the question

24   I'll call you to sidebar?

25                  MS. DEMASO:  Yes.

1          THE COURT:  Yes, that's a good idea.

2          MR. FISHER:  And there is one other juror

3     issue, your Honor.

4        When counsel was at the sidebar previously during

5     the initial individual juror voir dire one of the jurors

6     mentioned that she believed her cousin was on the

7     witness list.

8          THE COURT:  Right, and now you've confirmed

9     that --

10          MR. FISHER:  I'm pretty confident he is.

11          THE COURT:  You know, he was a Bishop, you

12     know, for --

13          (Laughter.)

14          MR. FISHER:  Well, we're not calling him.  The

15     case would be long, but not that long.

16          THE COURT:  So what do you want to do?

17          MR. FISHER:  She thought that the "Gavin" she

18     worked with used to work for parole.

19          THE COURT:  Here's what I think.  You've got

20     62 different cases here that we have to charge.  I just

21     assume get rid of the Gavin Cameron and let everything

22     go along smoothly, but I'm not ordering that, and I

23     don't know what else to do.  She knows someone, you

24     didn't know then that it was our Gavin Cameron, but,

25     now, yes, it is.  And maybe we can do things by

1    agreement, we can make her an alternate or something.

2         But one thing I'm hesitant to do is -- you've got

3    a very good jury, a very engaged jury, and I know

4    nothing more than what you know.  I mean the courtroom

5    is well-designed and I'm strictly away from them.  So

6    when I make comments like this, it's not like I know

7    something, but there is talk -- we've been hearing them

8    talk in the morning -- not on the case, but they're very

9    engaged.  If I throw someone off the jury, because

10   that's how they'll perceive it, that's a bad omen, and

11   I'm hesitant to do that.  You all think about that.

12             MR. BAILEY:  Your Honor, procedurally, just in

13   terms of cross-examination of Ms. Slaney --

14             THE COURT:  I've been given something by

15   Mr. Sinnis and that's just what I want.

16        Unless you want to change the order now?

17             MR. SINNIS:  I already let them know.

18             MR. BAILEY:  Oh, okay.

19        Thank you, your Honor.

20             MR. SINNIS:  When do we have to be back, your

21   Honor?

22             MR. FICK:  Well, your Honor, there's still an

23   issue in open court.

24             THE COURT:  Oh, Mr. Fick still wants to

25   continue.

 1

 2                  (In open court.)

 3                  MR. FICK:  Your Honor, the first issue is

 4    that, um, with regard to the Court's oral ruling

 5    yesterday on the motion to compel that was before the

 6    Court, I think the parties have, I think, a divergent

 7    understanding of what the order was.

 8                  THE COURT:  All right.  I think I can make

 9    myself clear.  It's this.

10        If the government presently possesses evidence of

11    untruthfulness of any witness, they are, by individual

12    letter, to -- or individual letters, if too complex, by

13    individual witness to call that out.  That's my order.

14                  MR. FICK:  The other question though is with

15    regard to the uncharged crimes of government witnesses,

16    there was the issue that I had raised of having it sort

17    of in two different letters now and the awkwardness of

18    that.

19                  THE COURT:  No, I'm satisfied with the

20    government's --

21                  MR. FICK:  And finally one other thing.

22        I think, especially after having seen how it

23    unfolded this morning, that we do want to, just for the

24    record, make an objection to the juror question

25    practice, and I know the First Circuit has approved the

1    procedure in *Sutton* albeit with some very cautionary

2    language.

3              THE COURT:  Yes, *Sutton* was my case, and with

4    the amendment suggested by your colleague, I think it

5    works very well.

6         We'll recess and -- and the pertinent question is

7    when do we have to be back?

8              MR. SINNIS:  Yes.

9              THE COURT:  5 minutes of 11:00.

10             MR. SINNIS:  Thank you, your Honor.

11             (Short recess, 10:45 a.m.)

12             (Jury enters, 11:00 a.m.)

13             THE COURT:  Proceed, Mr. Bailey.

14             MR. BAILEY:  Thank you, your Honor.

15

16   CROSS-EXAMINATION BY MR. BAILEY:

17   Q.  Good morning, ladies and gentlemen.

18   Good morning, Ms. Slaney.

19   A.  Good morning.

20   Q.  My name is Brad Bailey and along with Jeffrey Denner

21   we represent Ms. Tavares.

22        I want to talk a little bit about your tenure with

23   probation.

24        You were there approximately 36 years, is that

25   correct?

1    A.   I believe it was 39.

2    Q.   39 years.  You started in 1974 as a line probation

3    officer, correct?

4    A.   I did.

5    Q.   And eventually you were promoted to an assistant

6    chief probation officer, correct?

7    A.   Correct.

8    Q.   And after that you were promoted to a regional

9    supervisor or what you also ultimately referred to as a

10   regional administrator, correct?

11   A.   Correct.

12   Q.   And then after that, a first deputy?

13   A.   Yes.

14   Q.   And eventually acting commissioner, correct?

15   A.   Correct.

16   Q.   You worked hard at that job, didn't you?

17   A.   I did.

18   Q.   And you felt you were dedicated to that job, didn't

19   you?

20   A.   I did.

21   Q.   And it's true, is it not, that you worked your way

22   up through the ranks, yes?

23   A.   Yes.

24   Q.   And you were promoted each step from within the

25   department, correct?

1    A.   Correct.

2    Q.   Now, during the time that you were at OCP, you knew

3    our client, Elizabeth Tavares, correct?

4    A.   Correct.

5    Q.   In fact the entire time that you were at OCP she was

6    at OCP, correct, until she left?  I'm sorry, that was a

7    terrible question.

8         She was there from 1980 to 2010, give or take,

9    correct?

10                  MS. BELL:  Objection.

11                  THE COURT:  No, overruled.  If she knows.

12        Do you know?

13   A.   I don't know the exact years.

14   Q.   But you overlapped with her for quite a long time?

15   A.   Correct.  Yes.

16   Q.   And you knew that she had taken a similar path as

17   you within OCP, correct?

18   A.   Correct.

19   Q.   That she had started, like you, as a line probation

20   officer, correct?

21   A.   Correct.

22   Q.   And that, like you, she had been promoted after a

23   period of time to assistant chief probation officer,

24   correct?

25   A.   Correct.

1  Q.  And then she was, at some period, associate legal
2  counsel while you were there, correct?
3  A.  Correct.
4  Q.  And then she became a deputy commissioner, correct?
5  A.  Correct.
6  Q.  Then second deputy commissioner, correct?
7  A.  Correct.
8  Q.  Yes?
9  A.  Correct.
10  Q.  And then first deputy commissioner, correct?
11  A.  Correct.
12  Q.  So also not the exact same positions but a similar
13  inward-upward projectory through her 30 years at
14  probation, correct?
15  A.  Correct.
16  Q.  Now, in 2004 you were a regional administrator,
17  correct?
18  A.  Correct.
19  Q.  And I believe on your direct examination you
20  described her as being the first deputy, but she was
21  actually the second deputy in 2004, wasn't she?
22  A.  I don't remember the years.
23  Q.  Well, you remember a fellow named John Cremens,
24  don't you?
25  A.  I do.

1    Q.   And he was the first deputy for quite some time,

2    wasn't he?

3    A.   He was.

4    Q.   While you were there, correct?

5    A.   Yes.

6    Q.   And isn't it true that he stepped aside in or around

7    2008?

8    A.   I don't remember the year, but he retired.

9    Q.   As a first deputy?

10   A.   He did.

11   Q.   So would you agree, does that help you in

12   recognizing that in 2004 Ms. Tavares was the second

13   deputy?

14   A.   Again I don't remember the years, but, yes, she was

15   the second deputy while John Cremens was the first.

16   Q.   And you did a hierarchy chalk yesterday, correct, of

17   the office?

18   A.   Yes.

19   Q.   And you agree that the first deputy is above the

20   second deputy, correct?

21   A.   Correct.

22   Q.   And the first deputy is in essence on the flowchart

23   the supervisor of the second deputy, correct?

24   A.   Correct.

25   Q.   And then above the first deputy is the Commissioner,

1  correct?

2  A.  Correct.

3  Q.  Now, so at this particular point when our client was

4  the second deputy and you were the regional

5  administrator, one of your responsibilities was hiring,

6  correct?

7  A.  Yes.

8  Q.  And you were on a panel, as you've described, with a

9  first justice usually of the local court where the

10  vacancy was, correct?

11  A.  Correct.

12  Q.  With the chief probation officer from that court,

13  correct?

14  A.  Correct.

15  Q.  And then you, as the regional administrator, are

16  sort of the area supervisor of the chief probationers

17  and probation officers in that court, correct?

18  A.  Correct.

19  Q.  Now, you've testified at some length and answered

20  some jury questions that at some point the hiring

21  process within probation changed, right?

22  A.  Right.

23  Q.  And now before Mr. O'Brien the Commissioner was

24  Donald Cochran, correct?

25  A.  Correct.

1   Q.  And so there was one process under Mr. Cochran and

2   then it changed a little bit under Mr. O'Brien, correct?

3                MS. BELL:  Objection.

4                THE COURT:  No, overruled.  He may go over the

5   changes.

6   Q.  Yes?

7   A.  I'm sorry, could you repeat the question?

8                THE COURT:  The process changed when O'Brien

9   succeeded Cochran?

10  A.  Yes.

11  Q.  And in fact the hiring process became more involved,

12  right?

13  A.  Yes.

14  Q.  Another layer of scrutiny or focus on these

15  candidates was added, wasn't it?

16  A.  Yes.

17  Q.  Initially, under Mr. Cochran, you had this screening

18  round, right?

19  A.  Correct.

20  Q.  You kept the screening round under Mr. O'Brien,

21  right?

22  A.  Yes.

23  Q.  But Mr. O'Brien added the change or the innovation

24  of having now a second round, right?

25                MS. BELL:  Objection.

1             THE COURT:   Overruled.

2    Q.   Yes?

3    A.   Yes.

4    Q.   And just so we understand, when you say the

5    "screening round," and the jury still has the chalk in

6    front of them, that actually involves some pretty

7    experienced probation personnel in terms of the

8    screening, didn't it?

9    A.   (Silence.)

10   Q.   Yes?

11   A.   Yes.

12   Q.   Mr. Campbell, who was a regional administrator such

13   as you, right?

14   A.   Right.

15   Q.   And Ms. Rios, who was a regional administrator such

16   as you, correct?

17   A.   Correct.

18   Q.   So then in the second round you still involved -- or

19   Mr. O'Brien still involved an experienced member of the

20   Department of Probation, a supervisor that had been the

21   regional administrator for this second round as well,

22   right?

23   A.   Correct.

24   Q.   Okay.  And so you agree, don't you, that when you

25   went from two to now three interviews, that provided

1    more opportunity for members of the Department of

2    Probation to scrutinize candidates, correct?

3    A.  (Silence.)

4    Q.  There were more evaluations, right?

5    A.  Well, it depends on if they were given names at the

6    first set of interviews.  I don't know.

7    Q.  Well, I'm asking you, was there more opportunity for

8    representatives of Mr. O'Brien to evaluate candidates

9    when you went from 2 to 3 rounds of interviews?

10   A.  If it was a true evaluation, yes.

11   Q.  It was an opportunity added to look, consider, and

12   think about the candidates, correct?

13            MS. BELL:  Objection.

14            THE COURT:  No, we'll see what she says.  But

15   I think we have her answer.

16        Well, what is your answer?

17   A.  If it was a true evaluation, there would have been

18   an opportunity, yes.

19            THE COURT:  That's her answer.

20   Q.  And so it was at this new or second round that you

21   participated, correct?

22   A.  Correct.

23   Q.  Now, you say that most of the time you did this you

24   received names of certain candidates, correct?

25   A.  Some of the time.

1    Q.   So not all of the time, some of the time?

2    A.   I did very limited interviewing.  A few of the

3    times.

4    Q.   So a few of the times you received names of

5    candidates, correct?

6    A.   Correct.

7    Q.   And when you did you first had received them from

8    Janet Mucci, correct?

9    A.   Correct.

10    Q.   And then you had received them from Elizabeth

11    Tavares, correct?

12    A.   Correct.

13    Q.   When she was the second deputy?

14    A.   Well, that was her position at that time, correct.

15    Q.   And isn't it true, Ms. Slaney, that what you were

16    told was, by my client, that "These are the names of the

17    people who the Commissioner would like to have a further

18    interview," correct?

19    A.   Correct.

20    Q.   Or alternatively she would say, "These are some of

21    the names that the Commissioner has an interest in

22    seeing forwarded," correct?

23    A.   Correct.

24    Q.   And when she would tell you this, it would be "These

25    are the names that the Commissioner is interested in" or

1    "The Commissioner would like to see moved to the next

2    round," correct?

3    A.   Correct.

4    Q.   And that's essentially what you were told by our

5    client, right?

6    A.   Right.

7    Q.   And when you were told that by our client, you

8    didn't doubt that the Commissioner had an interest in

9    these names, did you?

10   A.   No.

11   Q.   And you didn't question that the Commissioner wanted

12   them to get a further interview or a further look,

13   right?

14   A.   Right.

15   Q.   And you took that to be a truthful statement from

16   our client, correct?

17   A.   Correct.

18   Q.   You didn't believe she was misrepresenting facts

19   when she told you that the Commissioner had an interest

20   in these folks getting a further interview, right?

21   A.   Right.

22   Q.   And so you say, when you received this information,

23   it was your understanding that you were supposed to get

24   them on the list for the next interview, right?

25   A.   Right.

1    Q.  Now, at the time that you had that understanding,

2    you agree, don't you, that the Commissioner was free to

3    recommend certain candidates in this process, wasn't he?

4                MS. BELL:  Objection.

5                THE COURT:  Overruled.  You may tell us.

6          Is that your understanding?

7    A.  It was not my understanding.

8    Q.  Well, you had --

9                THE COURT:  Well, that's -- there's a good

10   example.  The question suggests something, which is

11   perfectly appropriate on cross-examination, but her

12   testimony is "That wasn't my understanding."  Now it's

13   up to you whether you believe it or not, but the

14   testimony is the evidence.

15         Go ahead, Mr. Bailey.

16   Q.  Ms. Slaney, didn't you talk about the appointing

17   authority for probation officers changing at some point

18   earlier in your direct examination?

19   A.  I did.

20   Q.  And didn't you testify that at a certain point in

21   time that appointing authority was given to Mr. O'Brien

22   subject, as you said, to this final approval down the

23   line, correct?

24   A.  The Chief Justice had the authority to establish the

25   hiring process and then he had final approval at the end

1    of the process, yes.

2    Q.  But Mr. O'Brien had the sole appointing authority

3    for hires and promotions within the Department of

4    Probation and you knew that, didn't you?

5    A.  Yes.

6    Q.  Now, you agree, do you not, that Ms. Tavares, when

7    she gave you these names, never specifically told you

8    which ones or whether any one amongst those names was

9    the candidate, correct?

10   A.  Only once.

11   Q.  Only one time, but that was not in advance, that was

12   when a process was ongoing, correct?

13   A.  That was in advance.

14   Q.  Okay, and this was with Mr. Dooley?

15   A.  Correct.

16   Q.  And she just told you that that's what she

17   understood?

18   A.  Yes.

19   Q.  But that was the only time, the other times she

20   would just give you this list of names and say, "These

21   are the names that the Commissioner has an interest in,"

22   right?

23   A.  Right.

24   Q.  She would not tell you anything about who ultimately

25   was going to get the nod there, right?

1  A.  Right.

2  Q.  She never also told you, did she, why it was that

3  the Commissioner wanted those names to move on?

4  A.  Only when she said that "the political thing had to

5  be done."

6  Q.  Well, didn't you testify in an earlier proceeding,

7  Page 86, that you got no explanation from Ms. Tavares

8  when you were given these lists?

9  A.  That was a conversation that we had after a hiring.

10  Q.  Well, let me see if I can question you on this a

11  little bit more at this time.

12      Do you recall being asked a question and

13  answering:  "I was never told that or what their

14  connection might be, I was just given names."

15      Do you recall giving that answer in a prior

16  proceeding?

17  A.  Yes.

18  Q.  And Ms. Tavares never told you, "These are the names

19  that I, Elizabeth Tavares, want," did she?

20  A.  No.

21  Q.  Now, you weren't present when whatever source gave

22  her these names gave her the names, were you?

23  A.  No.

24  Q.  You don't know what if anything she may have been

25  told about those names when she received them to pass

1    them along, correct?

2    A.  Correct.

3    Q.  You have no idea whether anybody said, "This is why

4    I want you to pass this name along to Ellen Slaney,"

5    right?

6              MS. BELL:  Objection.

7              THE COURT:  Put your question again?

8              MR. BAILEY:  I shall, your Honor.

9    Q.  You don't know if she was ever given any explanation

10   as to why she was to pass those names along to you in

11   terms of who the Commissioner preferred, correct?

12   A.  I could only infer it from her statement, "Sometimes

13   the political thing needs to be done."

14   Q.  Well, if you don't mind we'll hold that aside, that

15   at one point she said, "Sometimes the political thing

16   needs to be done" -- at one point, right?

17   A.  Yes.

18   Q.  But other than that you never received an

19   explanation from her?

20   A.  Not from her, no.

21   Q.  In other words, as you sit here today you can't say,

22   can you, that she had any more information than you did

23   other than "These are the names that the Commissioner

24   wants to see in the next round or to get another

25   interview," right?

1              MS. BELL:  Objection.

2              THE COURT:  No, I'll allow the question.

3    A.   I wouldn't know that.

4    Q.   You never asked her why the Commissioner was

5    interested in those names, did you?

6    A.   No, I did not.

7    Q.   And you get them, as you indicated, before the

8    interviews, correct?

9    A.   Correct.

10   Q.   And Ms. Tavares was up front with you about who the

11   Commissioner wanted to have another look at, right?

12   A.   Right.

13   Q.   Now, you've been in hiring for a long time, correct?

14   Yes?

15   A.   Over a long period of time, yes.

16   Q.   And pretty much limited to the public sector, if I

17   understand it, right?

18   A.   Yes.

19   Q.   Now, you're familiar with the phrase "courtesy

20   interview," aren't you?

21   A.   Yes.

22   Q.   And you agree, don't you, that many of those names

23   on that list could have been "courtesy interviews,"

24   right?

25              MS. BELL:  Objection.

1          THE COURT:  Yeah, in that form I'm going to

2     sustain that, "could have been."

3     Q.  Did you ever testify at a prior proceeding that many

4     of these could have been courtesy interviews?

5     A.  I thought that they could have been.

6     Q.  And would you agree that the boss, the head of the

7     company, has the right to give courtesy interviews?

8          MS. BELL:  Objection.

9          THE COURT:  It's sustained.  Sustained.

10    Q.  Do you disagree with that concept?

11         MS. BELL:  Objection.

12         THE COURT:  No, sustained.  We're dealing with

13    this case.

14    Q.  You also knew, didn't you, that with some of those

15    names the Commissioner didn't have any intention of

16    hiring them?

17         MS. BELL:  Objection.

18         THE COURT:  Well, did you know that?

19         THE WITNESS:  Well, only one person can

20    prevail.

21         THE COURT:  Well, I didn't understand his

22    question that way and I think he's referring to

23    Commissioner O'Brien.

24         Did you ever know that, in the course of the time

25    that you had something to do with hiring, that

1    Commissioner O'Brien, the then Commissioner, had no

2    intention ever of hiring that person early on in the

3    interview process?

4         Is that your question, Mr. Bailey?

5              MR. BAILEY:  If, given the answer, I may

6    reframe that.

7    Q.  Isn't it true that you've testified in the previous

8    proceeding that, um, you knew that you were getting

9    names from time to time of people that probation didn't

10   have any intention of hiring, didn't you testify to that

11   effect before?

12   A.  I only mentioned, um, the potential of a courtesy

13   interview once in the Legati matter to Judge Nadeau.

14   That's my only recollection.

15   Q.  Well, I'm not asking that.

16        Do you recall being asked the following question

17   and giving the following answer, Page 90.  "So was it

18   your understanding that this list of names that you were

19   getting from Liz Tavares might just be people that they

20   didn't actually have any intention of hiring but they

21   just wanted to give an interview for, for political

22   purposes, to keep people happy that they are at least

23   giving folks a shot?"

24              MS. BELL:  Objection, your Honor.

25   Q.  Answer, "Yes, and not everyone can be hired."

1    Do you recall being asked that question and giving

2  that answer?

3              THE COURT:  And you object to that?

4              MS. BELL:  Only because it's consistent with

5  her prior testimony, not inconsistent.

6              THE COURT:  I'll let it stand.

7        You testified to that?

8              THE WITNESS:  I don't remember.

9              THE COURT:  Well, that's her answer, she

10  doesn't remember.

11  Q.  And that didn't refresh your recollection at all?

12  A.  Not really.

13              MR. BAILEY:  May I approach the witness,

14  please, your Honor?

15              THE COURT:  You may.

16  Q.  (Shows.)  Just read it to yourself, please --

17        With the permission of the Court?

18              THE WITNESS:  To myself?

19              THE COURT:  Yeah, read it to yourself.

20  Q.  Line 4 to Line 12.

21  A.  (Reads.)

22  Q.  Finished?

23  A.  Yes.

24              MR. BAILEY:  May I re-ask the question, your

25  Honor?

1       THE COURT:  You may ask a question and we'll

2   see.

3       MR. BAILEY:  Thank you, your Honor.

4   Q.  Ms. Slaney, does that refresh your recollection now

5   as to whether you were previously asked that question

6   and gave that answer that I have shared with the jury?

7   A.  I think I gave the same answer then that I did

8   today, that not everyone can be hired, so apparently not

9   everyone was going to be hired.  We were given multiple

10  names.  I mean there were 8 finalists and only one

11  person could be hired, so.

12  Q.  And so you understood that in these lists of names

13  there was not an intention of hiring everybody?

14  A.  Not at that point, I would think, no, only one

15  person could be selected.

16  Q.  All right.  Now, to your knowledge Ms. Tavares did

17  not participate in that final selection round, that

18  third round in which one candidate was chosen, correct?

19  A.  I wouldn't know that.

20  Q.  You wouldn't know that one way or the other?

21  A.  No, I wouldn't.

22  Q.  You knew that Fran Wall and Pat Walsh were involved

23  in that round because you said that, right?

24  A.  Yes, I did know that.

25  Q.  And you indicated that Liz Tavares never told you,

1    except for this one Joe Dooley situation, anything about

2    who the final candidate would be, right?

3    A.   Right.

4    Q.   So when you got this information from Ms. Mucci or

5    Ms. Tavares, you then told that same information to the

6    chief probation officer on your hiring panel, correct?

7    A.   Correct.

8    Q.   And it was your understanding that you were supposed

9    to tell that chief probation officer that the

10   Commissioner of Probation had an interest in having

11   those names get a second interview, correct -- a further

12   interview?

13   A.   Correct.

14   Q.   And you were the lead person, by your own

15   description, on these second-level interviews, right?

16   A.   Right.

17   Q.   And so you did that, you passed the names along of

18   candidates that the Commissioner wanted to have another

19   interview for, right?

20   A.   Right.

21   Q.   And would do this before the interviews happened,

22   right?

23   A.   Right.

24   Q.   In other words you were doing to the CPO under your

25   direction the same thing that Elizabeth Tavares did to

1    you, right?

2    A.  With the exception that I told them they had to make

3    up their own mind what they were going to do with those

4    names.

5    Q.  And you didn't say to these CPO people why the boss

6    was interested in them, correct?

7    A.  I didn't know, um, for sure.

8    Q.  But you did this because, in your opinion,

9    Mr. O'Brien was your boss, correct?

10   A.  Correct.

11   Q.  And you were his representative on a committee that

12   you perceived as being his committee, right?

13   A.  There was a process in place.  I think that

14   supersedes what the Commissioner's interest was at that

15   point.  The process was established by the Chief

16   Justice.

17   Q.  Do you recall, at a prior proceeding, Page 77, 78,

18   being asked the following question and giving the

19   following answer:

20        "Why in 1999 or 2000 did you not go along with the

21   Commissioner's request to get someone on the list of

22   finalists, but so far in the interviews we've seen in

23   2005," which is the period that we're focusing on right

24   now, "you've put candidates favored by the

25   Commissioner's office ahead of people you thought were

1   more qualified?"  Answer, "I guess I had convinced

2   myself that my vote, so to speak, as a member of the

3   committee, belonged to the Commissioner and that I was

4   there just to represent his interests, that's how I

5   tried to swallow it."

6       Do you recall being asked that question and giving

7   that answer?

8           MS. BELL:  Objection, completeness.  The full

9   question wasn't asked.

10          THE COURT:  I'm going to sustain it on that

11  ground.

12      You may read it, the full question.

13  Q.  Question, "Why was it, in 1999 or 2000, did you not

14  go along with the Commissioner's request to get" --

15          MR. BAILEY:  And if the completion, your

16  Honor, is that I didn't name the candidate, um, I think

17  that's the only thing that --

18          THE COURT:  Well, here, read her the full

19  question, the candidate and all.

20  Q.  "Why in 1999 or 2000 did you not go along with the

21  Commissioner's request to get Doug MacLean onto the list

22  of finalists but so far in the interviews we've seen

23  occurring in 2005 you've put candidates favored by the

24  Commissioner's office ahead of people that you thought

25  were more qualified?"  Answer, "I guess I had convinced

1   myself that my vote, so to speak, as a member of the

2   committee, belonged to the Commissioner and I was there

3   just to represent his interests, that's how I tried to

4   swallow it."

5   A.  Did I say that?  Yes, I did.

6   Q.  So it was his office, right?

7   A.  Right.

8   Q.  He was your boss, right?

9   A.  Right.

10   Q.  You felt that if your boss, as his representative,

11   wanted to have somebody get another look, he had the

12   right to ask for that, correct?

13          MS. BELL:  Objection.

14          THE COURT:  No, overruled.

15      You may answer.

16   A.  I didn't really believe that.

17   Q.  Well, you went along with this?

18   A.  Yes, I did.

19   Q.  And you passed names along, didn't you?

20   A.  I did.

21   Q.  And so isn't it true that as this particular process

22   went forward you actually wound up doing even more than

23   our client, Ms. Tavares, because you actually passed the

24   names along physically yourself, right?

25          MS. BELL:  Objection.

1          THE COURT:  Yeah, it's sustained.  Sustained

2     in that form or in any comparative form.  You may

3     inquire as to what she did.

4          MR. BAILEY:  Yes, your Honor.

5     Q.  So, Ms. Slaney, you get the names, you have the

6     process, right, you have the interview, yes?

7     A.  Yes.

8     Q.  And then you would put the names on a list, right?

9     A.  Yes.

10    Q.  And you would sign that list, right?

11    A.  Right.

12    Q.  With your signature on it, your endorsement on it,

13    right?

14    A.  Right.

15    Q.  Then you would hand that list back, right?

16    A.  Right.

17    Q.  And it was your understanding, wasn't it, that the

18    CPOs weren't surprised when you would give them these

19    names?

20          MS. BELL:  Objection.

21          THE COURT:  She can testify to her

22    understanding.

23    Q.  Right?

24    A.  Right.

25    Q.  And you also had a sense, didn't you, it was your

1    understanding, that some of the judges on the panel knew

2    about you getting names in advance, correct?

3    A.  I had heard that.

4    Q.  Well, you didn't just hear that, you had one judge

5    telling you, didn't you, "Ellen, if you want a name on

6    the list, just say so," right?

7    A.  Yes.

8    Q.  And you know Superior Court judge, Judge Kane, knew

9    about this, right?

10   A.  I believe so.  I don't know that for a fact.

11   Q.  But didn't you testify before that Judge Kane knew

12   about this, a Superior Court judge in Bristol County?

13   A.  I don't know.

14   Q.  Do you remember -- Page 136, being asked the

15   following question and giving the following answer.

16        "To your knowledge was Judge Kane one of the

17   judges who was aware of the Commissioner's practice of

18   providing names of favored candidates?"  Answer, "I

19   think he was.  I'm not even sure who the first justice

20   -- not the first justice, but the regional judge, I

21   believe they're called in Superior Court, I'm not sure

22   who it was at the time and I'm not sure it was actually

23   him, he may have just been put in for that interview

24   which was starting to happen right around that time."

25        Do you recall being asked that question and giving

1    that answer?

2              MS. BELL:  Objection.  It's context.  It's out

3    of context.

4              THE COURT:  No, overruled.  She may be asked.

5    A.  I think I said the same thing today that I said back

6    then.

7    Q.  Now, you agree, don't you, that in this process of

8    receiving names, our client, Ms. Tavares, never told you

9    not to pass along names, correct?

10   A.  Not to pass along names?  I don't understand what

11   you mean.  I'm sorry.

12   Q.  Ms. Tavares never interjected into the process to

13   the extent that she told you, "Do not pass a particular

14   candidate along," did she?

15   A.  No.

16   Q.  The folks who were ranked or voted upon got passed

17   along?

18   A.  (Silence.)

19             MS. BELL:  Objection.

20   Q.  According to what your panel scored or did, right?

21   A.  Yes.

22             THE COURT:  There was on objection, but it's

23   overruled.  I'll let that stand.

24   Q.  So you were never told to take someone off the list

25   who you or a judge or a CPO had deemed to move forward?

1    A.   Only to add someone to the list, make a 9th

2    position, but never to delete anyone.

3    Q.   I'm talking about off the list, that never happened?

4    A.   No.

5    Q.   And there was this one occasion you testified about

6    where you had received 9 names for 8 positions, do you

7    remember testifying about that?

8    A.   Yes.

9    Q.   And you said to my client, "What should I do?" and

10   she got back to you and said, "Of that preferred list,

11   take three of those names that the Commissioner wants to

12   have another look at, take them off the list," right?

13   A.   I think she took off five and one of the people had

14   already been promoted.  So six names were taken off and

15   there were only three at the end of that.

16   Q.   So names before that process were eliminated when

17   you said there are 8 positions and I have 9 names?

18   A.   Yes.

19   Q.   Okay.  Now, very often when you would raise

20   questions and ask Ms. Tavares, she wouldn't have an

21   immediate answer for you, correct?

22   A.   I'm not sure what you're referring to.

23   Q.   Well, wasn't it true that she often would take your

24   question and say, "I'll have to get back to you"?

25   A.   I only remember that one particular time with the

1    Dedham interviews.

2    Q.  You don't remember that on other occasions?

3    A.  No, I don't.

4    Q.  You had testified earlier about this phone

5    conversation you had with my -- with our client about

6    being taken off hiring because of Fall River and

7    "wanting to get it right."  Do you remember that

8    testimony?

9    A.  I do.

10   Q.  Isn't it true, Ms. Slaney, that with regard to Fall

11   River you had your own preferred candidate, didn't you?

12   A.  As much as I knew who the best POs were, that was my

13   job, yes.

14   Q.  And that candidate was named Erin Foster, correct?

15   A.  Um, no, actually Donnell Gomes would have been my

16   pick, she was the best candidate.

17   Q.  Well, did you have a candidate on a list that you

18   asked Ms. Tavares to put on this list named Erin Foster?

19   A.  Yes.

20   Q.  And you asked her to add that on the next round of

21   interviews list before the interviews happened, didn't

22   you?

23   A.  I asked if I could include her, um, because she is a

24   very good PO and I wanted her to receive recognition for

25   that.

1    Q.  But you did that, didn't you, with the intention

2    that even if she didn't do well in that interview, that

3    she would still get another look because she was

4    deserving?

5    A.  I couldn't imagine her not doing well on the

6    interview.  I was very familiar with her work.

7    Q.  Well --

8          MR. BAILEY:  If I could have a moment, please,

9    your Honor.

10          (Pause.)

11   Q.  Do you recall being asked the following questions

12   and giving the following answers.  Page 45.

13          Question, "During this interview process, after

14   you received the five names, did you ask Ms. Tavares to

15   add a name to that list?"  Answer, "I did."  Question,

16   "Why did you do that?"  Answer, "Because as its regional

17   supervisor I was familiar with everybody's work and I

18   thought there were some strong candidates who deserved

19   to be added to the list of people who got another

20   interview so I asked to add Erin Foster."  Question, "If

21   you didn't ask to add this to the name of the preferred

22   candidates, she wouldn't have had a chance of making it

23   to the second round?"  "Yes, that's right," answer.

24   Question, "Was your request granted?"  Answer, "It was."

25          Do you recall being asked those questions and

1    giving that answer?

2    A.   Yes.

3              THE COURT:   Come to the sidebar.

4

5              AT THE SIDEBAR

6              THE COURT:   It seems like an ideal question to

7    ask and it can be asked in a completely neutral way.

8              MR. SINNIS:   I would just ask that maybe you

9    wait and see if it's not cleared up after some further

10   cross-examination by the parties.

11             THE COURT:   Well, this is taking a long time

12   and it seems to be going nowhere and I'm going to ask it

13   now.

14

15             (In open court.)

16             THE COURT:   As a general matter during this

17   period, how many names were supposed to go on to fill a

18   vacancy?

19             THE WITNESS:   8.

20             THE COURT:   All right.   Now, did it happen, in

21   your view, that because there were recommended names

22   that were on the list, that some candidates didn't make

23   that list of 8?

24             MR. SINNIS:   Respectfully I object to "her

25   view," I'd say just from personal experience, your

1    Honor.

2              THE COURT:  I think that's, um -- your

3    objection is sustained and I accept that amendment.

4         You tell us what your experience was, did that

5    happen in your experience?

6              THE WITNESS:  That people who --

7              THE COURT:  Yeah -- no, no, no, and the jurors

8    need to understand this, I guess.

9         So you're supposed to send out 8 names?

10             THE WITNESS:  Correct.

11             THE COURT:  All right.  We've got a situation

12   where certain names are recommended?

13             THE WITNESS:  Right.

14             THE COURT:  And you've testified that you

15   understood that it was your duty to send those names on,

16   the ones that were recommended?

17             THE WITNESS:  Right.

18             THE COURT:  As a consequence were there other

19   people who didn't make that list of 8 names?

20             THE WITNESS:  Other applicants?

21             THE COURT:  Yes.

22             THE WITNESS:  Yes.

23             THE COURT:  Okay.

24        Go ahead, Mr. Bailey.

25   Q.  So with regard to you asking and receiving

1  permission to add Erin Foster onto the list of folks to

2  be recommended for a further interview, isn't it true,

3  Ms. Slaney, from your experience that it wasn't unusual

4  for judges on the hiring panel to express their

5  preferences for particular people that they had worked

6  with?

7  A.  From my experience, um -- I don't remember

8  discussing that during the interview process.

9  Q.  Well, you discussed it with chief probation

10  officers, correct?

11  A.  Um, yes.

12  Q.  They expressed to people that they felt merited

13  moving on, correct?

14  A.  Yes.

15  Q.  In fact you've talked about Joe Dooley, right?

16  A.  Yes.

17  Q.  And in that instance Gene Montairo was the chief

18  probation officer, correct?

19  A.  Yes.

20  Q.  And he had an extremely strong preference for

21  somebody named Mary Viera, correct?

22  A.  Correct.

23  Q.  And Joe Dooley is the individual who you indicate

24  that Ms. Tavares said was going to get the job, right?

25  A.  Yes.

1    Q.   And you agree, don't you, that he was a good

2    candidate?

3    A.   I was more familiar with him than the other

4    candidates because he reported directly to me as a

5    probation officer in charge.

6    Q.   And you ranked him Number 2 on the list, right?

7    A.   Yes, for that reason.

8    Q.   Do you describe him as a good employee?

9    A.   Yes, certainly.

10   Q.   Now, you never participated in the next and final

11   round of interviews, right?

12   A.   At the OCP level?

13   Q.   Yes, at the OCP level.

14   A.   No, I did not.

15   Q.   And you agree that candidates certainly can improve

16   their performance at that next round from the round they

17   were in before, right?

18   A.   Yes.

19   Q.   And you've even testified to that effect about

20   people who improved their performance, as far as you

21   could tell, at that final round, is that right?

22   A.   Well, I had never been at a final round, but I know

23   that as people interviewed sometimes their interview

24   would get better, at least at the local level.

25   Q.   And one of those would be Clinton Markey, right?

1    A.   At his second interview, you mean?

2    Q.   Now, you agree, don't you, that Clinton Markey could

3    have improved at that next round?

4    A.   He could have.

5    Q.   Now, you said that at one point my client said

6    something about "sometimes you have to do the political

7    thing," right?

8    A.   Right.

9    Q.   But you agree, you didn't really know what she meant

10   when she said it, right?

11            MS. BELL:   Objection.

12            THE COURT:   No, the question is appropriate.

13        Is that true?

14   A.   I had my own understanding of what that meant.

15   Q.   Well, she didn't explain it in any way, right?

16   A.   No.

17   Q.   And, um, have you ever heard of the phrase

18   "workplace politics"?

19   A.   "Workplace policy"?

20            MS. BELL:   Objection.

21            THE COURT:   "Politics."

22   A.   Oh, "politics." I'm sorry.

23            MS. BELL:   Objection.

24   A.   Um, not really.

25   Q.   Not about "pleasing the boss is sometimes good

1    politics"?

2              MS. BELL:  Objection.

3              THE COURT:  The objections are overruled.

4    A.  No.

5    Q.  You never heard of that expression --

6    A.  No, I haven't.

7    Q.  -- that "pleasing the boss is sometimes good

8    politics"?

9    A.  No.

10   Q.  All right.  You talked about these audits that you

11   asked, or it was asked of you and you suggested, you

12   said you believed were retaliatory, right?

13   A.  Yes.

14   Q.  And you were told to perform them by Fran Wall and

15   Pat Walsh?

16   A.  I was.

17   Q.  And it's true, was it not, that at the time you had

18   been told to perform these audits, you had repeatedly

19   informed OCP that you didn't want to participate in the

20   hiring process, right?

21   A.  There was no hiring process then.

22   Q.  You had told OCP that you didn't want to participate

23   in the interview process on several occasions, isn't

24   that correct?

25   A.  In 2000, yes.

1    Q.   Didn't you repeat that again in 2008 and 2005?

2    A.   Um, when I was taken off the Bristol Superior Court

3    interviews, yes.

4    Q.   So you made it known several times?

5    A.   Yes.

6    Q.   Now, isn't it true that audits are a part of the

7    regional administrator's job function, right?

8    A.   For their county, yes.

9    Q.   Not unusual for a regional administrator to perform

10   audits in their county, correct?

11   A.   In their county, yes.

12   Q.   And part of the other job functions was hiring,

13   right?

14   A.   Right.

15   Q.   And as you indicated it was also done by regional

16   administrators, right?

17   A.   The hiring?

18   Q.   Yes, at this second round.

19   A.   Yes.

20   Q.   So you agree, don't you, that hiring takes up a good

21   deal of a regional administrator's time?

22   A.   Well, there was a freeze back then.

23   Q.   Okay.  But when you're doing it --

24   A.   These audits were overdue by a year in many

25   instances.

1    Q.   So they were back-ordered, right?

2    A.   Yes.

3    Q.   And there was, um -- you were told, were you not,

4    that since other regional administrators were going to

5    take over your hiring, you needed to do their audits,

6    right?

7    A.   Right.

8    Q.   There's a logic to that, isn't there?

9    A.   If it was going forward I would have said, "yes,"

10   but to go back a year and clean up things for people

11   when they should have been responsible for them, I

12   didn't think that was right.

13   Q.   Even though there was a quite a backlog?

14   A.   Their backlog, mine was up to date and so was

15   Mr. Dalton's.

16   Q.   So your testimony is it's their fault, they should

17   be cleaning up, not you?

18   A.   That was their responsibility, yes.

19   Q.   Now, you testified about a niece named Maria Forman,

20   correct?

21   A.   Maura Toomey, yes.

22   Q.   I'm sorry, Maura Toomey.  And she was hired while

23   you were at OCP, wasn't she?

24   A.   Um, by default, she was one of the last

25   appointments.  We were allowed to select from a list if

1    there was one that was still active, and I don't know

2    whether it was 9 months or 18 at that point, it changed.

3    So if there was an active list going to that particular

4    court, they could go through all of the list.  She was

5    at the top of the list, they ran out of people to hire,

6    so they gave her a job.

7    Q.  Was she hired while you were at OCP?

8    A.  Yes.

9    Q.  And isn't it true, Ms. Slaney, that you actively

10   lobbied on behalf of her hire?

11   A.  No.

12   Q.  Well, you went to John Cremens and pushed him about

13   it, right?

14   A.  Yes, I told him I thought it was unfair that she was

15   being held for my relationship with John and if he had a

16   problem with me it should be between us and that she

17   should not be held responsible for it.

18   Q.  And you went to Elizabeth Tavares and lobbied for

19   her?

20   A.  I don't recall ever doing that.

21   Q.  Well, you seem to recall Ms. Tavares having a

22   communication with you about her?

23   A.  After the fact, she came down to tell me that I

24   should thank Jack.

25   Q.  So how would she know you were interested in this if

1   you didn't have any communication with her?

2   A.   Maybe John Cremens told her.

3   Q.   And this was at a time when 4.304 of the policies

4   and procedures manual was in effect?

5   A.   Yes.

6   Q.   And that was titled "Nepotism"?

7   A.   I was only asking that she be treated like everyone

8   else.

9            MR. BAILEY:  I have nothing further.  Thank

10  you, Ms. Slaney.

11           THE COURT:  Mr. Amabile?

12           MR. SINNIS:  Me, your Honor, I'm sorry, but

13  that's the order we --

14           THE COURT:  Oh, I stand corrected and I thank

15  you.  And you're absolutely right, Mr. Sinnis.

16           MR. SINNIS:  My memory's going but it's --

17           THE COURT:  No, no, I appreciate the

18  notification.  You go right ahead, Mr. Sinnis.

19           MR. SINNIS:  Thank you, your Honor.

20

21  CROSS-EXAMINATION BY MR. SINNIS:

22  Q.   Let's put some context to this.

23       How many interviews did you sit on between 2000

24  and 2010?

25  A.   I don't know for sure, but it was limited.

Q.  Well, what --

            THE COURT:  "It was limited," she said.

A.  It was relatively limited.

Q.  Right.  So under 10?

A.  A possibility.

Q.  Well --

A.  I think there were a couple in 2000 and then there

was a hiring freeze between 2001 and I think it was

until 2004, and then I participated in, um, one for the

chief probation officer for New Bedford, Fall River,

Dedham, um, which was outside of my county, but Frank

Campbell was doing the interviews at the other level,

that's why I took that one, or was assigned to that one.

Um, Fall River, an ACPO --

Q.  Yeah.

A.  An ACPO and, um --

Q.  You had no problem when you got picked for an ACPO

in Fall River, right?

A.  Um, no.

Q.  No problem with that, right?

            MS. BELL:  Objection.

            THE COURT:  No, he may ask that question.

       Is that true, you had no problem with that hire?

A.  Are you referring to Clinton Markey?  No.  I'm

sorry.  The ACPO in Fall River would have been Larry

1    Lopes.

2    Q.   Well, do you know?

3    A.   Larry Lopes was later chosen.

4    Q.   Okay.  Did you have any problem with Mr. Lopes?

5    A.   No, I don't think so.

6    Q.   Okay.  So let's get a number here.  Are we talking

7    10 interview panels that you sat on in 10 years?

8    A.   Well, approximately.

9    Q.   Okay, approximately.  And you've already testified

10   that you didn't get names every single time.  So out of

11   those 10, how many times did you get names?

12   A.   Um, let's see.  I'd say maybe 4 times.

13   Q.   Okay.  So 40 percent of the time you got a name.

14   And did you get Mr. Lopes's name?

15   A.   No.  No.

16   Q.   Okay.

17   A.   Well, I'm not sure about --

18   Q.   That's fine, you're not sure.

19        Did you get Mr. Barry Williams's name?

20   A.   No.

21   Q.   Did you get Mr. --

22   A.   He was already the acting chief for two years at

23   that point.

24   Q.   So you approved of that hire?

25   A.   Yes.

1    Q.   Okay.   That was a good hire that Jack made?

2    A.   Yes.

3    Q.   Okay.   Did you approve of Jim Flannery?

4    A.   Yes, he was also an acting chief for two years prior

5    to having been appointed.

6    Q.   A good hire by Jack?

7    A.   Yes.

8    Q.   No problems with those?   No problems with Larry

9    Lopes, right?

10   A.   No.

11   Q.   And you also testified that you had no reservations

12   about putting Mr. Dooley Number 2, correct?

13   A.   Correct.

14   Q.   Okay.   So -- so that's another one out of the 10

15   that you had no problem with in terms of how you ranked

16   them, correct?

17            MS. BELL:   Objection.

18            THE COURT:   Overruled.

19   A.   (Silence.)

20   Q.   That means you can answer.

21   A.   I'm sorry.   I'm sorry.   Could you repeat the

22   question?

23            THE COURT:   You had no problem with that one?

24   A.   With Mr. Dooley?

25   Q.   Right, with where you ranked him, you had "no

1    reservations," those were your exact words, I believe,

2    right?

3    A.   We were all in agreement as to who Number 1 should

4    be.

5    Q.   That's not what I asked you.

6    A.   He was Number 2 on my list.

7    Q.   Okay.  And you had no reservations about that,

8    right?

9    A.   No.

10   Q.   Okay.  And when you say "We were all in agreement

11   who should be Number 1," you mean the judge, who was

12   who?

13   A.   Um, for Mr. Dooley I believe that was Judge Kane.

14   Q.   And Mr. Montairo was the CPO, correct?

15   A.   Correct.

16   Q.   And yourself, right?

17   A.   Yes.

18   Q.   And you knew going into that interview that you were

19   going to put Mary Viera Number 1, correct?

20            MS. BELL:  Objection.  Can we be seen at

21   sidebar briefly, your Honor?

22            THE COURT:  You may.

23

24            AT THE SIDEBAR

25            MS. BELL:  Your Honor, this is not one of the

1    12 mail fraud hires and as a result of that I did not

2    present the evidence I was going to present on direct

3    including the scoring sheets, the rankings, and the real

4    story with respect to Mr. Dooley.

5              THE COURT:  All right.

6              MS. BELL:  So to have Mr. Sinnis inquire about

7    it on cross gives a wrong impression to the jury about

8    what this hire is about.

9              THE COURT:  Yeah, that's a problem with my

10   order, but, um, rather than just let it go, um, I can't,

11   and nor do I intend to revisit it, but you have her on

12   redirect.

13             MS. BELL:  And I plan to --

14             THE COURT:  And you may, notwithstanding my

15   order.

16             MS. BELL:  Thank you.

17             THE COURT:  I think that's the appropriate

18   balance.  If the defense gets into stuff, you have to

19   deal with it in a timely manner.  But other than that

20   I'm standing on my order.

21             MS. BELL:  Thank you, your Honor.

22             MR. SINNIS:  Thank you, your Honor.

23

24             (In open court.)

25   Q.  You knew going into that interview that you were

1    going to put Ms. Viera Number 1, I think you testified

2    to that actually?

3    A.   She was my preference, yes.

4    Q.   She was your preference.   Before you interviewed a

5    single candidate, she was your preference?

6    A.   I knew everybody on that list.

7    Q.   That's not my question.

8         She was your preference before the interview?

9    A.   Yes.

10   Q.   Okay.   And Joe Dooley was his preference before the

11   interview, right?

12              MS. BELL:   Objection, argumentative.

13              THE COURT:   No, wait a minute.   I'm going to

14   sustain that, not because it's argumentative, but she

15   can't testify.   She can only say what she knows.

16   Q.   Well, I thought you testified that you believed the

17   names you'd been given by Ms. Tavares were people who

18   the Commissioner preferred, right?   That's your

19   testimony, right?

20   A.   Right.

21              THE COURT:   And that's what she thought he

22   thought, not an assertion by you.   That's what I ruled.

23              MR. SINNIS:   Fair enough, your Honor.

24   Q.   It was your belief that Joe Dooley was the

25   Commissioner's preference, right?

A.  Correct.

Q.  And your preference was Mary Viera, correct?

A.  Correct.

Q.  So you had a preference prior to the interview, right?

A.  I did.

Q.  And you believe the Commissioner had a preference prior to the interview, correct?

A.  Correct.

Q.  But you feel that it's morally somehow wrong for the Commissioner to have a preference before the interview, correct?

A.  I don't have a problem with that.

Q.  Okay, I thought that's what -- well, that's good, fair enough.  I thought you had said on --

        THE COURT:  Well, the "that's good" is stricken.  Ask questions.

Q.  I thought you had said on direct that you had a problem with being given names?

A.  I had a problem with influencing the process.

Q.  So, okay, I'm trying to --

    Your predisposition towards Ms. Viera is not predetermining the process?

A.  I don't believe so.

Q.  Really?  But you believe -- you believe that his

1    predisposition towards Mr. Dooley is interfering with

2    the process?

3    A.  (Silence.)

4    Q.  I don't think you need to answer that.

5             MS. BELL:  Objection, your Honor, move to

6    strike.

7             THE COURT:  No.  No.

8         No.  No.  Is that what you think?

9    A.  I'm sorry, could you repeat your question.  I kind

10   of lost you.

11            MR. SINNIS:  Or actually --

12            THE COURT:  All right, he wants to let it go

13   and we'll pick it up downstream if we need to.

14        Go ahead, Mr. Sinnis.

15            MR. SINNIS:  Perhaps the Court Reporter could

16   read it back for me, your Honor?

17            THE COURT:  Do you want it now or not?

18            MR. SINNIS:  Yes, I do.

19            THE COURT:  All right, here it is.

20        "You fault the then Commissioner O'Brien for

21   expressing an interest in Mr. Dooley prior to

22   interviews, is that correct?"

23            THE WITNESS:  Correct.

24            THE COURT:  Okay.  Go ahead, Mr. Sinnis.

25            MR. SINNIS:  Thank you, your Honor.

1   Q.   But you had a preference prior to interviews,

2   correct?

3   A.   Correct.

4   Q.   Okay.  And I'm going to show you Mary Viera's

5   application for that job and you tell me, on Page 4, who

6   her third reference is.  Read it out to the jury,

7   please.

8              THE COURT:   Is this in evidence?

9              MR. SINNIS:   It is not.

10             THE COURT:   Well, then she can't read it out,

11   can she?

12   Q.   Is it true that Ms. Viera had a representative

13   sponsoring her as a recommendation for that job?

14             MS. BELL:   Objection.

15             THE COURT:   Only if she knows of her own

16   knowledge, her own knowledge and not from reading that.

17   A.   From my own knowledge I don't remember that at all,

18   no.

19   Q.   Did you look at her application in determining

20   whether to hire her or not?

21   A.   I did.

22   Q.   Okay.  Can you look at that application you have in

23   front of you and tell me whether or not that refreshes

24   your recollection for what position she's applying for

25   in that job?

1    A.   Here?

2    Q.   Well, look here.

3    A.   (Looks.)

4    Q.   What position does she say she's applying for in

5    that job?

6    A.   First assistant chief, Bristol Superior Court.

7    Q.   And that's the Joe Dooley hire, right?

8    A.   Yes.

9    Q.   Okay.  I assumed that before you interviewed people

10   you looked at their applications, correct?

11   A.   I did.

12   Q.   Okay.  And you went through with Ms. Bell on direct

13   a sample application of Pat Lawton's, right?

14   A.   I did.

15   Q.   And does that look like an application from the

16   Office of the Commissioner of Probation?

17   A.   Yes.

18   Q.   Okay.  It is, right?

19   A.   Yes.

20   Q.   And that's Ms. Viera's application for the position

21   of first assistant chief probation officer, correct?

22   A.   Correct.

23   Q.   Okay.  And if you could tell me if, by looking at

24   that, does she list references on there?

25   A.   She does.

1    Q.   And is one of them Representative Quinn?

2              MS. BELL:  Objection, your Honor, this is --

3              THE COURT:  Yeah, the objection is sustained

4    because the document is not in evidence.

5    Q.   That is an OCP document, ma'am?

6    A.   Yes.

7    Q.   Okay.

8              MR. SINNIS:  I'd like to move that into

9    evidence, your Honor.

10             THE COURT:  Any objection?

11             MS. BELL:  Yes, your Honor, for the same

12   reasons we've discussed previously.

13             THE COURT:  Oh, and with the same order, if

14   he's going to open this up, you can go there.

15             MS. BELL:  No, just with respect to the

16   document, your Honor, I haven't even seen it before

17   today, so I --

18             THE COURT:  Well, she's authenticated it.

19   Take a look at it.

20        Any objection?

21             (Silence.)

22             THE COURT:  And what will be the next number

23   for it?

24             MS. BELL:  Your Honor, it's just not clear to

25   me she's authenticated this --

1          THE COURT:  It's clear to me.

2          MS. BELL:  -- to say it's an OCP record.

3          THE COURT:  It's clear to me.

4          THE CLERK:  It's 123.

5          THE COURT:  So you do object?

6          MS. BELL:  I do, your Honor, on those grounds.

7          THE COURT:  All right, your rights are saved,

8   but it's overruled.  Admitted in evidence as Exhibit

9   123.

10          (Pause.)

11          THE COURT:  Oh, I'm sorry, Exhibit 124 in

12   evidence.

13          MR. SINNIS:  Thank you, your Honor.

14          (Exhibit 124, marked.)

15   Q.  On Exhibit 124, who does Ms. Viera, the candidate

16   you wanted for this job, list as her third reference?

17   A.  Representative John F. Quinn.

18   Q.  She had a political sponsor?

19   A.  I wouldn't know.

20   Q.  She had a political reference?

21   A.  Yes.

22   Q.  Do you know the other people who applied for that

23   job?

24   A.  Yes.

25   Q.  Who are they?

1    A.   Um, do you have, um, a list that I could refresh my

2    memory with?

3    Q.   Sure.

4              (Pause.)

5              THE COURT:   Now I'm allowing all of this in as

6    to what actually was going on there, if you believe the

7    testimony of the witnesses, but I just remind you that

8    -- to keep your eye on the ball, that what's charged

9    here is not some criminality in this process, however it

10   went down, but in the certification of the best

11   candidate by the Commissioner, at the end of the

12   process, to the Chief Justice for Administration.

13        Go ahead, Mr. Sinnis.

14              MR. SINNIS:   Thank you, your Honor.

15   Q.   I'm showing you the scoring sheet.

16        Does that refresh your recollection of who else

17   was applying for that job?

18   A.   It does.

19   Q.   Can you read the names off of it?

20   A.   Mary Viera.  Joe Dooley.  Louise Medeiros.  Mary

21   Santos.  Tanya Brooks.  Larry Lopes.  And Chris Howak.

22   Q.   (Pause.)  Let me show you some documents and I ask

23   you if you recognize them?

24   A.   (Looks.)

25   Q.   I believe they might be applications for Mr. Howak,

```
 1    Ms. Medeiros, and Ms. Santos.
 2          Do you see those?
 3    A.   I do.
 4    Q.   Okay.  They all indicate that they're applying for
 5    the first assistant chief probation officer job?
 6    A.   They do.
 7    Q.   And do they look like OCP applications that you've
 8    testified to on direct like Mr. Lawton's?
 9    A.   Yes, they are.
10    Q.   Okay.
11              MR. SINNIS:  All right.  I ask that they be
12    admitted as the next three exhibits.
13              THE COURT:  Any objection?
14              MS. BELL:  No, your Honor.
15              THE COURT:  They may be received as Exhibits
16    125, 126, and 127.
17              MR. SINNIS:  So the record's clear and I know
18    what to mark, I do Mr. Howak as 125, Ms. Medeiros as
19    126, and Ms. Santo as 127, your Honor.
20              THE COURT:  So marked.
21              MR. SINNIS:  Thank you.
22              (Exhibits 125, 126 and 127, marked.)
23    Q.   Can you turn to the last page of each of those
24    applications?
25    A.   I'm sorry, I can't hear you.
```

1    Q.   Would you turn to the last page of each of those

2    applications.

3    A.   (Turns.)  Okay.

4    Q.   Okay.  Does Mr. Howak list Representative Hagan as a

5    reference?

6    A.   Yes, he does.

7    Q.   Does Ms. Medeiros list Senator Montigney as a

8    reference?

9    A.   Yes, she did.

10   Q.   And did Ms. Santos list Senator Montigney as a

11   reference?

12   A.   Yes, she did.

13   Q.   So that's Mary Santos, Mr. Medeiros -- Ms. Medeiros,

14   sorry, Mr. Howak, Ms. Viera, and Mr. Dooley, five out of

15   the seven people listed political leaders as references,

16   correct?

17   A.   Um, I don't know if the remaining people did or not.

18   Q.   Okay.  But as to the ones I've shown you, they all

19   did, right?

20   A.   The ones that you've shown me, yes.

21   Q.   All right.

22          MR. WYSHAK:  I'm sorry, your Honor, is

23   Mr. Dooley's application in?

24          MR. SINNIS:  Not yet.  Well, I think it

25   actually is in from the government's exhibits.  It's one

1   of the ones we did pretrial.

2                   THE COURT:  I don't actually know, but the

3   record is what it is.  Go ahead.

4   Q.  You testified that you had an idea, before you went

5   into an interview, of who you wanted to get the job,

6   right?

7                   MS. BELL:  Objection.

8                   THE COURT:  In that form I'm going to sustain

9   it.

10                  MR. SINNIS:  Let me rephrase it.

11  Q.  Before you went to Fall River, you believed you knew

12  who you wanted to get the job, right?

13  A.  I knew who I believed was the best candidate, yes.

14  Q.  Before the interview?

15  A.  I'm her supervisor, I was very familiar with her

16  work and that of the other folks there.

17  Q.  (Points to defendant.)  What was his title during

18  that time?

19  A.  Commissioner of Probation.

20  Q.  And he was your boss, right?

21  A.  Yes.

22  Q.  And he was everybody's boss, right?

23  A.  Right.

24  Q.  He had familiarity with the probation department,

25  did he not?

1            MS. BELL:  Objection.

2            THE COURT:  She can give us her view of his

3    familiarity with the Department.

4        What is your view?

5    A.  I don't know if he was familiar with the, um,

6    probation officers assigned to the Bristol Superior

7    Court.  I was their direct supervisor.

8    Q.  Okay.  You don't know if he was or wasn't, right?

9    A.  Correct.

10   Q.  Okay.  Do you know Mr. O'Brien's history as a

11   probation officer?

12   A.  Somewhat.

13   Q.  Do you know that he started as a probation officer

14   just like yourself?

15   A.  Yes.

16   Q.  Do you know that he was an assistant chief probation

17   officer at some point?

18   A.  Yes.

19   Q.  Do you know that he was the director of community

20   corrections at some point?

21   A.  Yes.

22   Q.  Do you know that he worked for Chief Judge Irwin as

23   a legislative liaison at some point?

24   A.  Yes, I've heard it.

25   Q.  Do you know that he --

```
 1              THE COURT:  Well, what you've -- I'm being
 2    technical, but I have to be.  What you've heard doesn't
 3    count.  When he's saying "Do you know," it means you
 4    know because you were there seeing him do the job in
 5    that capacity or that you interacted with him with the
 6    official documents so that you know he was exercising a
 7    particular role.  So where you've heard, I'll strike it
 8    out.
 9         Mr. Sinnis, go ahead.
10    Q.  And you knew obviously he became the Commissioner of
11    Probation, correct?
12    A.  I know he became the Commissioner, yes.
13    Q.  And you know that Jack Irwin -- Chief Judge Jack
14    Irwin made him Commissioner, correct?
15    A.  Correct.
16    Q.  Now, you've named some names on direct examination,
17    Ed Dalton, correct?
18    A.  Correct.
19    Q.  A friend of yours?
20    A.  Yes.
21    Q.  And a colleague?
22    A.  Yes.
23    Q.  Ron Corbett, a friend of yours?
24    A.  Yes.
25    Q.  And a colleague?
```

1    A.  Yes.

2    Q.  Um, Ron Corbett -- that's -- when Jack got

3    appointed, Ron Corbett had an interest in becoming

4    Commissioner, did he not?

5              MS. BELL:  Objection.

6              THE COURT:  Um, if she knows of her own

7    knowledge, she may testify.

8    A.  He never told me that directly.

9              THE COURT:  Well, did you know from seeing

10   applications or other such documentation within the

11   Department?

12             THE WITNESS:  No.

13             THE COURT:  All right.  That's your answer.

14   Q.  (Pause.)  You became Commissioner of Probation at

15   some point, right?

16   A.  Yes.

17   Q.  In January of 2013, correct?

18   A.  Correct.

19   Q.  Until May 30th or so of 2013, correct?

20   A.  Yes.

21   Q.  How many interviews did you go through to get that

22   job?

23   A.  I was appointed acting while they were going through

24   an interview process for a permanent candidate.

25   Q.  Let's try my question.  How many interviews did you

1    go through for that job?

2              MS. BELL:  Objection, motion to strike.

3              THE COURT:  This is after Mr. O'Brien had

4    left?

5              MR. SINNIS:  It is, your Honor, but it goes to

6    her --

7              THE COURT:  Yes, sustained.

8              MR. SINNIS:  Can I be heard at sidebar, your

9    Honor?

10             THE COURT:  You may be.

11

12             AT THE SIDEBAR

13             MR. SINNIS:  Your Honor, as you know this is a

14   criminal case and I have the right to impeach the

15   credibility of the witness and to show her bias.  She

16   has stated on the record that she believes --

17   "circumventing hiring processes," "circumventing

18   interviews" is -- she said she objected to being on an

19   interview because she felt that it was morally wrong.

20   She circumvented the hiring process herself.  It's just

21   like a drug dealer saying, "I've stopped selling drugs

22   and I have evidence that I didn't."  That's impeachment.

23             THE COURT:  It's not that close at all in my

24   mind.  Once he's left then the criminal conduct that

25   we're interested in here is at an end.  Now it may be

1    that bias downstream or other relevant matter can be

2    elicited, but here I just don't see it, you're just

3    saying that because she was named in the administrative

4    context at that time the acting commissioner, um, and I

5    suppose you could say -- well, it's not how she got it,

6    if you want to say, "And that's the job you wanted all

7    along, isn't that true?" or something.

8              MR. SINNIS:  But here's my point.  Mr. Wyshak

9    opened on the fact that Jack O'Brien hired people

10   without an interview process and on an acting basis and

11   made it sound like that was a violation of law.  She was

12   hired the same way.

13             THE COURT:  And it wasn't and isn't and if --

14   well, that's not what this case is.  If we get to

15   bribery, we'll see as to bribery.  Sustained.

16             MR. SINNIS:  Note my objection, your Honor.

17             THE COURT:  Noted.

18

19             (In open court.)

20             THE COURT:  Anything else, Mr. Sinnis?

21             MR. SINNIS:  Yes, your Honor.

22             THE COURT:  Go ahead.

23   Q.  Now, you talk about the hiring manual, correct?

24   A.  Correct.

25   Q.  All right.  And that hiring manual talks about the

1    point that you made, the objective is to hire the most

2    qualified candidate, correct?

3    A.   Yes.

4    Q.   That manual doesn't tell you anything about whether

5    or not you can consider recommendations, correct?

6    A.   I think it just refers to, um, avoiding any

7    appearance of favoritism.

8    Q.   That's not my question.  I mean you don't have to do

9    this by memory.

10        Do you have Section 4 still up there?

11   A.   (Looks.)  Oh, yes.

12   Q.   If you would look at 4.303.

13   A.   (Looks.)  Okay.

14   Q.   It deals with references, correct?

15   A.   Yes.

16   Q.   It doesn't indicate in any way that certain types of

17   recommendations shouldn't -- or recommendations from a

18   certain class of people cannot be considered, does it?

19   A.   Do you want me to read it or --

20   Q.   Well, yes, unless you know it off the top of your

21   head.

22   A.   "Reference checks should be" --

23   Q.   No, no, I don't want you to read it out loud.

24   A.   All right.

25   Q.   I only need you to read it to refresh your memory.

A.  Okay.  (Reads.)  Okay.

Q.  Does it indicate that people who were following this manual can't take recommendations from state representatives into account?

A.  (Reads.)  No, it just refers to, um, "inquiries should be job-related and relevant."

Q.  Does it indicate that recommendations are not to be taken into account?

MS. BELL:  Objection, your Honor, as to the section.

THE COURT:  I am going to sustain that --

Are you suggesting that's what it says?

MR. SINNIS:  No, I'm suggesting it doesn't say that.

THE COURT:  Well, then put a question -- the document speaks for itself.  You can ask her about her understanding.

Q.  Does that policy say that you can't consider recommendations from, you know, senators or representatives?

MS. BELL:  The same objection.

THE COURT:  Overruled.  She can give us her view of what it says, and you'll see it, it says what it says.

But what did you think it said as to that?

1    A.   Um, it doesn't eliminate anyone and it seems to

2    imply that as long as it's job-related and relevant, for

3    a recommendation.

4    Q.   Okay.  Now, that manual was changed after

5    Mr. O'Brien left office, correct?

6    A.   Correct.

7    Q.   Okay.  And the new manual, which you operated under

8    in the Commissioner's position, actually has specific

9    criteria of how to handle recommendations, correct?

10                   MS. BELL:  Objection.

11                   THE COURT:  Sustained.

12                   MR. SINNIS:  Your Honor, can we be heard at

13    sidebar?

14                   THE COURT:  You may be.

15

16                   AT THE SIDEBAR

17                   THE COURT:  Isn't that a classic subsequent

18    repair?  I'm not going there.

19                   MR. SINNIS:  But it goes to the defendant's

20    intent and state of mind, your Honor.  The fact that the

21    manual is silent and then all of a sudden the law

22    changes and specifically says, "You can put her in a

23    lock box until the hiring process is over" --

24                   THE COURT:  I'm not going to rely on it.  The

25    manual does say what it says.  I -- without going too

far, you talked about "criminalizing conduct" and as I
listened to your opening I thought, "Yes, I've got to
emphasize that concept in a neutral jury charge at the
end," but I'm not going to have any criminalizing of
conduct that is not criminal.

The conduct that is criminal here, if there is
any, is mail fraud, as we now know what the case has to
deal with regard to that, and maybe state bribery, state
gratuity, and I'm mulling over the racketeering in
which the government emphasizes is so central.  But it
seems to me that it has to be -- it isn't just that the
Department of Probation is a criminal enterprise, but it
can be, and I think the evidence may well show, that it
seems to be where the government is going, that the use
of the -- the then organization of the Department to
accomplish mail fraud and perhaps the bribery and
gratuity, that could be a criminal enterprise, that use
of the Department.  Now that's what I think this case is
and I'm not going beyond that.

MR. SINNIS:  I appreciate that, but the fact
that specific changes were made to the hiring manual
that he -- that he was under doesn't suggest that there
wasn't any obligation at the time.

THE COURT:  But it's a subsequent repair.  You
can argue that the manual was vague and you're not

1  making some criminal basis.  Indeed the government

2  doesn't allege that, they allege that the certification

3  which was under law was the misrepresentation that is

4  the mail fraud.  I follow that.

5          MR. FICK:  But, your Honor, the predicate --

6  the predicate for the certification being false is --

7          THE COURT:  You'll recognize that it isn't a

8  seminar and usually if he's examining, while -- I'm

9  always delighted to hear from you until I'm not.

10         (Laughter.)

11         THE COURT:  Go ahead.

12         MR. FICK:  So the certification is the alleged

13 fraud, but the predicate, the reason why it's supposedly

14 a fraud is a violation of the manual.

15         THE COURT:  Precisely, that's why I'm allowing

16 extensive evidence on both sides.

17         MR. FICK:  But the subsequent remedial measure

18 bar, it's a bar under 407 to prove liability, but it can

19 be used to prove tertiary things like intent or the lack

20 of intent, which is precisely why --

21         THE COURT:  So it can, but I don't think it's

22 close-enough here.  But I do understand the rule.

23 That's my ruling.

24         MR. SINNIS:  Note our objection.

25

```
1              (In open court.)
2     Q.  Who is Eileen Parone?
3     A.  I don't know.  I'm sorry.
4              MR. SINNIS:  May I approach, your Honor?
5              THE COURT:  You may.
6              MR. BAILEY:  Your Honor, there's a hand that
7     has been raised for a while of the jurors.
8              THE COURT:  Oh, I'm sorry.  I apologize.  Go
9     ahead.
10             (Hands up juror note.)
11    Q.  I would ask if you would read through those series
12    of e-mails and I ask if that reminds you of who Eileen
13    Parone is?
14    A.  (Reads.)  Okay.
15    Q.  Okay?
16    A.  Yes.
17    Q.  So is Eileen Parone someone you assisted in getting
18    a job?
19    A.  Um, she wanted information about being a court
20    investigator, um, I think, so I referred her to one of
21    the juvenile chiefs.
22    Q.  You got an e-mail from somebody, right?
23    A.  Yes.
24    Q.  Okay.  Who did you get the e-mail from?
25    A.  (Reads.)
```

1  Q.  Eileen Parone is a female, correct?

2  A.  Yes, I believe so.

3  Q.  Okay.  And she told you that she had gotten your

4  name from somebody else, correct?

5  A.  Yes.

6  Q.  Okay.  And you in turn called a friend of yours,

7  John Miller, right?

8  A.  Yes.

9  Q.  Who's John Miller?

10  A.  He's the juvenile chief probation officer.

11  Q.  By the way, Jack O'Brien promoted him, didn't he?

12              MS. BELL:  Objection.

13              THE COURT:  If she knows.

14  A.  To chief?  Um, I would assume so, yes.

15  Q.  Is that a good hire by Jack?

16  A.  Yes.

17  Q.  So you get an e-mail from Ms. Parone interested in a

18  court position, a court investigator position, correct?

19  A.  It's not a trial court position, it's -- I believe

20  it's an agency that contracts with the trial court.  I

21  really didn't have a lot of information about it so I

22  referred her to someone that would.

23  Q.  Okay.  So you passed on her resume to a friend of

24  yours, correct?

25  A.  (Looks.)  I'm not sure if I did or not.  It says

1    here that she sent it to me, but I don't know if I just

2    gave her name to the contact or for what -- without

3    reading through all of this.

4    Q.  Well, read through it all, please.

5    A.  Okay.  (Reads.)  It doesn't say if I referred her

6    resume or I just told her to call the chief.

7    Q.  Okay.  You got in touch with John Miller and said

8    you're sending someone to him to reach out to him,

9    correct?

10   A.  To answer some questions for her, yes.

11   Q.  Okay.  And in a matter of two weeks that person got

12   hired by Judge Borders for a job, right?

13   A.  (Reads.)  Um, yeah, later it says here that

14   approximately a month later she did get hired as a court

15   investigator, yes.

16   Q.  Did you have any qualms about helping someone out

17   who you never ever met in terms of getting a job as a

18   judicial officer?

19   A.  The only help I gave her was for her to be able to

20   talk to someone who could tell her about the process.

21   Q.  You put her in touch with someone who could contact

22   judges for her, right?

23              MS. BELL:  Objection.

24              THE COURT:  No, he may ask the question that

25   way, the question's not evidence.

1          Is that right, is that why you did it?

2    A.   So she could get information about the process, yes.

3    Q.   And she ended up getting hired?

4    A.   That had nothing to do with me.

5    Q.   Did you feel bad for the people who didn't have an

6    Ellen Slaney to help them out on that hire?

7              MS. BELL:  Objection.

8              THE COURT:  Sustained on this foundation.

9    Q.   Did you know whether any other people were trying to

10   get that job?

11   A.   I wouldn't know.  It's just like someone asking for

12   a position for a PO, I would refer them to the Human

13   Resources Department for more information.

14   Q.   So it's just like Jack O'Brien referring a name to

15   you to say "I'm interested in this candidate"?

16             MS. BELL:  Objection.

17             THE COURT:  No, she may give us her judgment

18   of whether it's just like that.

19        Is that just like it?

20   A.   I don't think it's the same thing.

21   Q.   Because you were doing it here and he was doing it

22   then?

23             MS. BELL:  Objection, your Honor.

24             THE COURT:  No, he --

25        Is that the reason you think it's different?

1          THE WITNESS:  No.

2          THE COURT:  All right.

3   Q.  Now, let's talk about your niece.  You said she was

4   an excellent candidate, right?

5   A.  I did.

6   Q.  Okay.  She interviewed for Newberry District Court,

7   I'm going to show you some scoring sheets, there are

8   three scoring sheets for Newberry District Court.

9   A.  (Shows.)  Okay.

10  Q.  Okay.  She didn't do very well on that interview,

11  did she?

12          MS. BELL:  Your Honor, may I see those sheets,

13  please?

14          THE COURT:  You certainly may.

15          MR. SINNIS:  Absolutely.  I apologize.  They

16  were the government's documents.  I thought you had

17  them.

18          (Shows to counsel.)

19  Q.  You talk about different rounds of interviews.  Does

20  this look like second-round interview scoring sheets?

21  A.  Yes, these would have been, um, for the local

22  interview, yes.

23  Q.  Okay.  And that's the interview where the judge, the

24  chief probation officer, and someone from the

25  Commissioner's office, correct?

```
 1    A.   Yes.

 2    Q.   And Jeff Acres -- who is Jeff Acres?

 3    A.   He's a regional supervisor.

 4    Q.   And who is Patricia Kane?

 5    A.   She's the chief probation officer.

 6    Q.   And who is Peter Doyle, is he a judge?

 7    A.   Yes.

 8    Q.   And how did Judge Doyle rate your niece?

 9    A.   Number 12.

10    Q.   Okay.  All right.  Thank you.

11         Do you know Judge Donnelly in the Brighton

12    District Court?

13    A.   I don't.

14    Q.   Do you know Judge Whitehead in the Essex Superior

15    Court?

16    A.   I don't.

17    Q.   You don't?

18    A.   No.

19    Q.   You were the Commissioner of Probation at some

20    point, right?

21              MS. BELL:   Objection.

22    A.   For 6 months.

23    Q.   Well, how long have you been in the probation

24    department?

25    A.   39 years.
```

1          (Pause.)

2          THE COURT:  Are you about done with this

3   witness, Mr. Sinnis, in view of the Court's schedule?  I

4   don't want to crowd you.

5          MR. SINNIS:  Um, I will be done with this area

6   in like one minute.

7          THE COURT:  Well, let's finish up this area

8   then.

9          MR. SINNIS:  Okay.

10  Q.  Does this again look like a scoring sheet from the

11  Essex Superior Court for the first round?

12  A.  It does.

13  Q.  And how was your niece rated on that?

14  A.  Number 14.

15  Q.  Okay.  And is this, from the Brighton District

16  Court, does this look like a second-round scoring sheet?

17  A.  It does.

18  Q.  And where is your niece rated there?

19  A.  Number 11.

20  Q.  All right.  And by someone named David Donnelly,

21  correct?

22  A.  Yes.

23  Q.  And this one is by someone named Howard Whitehead,

24  correct?

25  A.  Yes.

Q.  So you agree with those names?

A.  Yes.

Q.  So if those turn out to be judges, the judges rated your niece 11 and 14, correct?

            MS. BELL:  Objection.

            THE COURT:  Well, the documents aren't in evidence, those documents, are they?

            MR. SINNIS:  No, they're not in evidence yet, your Honor.

            THE COURT:  Yeah, so sustained.  The answer's stricken.  Disregard it.

            MR. SINNIS:  Well, is this a good time, your Honor, we're done with that section?

            THE COURT:  All right.

        Ladies and gentlemen, because of my obligations, we have to stop now.

        A couple of things.  This is the first weekend since the trial began and for those of you whom this applies -- well, everyone has a mother, so happy Mother's Day.  But recognizing that the weekend is coming up, you're going to see people who you haven't seen and they're going to wonder what you're doing and you're not to start in on a discussion of your service as jurors.  The obligation is just going to be different this weekend and harder.  So be alert, because you'll

1    run into different people as you go about your own

2    affairs this weekend, so be alert not to be exposed to

3    any reporting about the case.  Likewise newspapers do

4    like a news-of-the-week-in-review and frequently they'll

5    go back over what's happened this week.  So be aware

6    that in the weekend papers there may be some mention of

7    the case and you're not to be exposed to that.

8            Finally, as I've said, but I want to emphasize it

9    because you people are so good on the schedule and I'm

10   so incredibly grateful, but in order to enable everyone

11   to assemble Monday morning after the weekend, Monday we

12   start at 10:00, we'll start right on the dot of 10:00,

13   and I will go to 2:00 and we'll take a half an hour

14   recess.  So that's a four-hour trial day, but we'll let

15   you out of here at 2:00 on Monday.

16           So you have not heard all the evidence so keep

17   your minds suspended, do not discuss the case either

18   among yourselves nor with anyone else.  You may stand in

19   recess until 10:00 a.m. on Monday morning.  The jury may

20   recess.

21                  (Jury leaves, 12:35 p.m.)

22                  THE COURT:  Please be seated.  Ms. Slaney, you

23   may step down.

24           I have a juror question, which I propose to ask,

25   and that's where we'll start:  "Please describe the

1    difference, if any, between, quote, 'reference checks,'

2    closed quote, and 'recommendations'"?  And I'm going to

3    ask that question.

4         We'll recess until 10:00 on Monday morning.  We'll

5    recess.

6              (Adjourned, 12:35 p.m.)

7

8              C E R T I F I C A T E

9

10        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

11   hereby certify that the foregoing record is a true and

12   accurate transcription of my stenographic notes, before

13   Judge William G. Young, on Friday, May 9, 2014, to the

14   best of my skill and ability.

15

16

17

18   /s/ Richard H. Romanow 06-30-15
     _____
19   RICHARD H. ROMANOW  Date

20

21

22

23

24

25