1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3                           No. 1:12-cr-40026-WGY

4

5

6   UNITED STATES OF AMERICA

7

8   vs.

9

10  JOHN J. O'BRIEN, et al

11

12

13                     * * * * * * * *

14

15                   For Hearing Before:
                     Judge William G. Young
16

17                      Sentencing

18
                     United States District Court
19                   District of Massachusetts (Boston)
                     One Courthouse Way
20                   Boston, Massachusetts 02210
                     Wednesday, November 12, 2014
21

22                     * * * * * * *

23          REPORTER: RICHARD H. ROMANOW, RPR
                     Official Court Reporter
24                United States District Court
         One Courthouse Way, Room 5510, Boston, MA 02210
25                   bulldog@richromanow.com

1                    A P P E A R A N C E S

2

3    FRED M. WYSHAK, JR., ESQ.
     KARIN M. BELL, ESQ.
4    ROBERT A. FISHER, ESQ.
        United States Attorney's Office
5        J. Joseph Moakley U.S. Courthouse
         1 Courthouse Way, Suite 9200
6        Boston, Massachusetts 02210
         (617) 748-3954
7        Email: Fred.wyshak@usdoj.gov
         For the United States

8

9    STYLIANUS SINNIS, ESQ.
     WILLIAM W. FICK, ESQ.
10   CHRISTINE DeMASO, ESQ.
        Federal Public Defender Office
11       District of Massachusetts
         51 Sleeper Street, 5th Floor
12       Boston, Massachusetts 02210
         Email: stellio_sinnis@fd.org
13       For John J. O'Brien

14

     R. BRADFORD BAILEY, ESQ.
15   ADAMO LANZA, ESQ.
        Denner Pellegrino, LLP
16       Four Longfellow Place, Suite 3501
         Boston, Massachusetts 02114
17       Email: bbailey@dennerpellegrino.com
         For Elizabeth V. Tavares

18

19   JOHN A. AMABILE, ESQ.
     JAMES C. BRADBURY, ESQ.
20       Amabile & Burkly, P.C.
         380 Pleasant Street
21       Brockton, Massachusetts 02401
         Email: John.amabile@amabileburkly.com
22       For William H. Burke, III

23

24

25

1          P R O C E E D I N G S

2          (Begins, 2:30 p.m.)

3          THE CLERK:  Now hearing 12-cr-40026, the United

4    States of America versus John J. O'Brien, et al.

5          THE COURT:  Good afternoon.  Would counsel

6    identify themselves.

7          MR. WYSHAK:  Good afternoon, your Honor.  Fred

8    Wyshak, Rob Fisher, and Karen Bell, for the United

9    States.

10         MR. FISHER:  Good afternoon.

11         MS. BELL:  Good afternoon, your Honor.

12         MR. BAILEY:  Good afternoon, your Honor, Brad

13   Bailey and Adamo Lanza for Ms. Tavares.

14         MR. LANZA:  Good afternoon, your Honor.

15         MR. AMABILE:  Your Honor, John Amabile and James

16   Bradbury, and we represent Bill Burke.

17         MR. FICK:  Your Honor, William Fick, Christine

18   DiMaso, and Stellio Sinnis for Mr. O'Brien.  And just a

19   note, Ms. DiMaso has a jury out in another case and so

20   it may be that she has to step out at some point in

21   time.

22         THE COURT:  That's perfect understandable and she

23   may just step out when she needs to.

24         All right.  We need to go back because having

25   reviewed the relevant portions of the transcript the

1    government, as I understand its position, wishes to

2    argue for an enhancement for abuse of a position of

3    trust as to Ms. Tavares and Mr. Burke, and the

4    transcript fairly read, I cannot find, nor do I, that

5    they have waived that right.

6       So, Mr. Fisher, you made that argument before --

7       MR. FISHER:  I have.

8       THE COURT:  And am I correct you're pressing that

9    as to these two defendants as well?

10      MR. FISHER:  Your Honor, correct.  In fact the

11   government, our intention was to press it, as I wrote in

12   my sentencing memo, will be both enhancements,

13   leadership and an abuse of a position of trust.

14      THE COURT:  How can you, as to them, press

15   leadership in light of my question on the record to

16   Ms. Bell?  This is what I was referring to.  This is the

17   Court, um, let's see how much we need to read here.

18      (Reviews transcript.)

19      MR. FISHER:  Is that from the March 13th?

20      THE COURT:  Let me see here.  It is, yeah, March

21   13th.

22      I say to her, "Assume" -- as the government of

23   course assumes, "in bringing the case and pressing it in

24   good faith, assume there's a guilty verdict on some or

25   all of the counts here.  What enhancements is the

government going to seek, if any?"

"MS. BELL:  Your Honor, at this time the only enhancement that the government has considered is an enhancement regarding an abuse of trust."

And I explain my position.  And so I would think that's -- I'm perfectly amenable to that.  I think you're on weak ground in arguing organizer and leader as to these two defendants.

MR. FISHER:  Well, our position is -- I remember that day also, your Honor, I was due in court, that was our first status.

THE COURT:  Well, here's the transcript.

MR. FISHER:  And I'm just -- I'm letting you know what -- prior to that day we knew your practice in terms of proving it beyond a reasonable doubt before the jury. In fact I believe, if I remember correctly, the words you used right after that were "Let the Court know if there's any change to your position if there are any further" --

THE COURT:  You are correct, I'll read it.  "So" --

"THE COURT:  So if there's something else, an organizer, leader, loss, something like that, all of that's got to be proved to the jury, and the government understands that?"

1          "MS. BELL:  Yes, your Honor.  Thank you."

2          MR. FISHER:  Correct.  So we do understand that.

3     We -- our position is that between that hearing and the

4     colloquy on July 11th of this year, I believe was the

5     date, that we had injected leadership into our -- after

6     the Court had said it, we did decide to move forward on

7     another enhancement, leadership, and that's why that was

8     involved with the colloquy in terms of Mr. O'Brien.  Our

9     understanding is that when we -- and we can't find the

10    transcript where we said that to the court.

11         THE COURT:  Yeah, actually, Mr. Fisher, you know

12    the better part of valor, because waiver is a, um,

13    should be pretty express, whether it's the government's

14    or the defense, without finding ruling on that, I do

15    think the better part of valor is to allow you to make

16    that argument.  So as to those two enhancements, you

17    argued it before, if you're the one who's going to argue

18    it, I'll hear you.

19         MR. FISHER:  For both Ms. Tavares and Mr. Burke?

20         THE COURT:  Correct.

21         MR. FISHER:  Okay.

22         Your Honor, as I said before, in terms of

23    organizer and leader, and we spoke about it previously,

24    I believe last week, of five participants, well, we have

25    three participants here, um, and I had mentioned many

1    names last week, um, Fran Wall --

2         THE COURT:  Yes, but now you have to be specific.

3    You can argue it in any order, but who did Ms. Tavares

4    organize and lead?  Who did Mr. Burke organize and lead?

5    And then address the issue of abuse of a position of

6    trust as you see fit.

7         MR. FISHER:  Sure, well, I'm not sure that --

8    under the guidelines I'm not sure we have to --

9         THE COURT:  Really.

10        MR. FISHER:  -- prove that.

11        THE COURT:  All right.

12        MR. FISHER:  In my memo I do mention that.  And I

13   cite "Participants do not need to be subordinate to the

14   defendants or supervised by the defendants, they only

15   need to be participants in the scheme of which the

16   defendants could be considered leaders or organizers."

17        THE COURT:  Oh, but that's not a strained reading.

18   So in the scheme that the jury has so clearly found by

19   their verdict, in that scheme, what did Ms. Tavares

20   organize and lead, Mr. Burke organize and lead?

21        MR. FISHER:  Sure.  Well, I'll start with

22   Ms. Tavares.

23        THE COURT:  Very well.

24        MR. FISHER:  In terms of Ms. Tavares, and being

25   the First Deputy Commissioner of this organization, from

1     the testimony that you heard, from the jury verdict, she

2     was sort of like the air traffic controller of what was

3     happening in this scheme, she was the one who at times

4     would pass upon -- would pass on the names to regional

5     administrators or chief probation officers to make sure

6     names made the list.  When regional administrators had

7     issues with getting those names on the list, as you

8     heard testimony of, I believe one individual was

9     Regional Administrator Murphy, had concern about getting

10    a name on a list, who did he call?  Ms. Tavares.  When

11    judges had concerns about names that they saw were being

12    passed on to next rounds or people that were getting

13    jobs, who did they call?  Ms. Tavares.

14         THE COURT:  But they're not conspirators.

15         MR. FISHER:  Well, they don't need to -- as I said

16    last week, they don't need to necessarily be

17    conspirators, they need to be participants.

18         THE COURT:  Are they participants, the judges?

19         MR. FISHER:  Oh, no, no, not the judges.

20    Mr. Murphy was though, I would say, the regional

21    administrator was.

22         THE COURT:  He was a participant?  Doesn't -- as

23    used in the sentencing guidelines, doesn't that word

24    import some culpability?

25         MR. FISHER:  Without a doubt, that you're aware of

1    what's occurring.

2         THE COURT:  All right.

3         MR. FISHER:  So when you're receiving a name and

4    you have to score that person higher than other people

5    that are being interviewed, before the interview, and I

6    think Mr. Murphy and other regional administrators like

7    Mr. O'Neil testified, and Mr. Driscoll, that they had

8    concerns about that.  Mr. Dalton certainly did.  He

9    testified he had concerns he would be testifying about

10   that activity one day, as did Mr. Driscoll.

11        So I think that shows the knowledge and

12   culpability of these individuals that what they were

13   participating in was not correct and outside what should

14   have been occurring in a just, um, system of promotion

15   and hiring.

16        So she's clearly an organizer of what's occurring

17   in terms of even in the office with Ms. Mucci, Ms. Mucci

18   testified, she seemed to be somebody who took direction

19   quite often from Ms. Tavares.  Ms. Tavares's name was on

20   the rejection letters that were being sent out by

21   administrative staff there.  Her testimony was she had

22   actually signed some of those letters early on, or later

23   on as they were sent.  But clearly she had knowledge of

24   what was occurring.  And I believe that testimony came

25   from Ms. Mucci.  And she had knowledge of the

1    individuals that were needed to make this scheme

2    successful, and it was many, regional administrators,

3    other deputy commissioners, chief probation officers.

4    She is the person that is really the hub to the spoke of

5    this conspiracy.

6          So many individuals came in here and said they had

7    conversations with Ms. Tavares, as opposed to even

8    Mr. O'Brien, that Ms. Tavares was the one that they went

9    to with complaints.  I think that makes her someone who

10   is an organizer or a leader in terms of holding this

11   conspiracy together.

12         And as Mr. Wall testified, she passed names on to

13   him, he was another deputy commissioner conducting

14   interviews.  Ms. Walsh also received names.  Ms. Slaney

15   testified that she received names and had such concerns

16   with the hiring process she went to Ms. Tavares and

17   said, "I don't want to be involved in this."

18         THE COURT:  But you see that's -- there --

19   that's -- I'm just having an issue, not with your

20   recitation of evidence before the jury, but with the

21   coloration you put on it.  Is Slaney a "participant" as

22   the sentencing guidelines read?

23         MR. FISHER:  I think without a doubt, your Honor,

24   she is.  Did she have knowledge of --

25         THE COURT:  So you -- so what is your authority

1    for reading the word "participant" as "aware of"?

2          MR. FISHER:  Well, I cite it in my memo, Page 2,

3    the first full paragraph:  "In fact, courts consistently

4    count as participants those," and I quote, "were (1)

5    aware of the criminal objective and (2) knowingly

6    offered their assistance."

7          THE COURT:  Well, but that's an accessory.  So you

8    say Slaney is an accessory?

9          MR. FISHER:  Well, you don't necessarily have to

10   be a co-conspirator.

11         THE COURT:  No, no, no, an accessory is not a

12   co-conspirator, an accessory is one who is aware of the

13   criminal conduct and does something to help bring it

14   about.

15         So you're telling me Slaney's an accessory?

16         MR. FISHER:  I think she -- yes, I think she is.

17         THE COURT:  All right.

18         MR. FISHER:  And even Mr. O'Neil at one point, he

19   testified before the court and jury and he had serious

20   concerns about receiving names and passing them along,

21   he felt very uncomfortable.  He also testified that he

22   was afraid that he would end up in court one day

23   testifying about what happened.  And he was someone who

24   went to Ms. Tavares.  She is the person I think these

25   other participants viewed as a supervisor in this.

1          THE COURT:  But how about Dalton?  I mean an

2     accessory has to share the same criminal intent as the

3     perpetrator.  You don't say Dalton did?

4          MR. FISHER:  Well, I don't think they have to

5     share the same criminal intent, they have to be aware of

6     the fact that --

7          THE COURT:  So it's less that -- you say

8     "Participant" is less than an "accessory"?

9          MR. FISHER:  I think I -- yes, I think it is.

10          THE COURT:  And your authority is?  We have no

11     First Circuit case interpreting it in that broad

12     fashion.

13          MR. FISHER:  Well, your Honor, I think -- the

14     quote I take is from United States v. Anthony and also

15     United States v. Beau, including that "a person need

16     only have participated knowingly in some part of the

17     criminal enterprise" --

18          THE COURT:  Um, help me out with the court there?

19          MR. FISHER:  Oh, I apologize.  That was the Fifth

20     Circuit, your Honor.

21          THE COURT:  Yes.  All right.

22          MR. FISHER:  And just to remind the Court, this

23     part of the argument is only for getting to the five

24     people.  Again, we're at three now.  And frankly, um, it

25     can also be "otherwise extensive," and that also gets

1   you around, I think the count of getting to five people.

2   I think it's easier for us to get to five people under

3   circumstances to which the Court acknowledges.  And of

4   course I also cited in my memo, um, the chart that we

5   submitted as an exhibit which shows --

6          THE COURT:  Oh, yes, I have that in mind.

7          MR. FISHER:  So this is a rather -- so even if we

8   can get away from trying to get to two of --

9          THE COURT:  But she had a high -- she had a high

10  position, next to the Commissioner, the highest, at

11  least at the end, but for instance you're not saying

12  Cremens is a participant?  He had the position before

13  her.

14         MR. FISHER:  Correct, but we don't have any -- we

15  didn't have any evidence that he was the one passing

16  names along.

17         THE COURT:  Quite so.

18         MR. FISHER:  There's also another element that --

19         THE COURT:  No, my point is, simply because she

20  occupied that position doesn't make her a leader of this

21  criminal enterprise.

22         MR. FISHER:  No, my argument is that her activity

23  and what she did, in the testimony we presented to this

24  court, and the other participants in this rather

25  extensive conspiracy.

1          The other factor I'd like to note, your Honor, is

2     Ms. Tavares, during the time of this conspiracy, was a

3     member of the bar, she was a lawyer, and in fact, and I

4     think it's noteworthy, she came from the General

5     Counsel's office, she was a Deputy General Counsel.  So

6     this is somebody that, I suggest was, if not should have

7     been aware of the fact that when these union jobs and

8     promotions are grieved, that these deputy commissioners

9     and regional administrators are being sent off to

10    arbitrators and testifying under oath as to how the

11    policies and procedures are being followed.

12         In fact, I suggest she had a fiduciary duty that

13    if she had -- even if she had heard this was occurring,

14    to bring it to somebody's attention, to make sure it did

15    not occur.  In fact, not only did she not do that, as I

16    said, she was like the air traffic controller here.  She

17    made sure the planes landed and took off on time, that

18    names were sent to the right panels, that the names were

19    passed on, that they made it to the final rounds, that

20    things happened the way they should happen.  That when

21    regional administrators who were being passed names

22    would call and say, "Ms. Tavares, I'm having a problem

23    getting this person on the list," "Well, do the best you

24    can."  That's someone with, I suggest, clear ability to

25    make decisions and leadership ability as part of this

1    scheme.  Not only in the organization, but in making

2    sure this scheme runs effectively.

3          THE COURT:  And Mr. Burke?

4          MR. FISHER:  Well, Mr. Burke, your Honor, he was

5    again another -- he wasn't the First Deputy

6    Commissioner, but he was the Deputy Commissioner out

7    west.  And out west I think the testimony, presented to

8    the court and jury, demonstrates that he was as powerful

9    as Jack O'Brien out west.  In terms of the number of

10   people out there that spoke to him, um, we had testimony

11   from Mr. DeAngelis.  Mr. DeAngelis said that Mr. Burke

12   was his boss as Deputy Commissioner and he had received

13   names from Mr. Burke and had also communicated to

14   Mr. Burke his concerns with the fact that these names

15   were being passed on.

16          One of the first witnesses in the trial, I know it

17   was my first witness, Mr. Driscoll, had also testified

18   that he had received names from Mr. Burke and likewise

19   had said, "Well, I have concerns with this."  Again, I'm

20   paraphrasing.  And Mr. Burke's response to him was,

21   "Well, I wrote the book on this, don't worry about it,"

22   so to speak.  So this is somebody who as a Deputy

23   Commissioner should have been not only not doing what he

24   was doing in passing names along to subordinates to

25   effectuate this crime, but if he had found out it was

1    happening, should have been reporting it to the

2    Counsel's office or somebody to crack down on this

3    hiring abuse.

4         Another person to testify, I think closer to the

5    end of trial, was Stephen Alpers, and that was the Marie

6    Parente hire, and he testified that Mr. Burke -- that

7    even though Mr. Burke was the Deputy Commissioner out

8    west and not in the Milford region, um, Mr. Burke had

9    called him before the interview to say that -- um, to

10   pass along Ms. Parente's name.  Again that shows, I

11   think, the supervisory powers that Mr. Burke had in this

12   criminal conspiracy.  He wasn't someone who just was

13   being told where to interview people and "Here's the

14   name you have to make sure is on the list," he was

15   someone who actually, we had testimony, had passed on

16   names.  Um, two rather high-level functionaries within

17   the Department of Probation, but clearly these three

18   individuals, including Ms. Tavares and Mr. Burke, were

19   higher-level than anybody else in the conspiracy.

20        THE COURT:  And you say, now focusing on

21   Mr. Burke, that DeAngelis, Driscoll and Alpers, in

22   addition to the people here, were "participants" in this

23   criminal activity as that language is used in the

24   sentencing guidelines, and your authority is that Fifth

25   Circuit case?

1        MR. FISHER:  And I believe there was a Sixth

2    Circuit case, also, your Honor.

3        THE COURT:  Fifth and Sixth Circuit.

4        MR. FISHER:  Yes, that's my argument.  In terms of

5    DeAngelis and Driscoll, their testimony was that they

6    actually did get names on the list.  And just to be fair

7    and concise, Mr. Alpers, for the Parente hire, I believe

8    he stated that he was given a name, of Ms. Parente, but

9    he did not in fact rank her, I believe, higher because

10   of anything that --

11       THE COURT:  But taking things in favor of the

12   verdict, which I must do here, we'll accept that

13   testimony that he was given names -- a name.

14       MR. FISHER:  Yes.

15       THE COURT:  Fine.  All right.

16       MR. FISHER:  So we come to -- you know, I think it

17   shows that Ms. Tavares and Mr. Burke were -- Ms. Tavares

18   more than Mr. Burke in terms of who handled the day-to-

19   day maintenance of this conspiracy actually functioning

20   and running on time and making sure names were on lists,

21   Ms. Tavares clearly was more of a leader in terms of the

22   evidence we presented, but I think for purposes of this

23   enhancement, Mr. Burke was also an organizer or leader.

24       And in terms of -- and I'll move on to trust now,

25   your Honor, that I would argue for both defendants.

1  Again as I said last week, we start there by asking did

2  they hold a position of public trust?  I think there's

3  really no doubt to that.  They were -- you know,

4  Ms. Tavares was a member of the bar, she was the First

5  Deputy Commissioner of a major, I believe, 2000-member

6  law enforcement organization in Massachusetts with a

7  very high-level position to make sure it operates

8  effectively in serving the citizens of the Commonwealth.

9  So then once we satisfy that question under the

10  guidelines, as I say in my memo, we have to ask

11  ourselves, "Did they use that position in some way to

12  facilitate or conceal the offense?"

13       Well, in this offense the only way you really can

14  be a participant or a leader or an organizer is to be a

15  member of the Department of Probation.  I think that

16  goes hand in hand.  It is their position that allowed

17  them to get this criminal conspiracy off and running and

18  hide it from others.  If they were much lower than their

19  -- from the probation Commissioner, the First Deputy, to

20  the Deputy Commissioner, they'd have too many people to

21  report to, but effectively they are the leadership, they

22  report to themselves, and that enabled them to hide this

23  from the public at-large and from the larger judiciary

24  as to what was really happening.  They actually had the

25  ability to make sure that these names were presented on

1    interview forms to appear as if these people were

2    weighed on their merits and on their credentials and on

3    their resumes and on their answers to specific

4    questions.  You don't have the ability to present that

5    package to the CJAM and the judiciary and then

6    arbitrators and lawyers for people that are grieving

7    them unless you have the position of trust they had.

8    That's really the only way to present those packages to

9    people who are going to be analyzing them and asking

10   people under oath how did individuals score this way and

11   how did you select and promote people under these

12   policies and procedures.

13        Any other individuals but them, I don't think

14   would have been able to pull it off.  And therefore I

15   suggest they also violated a position of public trust.

16        THE COURT:  Thank you.

17        For Ms. Tavares?

18        MR. BAILEY:  Yes, your Honor, I'm going to handle

19   the organizer and leader part of the argument.

20        At the outset, regarding the transcript, your

21   Honor, I suggest there is an estoppel issue at least

22   with regard to the manager/organizer.  That colloquy did

23   occur on March the 23rd prior to trial commencing.  And

24   then the second one occurred on July the 11th and

25   according to my notes the closing arguments were only

1    four days later.  We're 12 weeks into the trial at that

2    point.  And while certainly we agreed with this court's

3    wise decision to perform an Apprendi colloquy at that

4    time, I don't think that anybody, at least as far as

5    Mr. -- I can't speak for Mr. Amabile, but I can for

6    myself, realize that it was focused on anything other

7    than that abuse of trust, if at all.  And I suggest that

8    to go further than that at this point is unfair to us

9    and also may well have been estopped.  I would ask this

10   Court to consider the timing of that "second," as

11   Mr. Fisher says, um -- I can't remember, "update" or

12   "revision" or whatever.

13       Your Honor, with regard to the argument today we

14   laid out in our sentencing memo the application notes

15   with regard to this organizer and supervisor, and I

16   disagree with Mr. Fisher's interpretation of the

17   participants.  And I would like to focus on Dalton and

18   Slaney.

19       I think this court may well recall that when they

20   didn't want to do this, when they didn't want any part

21   of it, when they wanted to -- they went and complained

22   to Mr. O'Brien.  And in fact Mr. Dalton, on

23   cross-examination, when I cross-examined him, said the

24   ultimate decision for him to be taken off the interview

25   panels had nothing to do with Ms. Tavares, and he knew

1    that, and he said words to the effect of "I did not

2    believe she had anything to do with that decision."  And

3    I think Ms. Slaney's testimony, while I didn't

4    cross-examine her exactly on that same point, certainly

5    would echo that and support that.

6         I think to suggest that Ms. Tavares is the

7    decision-maker based on the offense conduct in this case

8    runs counter to the evidence.  We have argued, and I

9    continue to press, that she was a messenger, a passer-on

10   -- a messenger saying who it was who the Commissioner

11   wanted to see go to the next round.  I don't see how

12   that suggests organization, I don't see how that

13   suggests management, and simply to take her position as

14   the first assistant, the First Deputy, I agree, there

15   was testimony that for at least eight years of this

16   alleged conduct Mr. Cremens was the First Deputy and by

17   extension therefore he would be the manager, and that

18   just doesn't work.  And they, in my opinion,

19   respectfully, have cut out the legs from under their

20   argument by saying, "Well, we had no evidence of him

21   doing any of this."  Because at the same time they're

22   saying "enhance her because of her position," but on the

23   other hand they're saying, you know, "Mr. Cremens, even

24   though he's her supervisor, really shouldn't factor into

25   this."

1        I mention Ms. Mucci.  I joke, but this really

2    isn't a laughing matter, but my prepared cross-

3    examination of Ms. Mucci went from 45 minutes to 20

4    minutes to 5 minutes to 2 minutes based on the fact that

5    by the time direct of her was done, she had rarely

6    mentioned our client at all but to say that, yes, her

7    name was stamped on rejection letters and, yes, her name

8    was stamped on these interview packets.  I don't think

9    it was clear who stamped that, whether or not this was

10   anything other than just an administrative function done

11   by Ms. Mucci.  And, your Honor, we have this alleged,

12   and I suppose now, proven scheme where the core of the

13   crime was this certification after this process.  There

14   was no evidence whatsoever that our client participated

15   in any way in the certification practice, even knew what

16   was being certified, what was being said and what was

17   happening at that next level.  That can't be a manager

18   or a supervisor, I humbly submit, if she's not even

19   there at this critical end-stage of the offending

20   conduct.

21       Also there was no evidence that she was

22   participating in the alleged -- and I think this was a

23   phrase that you used, "jimmied scores" at this third

24   round.  That was Mr. Wall who admitted he was doing

25   that.  I don't believe he once said he did that at

1    Ms. Tavares's suggestion or because she said --

2         THE COURT:  But what do you say -- I've pressed

3    the government, but don't assume because I've pressed

4    them that I've rejected the argument, but they say they

5    don't have to show any of that, they simply have to show

6    that these various people knowingly, knowing that it was

7    criminal, participated in a criminal -- this criminal

8    enterprise and that those people are sufficient to be

9    counted for this enhancement.

10        What do you say to that as a matter of law?

11        MR. BAILEY:  I say to that that you respectfully

12   need to look at, with regard to their conduct, whether

13   Ms. Tavares was a decision-maker or whether or not she

14   was simply passing along this --

15        THE COURT:  Well, where are you getting that?  You

16   see there isn't much law interpreting the sentencing

17   guidelines in this regard.  They've done a rather

18   thorough job, it's persuasive only, but you can't point

19   to anything that authoritatively gives a narrower

20   interpretation.

21        MR. BAILEY:  Only the application notes, your

22   Honor, and I think that that's a fair direction to take.

23        THE COURT:  Yeah.

24        MR. BAILEY:  And in some ways I would suggest that

25   for this case and what we're working with, that is

1    probably more appropriate than the Fifth Circuit

2    decision that's cited here.  I think that those seven

3    factors that need to be considered, some of which don't

4    apply at all, also help and aid in our argument.

5         And, your Honor, I think that finally, um, also

6    the whole issue of this ELMO aspect where this court

7    gave us a ruling that all that evidence was simply

8    limited to Mr. O'Brien and not even involving our client

9    even cuts her out further, as does the fact that in my

10   respectful opinion there was no evidence whatsoever of

11   her interacting with legislators, having any part of

12   that, not one speck of testimony regarding that in this

13   case.  And so for those reasons I would respectfully

14   suggest that that enhancement should not apply.

15   Mr. Lanza is now prepared to handle the trust aspect.

16        THE COURT:  I'll hear you, sir.

17        MR. LANZA:  Thank you, your Honor.

18        I think the Zeron case that recently interpreted

19   this enhancement stated that the sine -- basically, they

20   didn't say it in these words, but I think the sine qua

21   non of this enhancement is discretion, whether or not

22   Ms. Tavares abused that discretion when performing her

23   duties.

24        THE COURT:  But of course she did, the jury

25   verdict establishes that.

        MR. LANZA:  Well, I think, your Honor, the

question is whether or not the conduct at issue was

discretionary.  She didn't pick any of the names.  She

didn't choose any of the people that she wanted to pass

along.  She was merely an intermediary.

        THE COURT:  Aren't you asking that case to carry

considerably more water than it does?  She -- the jury

has found she's a co-conspirator in a variety of mail

fraud counts as part of a criminal enterprise.  I, while

I'm making independent findings here, none of those

findings, I suggest to you, would be in conflict with

the jury verdict.  And so if she knowingly participates

in all of the things that the government -- it seems to

me their recitation of the evidence is apt, she's

knowingly doing all of those things, you say, "Well, she

doesn't have any discretion because her position in the

criminal enterprise is she's expected to do those

things"?  Seriously, do you think the case goes that

far?

        MR. LANZA:  It's not a question of whether or not

she's expected to do those things.  So, your Honor, for

the first step, your Honor has to determine whether or

not her position was one of professional or managerial

discretion.  Respectfully the government put on no

evidence what her job actually was.  We have nothing.  I

1   don't see how your Honor can determine beyond a

2   reasonable doubt --

3         THE COURT:  Isn't it a reasonable inference in

4   light of the evidence I do have that she played a

5   central coordinating role in the execution of this

6   rigged hiring scheme?  Mr. Fisher's analogy to an air

7   traffic controller is not farfetched.

8         MR. LANZA:  But an air traffic controller is

9   merely receiving information from another source and

10  it's just hooking up the line and it's going out the

11  other end.  The air traffic controller has no discretion

12  over the signals that are coming in, nor the signals

13  that are going out.  As I said, your Honor, the basic

14  principle of this enhancement --

15        THE COURT:  What about their argument that she's

16  an attorney here?

17        MR. LANZA:  Whether or not she could have

18  exercised better judgment in determining whether or not

19  to go along with the conspiracy or with the charged

20  conduct or the charges at issue is a separate issue of

21  whether or not her actions she had discretion in

22  performing.

23        THE COURT:  She could have refused.

24        MR. LANZA:  She could have refused.

25        THE COURT:  And if she refused -- but I don't

think this is central here when we get to the actual

evaluation, but, you know, she's in an interesting

position here.  Had she refused and done the right

thing, it could well have all brought this down.  It

seems to me that's the evidence.

MR. LANZA:  But, your Honor, we don't know that,

she could have -- your Honor, we don't know that.  And

also, your Honor, that she was an attorney, she wasn't

an attorney -- as First Deputy Commissioner she wasn't

acting as an attorney, that's not what her position was

about.  So I think that, your Honor, they're waving

around the fact that she was First Deputy Commissioner,

I think your Honor needs to look at whether or not that

position, um, afforded her with discretion to abuse, and

if, your Honor, we don't know what her job actually was

there because no evidence was presented, so I don't

think that they can pass the first hurdle.  And as to

the second hurdle, as we've discussed, your Honor,

I don't -- everything that she did was at the direction

of another.  All of her liability is predicated on the

substantive acts of other people.

THE COURT:  It simply cannot be that if you're

asked to do something that's part of a criminal scheme,

your defense is, "Well, I was asked to do it."

MR. LANZA:  But, your Honor, I think that your

1   Honor is conflating the discretion to do the criminal

2   act with the discretion that we're talking about for

3   purposes of the abuse of trust, and I think that's --

4        THE COURT:  What's the authority that you have

5   here for this broad reading -- well, you've cited it,

6   respectfully, you have cited it.  I understand.  All

7   right.

8        MR. LANZA:  So, your Honor, I -- the fact that she

9   passed names on at the direction of another, the fact

10  that her name was stamped and not written on it herself,

11  basically is the fact that all of her acts were --

12       THE COURT:  It's a reasonable inference she knew

13  all that.

14       MR. LANZA:  But the question is whether or not

15  those acts, whether or not she exercised any discretion

16  in performing those acts.  She didn't choose any of

17  them.  As I said, your Honor, she didn't choose any of

18  the names of the people that were to be passed along.

19  She didn't deal with the legislature.  She didn't

20  exercise any discretion with any of the important

21  aspects of the alleged fraud here.

22       Thank you.

23       THE COURT:  Thank you.

24       Mr. Amabile.

25       MR. AMABILE:  Thank you, your Honor.

1          Your Honor, as a preliminary matter I noted your

2     response to my motion to postpone the sentencing until

3     after the indictment had been fully adjudicated, and I

4     think --

5          THE COURT:  Well, I don't know that I've made a

6     formal response, but I told the Clerk what I was going

7     to do and what I'm going to do is once I've done -- I

8     don't mean to prolong, and I've thought about this, the

9     agony for anyone, including the three people who await

10    sentencing.  This afternoon is largely arithmetic.  I

11    find it very difficult to go through arithmetic when I

12    am called upon to devise a fair and a just sentence.

13    We're going to do that tomorrow.  We're going to do the

14    arithmetic today.  And once I've done all the arithmetic

15    today, then you can be clear I'm going to ask the

16    government, because they'll know what the framework is

17    anyway, if they're going to dismiss the rest of it.  If

18    they're not, then I'm postponing it.  Now, that's my

19    plan.  But if they do dismiss the rest of it, we're

20    going ahead with sentencing tomorrow.  Now that's my

21    plan.

22         Is that how you got it?

23         MR. AMABILE:  That's what I was hoping your plan

24    was, your Honor.

25         THE COURT:  Well, that's the plan.  So now let's

1    get to the matters which I need to determine and I need

2    to determine them independently on evidence from this

3    trial.  And I'll hear you.

4         MR. AMABILE:  All right.

5         Well, your Honor, starting with the abuse of a

6    position of public trust, you heard from my colleagues,

7    Mr. Sinnis and Mr. Lanza, and we proceed now with, um,

8    under the supposition that the verdict -- but only the

9    verdict is viable and triggers this inquiry, and I'm not

10   going to add anything to what my colleagues have said

11   with respect to that particular issue because certainly

12   my client was in a position in the -- a supervisory

13   position in the probation department and he's been

14   convicted of committing a criminal offense while in that

15   capacity and I'm not going to add anything more to that.

16        THE COURT:  Very well.

17        MR. AMABILE:  Now, with respect to this issue of

18   leadership, however, your Honor, I think not only do I

19   not think that the government have proved beyond a

20   reasonable doubt at the trial that Billy Burke was a

21   leader in this scenario, I think the evidence and the

22   verdict that supports this conclusion was reed thin that

23   he participated at all in this criminal activity.  He

24   was acquitted of every substantive count.

25        THE COURT:  But that's not before me.

1        MR. AMABILE:  Well, but I think it bears on the

2    issue, your Honor, of whether or not he played a

3    leadership role.

4        Now, with respect to the testimony at the trial

5    and the individuals that are brought up by my colleague

6    here, if you look first at Mr. Driscoll, this is the man

7    who wasn't clear on what decades he was referring to

8    during the course of his testimony, he kept talking

9    about the '90s and -- and certainly with respect to

10   anything he attributed to Bill Burke, it was a vague

11   allegation of having received a name not placed with

12   respect to any particular candidate or scenario, not

13   temporally based or anything of that nature.  So I would

14   suggest that that testimony does not give rise to any

15   support for the proposition of a leadership role.

16       Similarly, with Mr. Nick DeAngelis, he testified

17   that he believed on one unspecified occasion he may have

18   received some names from Billy Burke, but that was it.

19   It wasn't referenced as to any particular candidate, it

20   didn't suggest that he did anything untoward with the

21   information or anything like that.

22       Now, with respect to this allegation respecting

23   the hire of Marie Parente, the jury found that that

24   allegation was not proven.  The testimony was not that

25   Billy Burke said, "You have to score this person" or "I

1  want you to inflate a score" or anything of that nature,

2  and the jury found that particular hire of Marie Parente

3  was not proven.

4      With respect to the other two hires that were

5  alleged in the indictment, Billy Burke's role was to sit

6  as a member of the judge's round hiring panel, and again

7  no evidence that he suggested a candidate or asked

8  anybody to do any scoring or anything like that.

9      Now, contrast that, your Honor, with a number of

10  unindicted parties, like Fran Wall and Pat Walsh, who

11  allegedly changed scores or altered scores in the final

12  round, or Ed McDermott, also a lawyer, who coined the

13  phase "stretch-scoring," these people are above my

14  client with respect to any activity with respect to this

15  particular hiring scenario.

16      So I not only believe, your Honor, that the

17  evidence is completely inadequate with respect to the

18  question of whether or not Billy Burke played a

19  leadership role, but I believe the Court should downward

20  depart by 2 to 4 points.

21      THE COURT:  Well, we'll get to that.  That's not

22  for this.

23      MR. AMABILE:  Okay.

24      Now I also would finally say, your Honor, that I

25  would join Mr. Bailey in saying there's an estoppel

1  issue, that I would also point out that the very

2  thorough investigation conducted by the probation

3  department, um, which addressed both of these issues,

4  found that there was an inappropriate enhancement for

5  violating the public trust but not for the leadership

6  role.

7       THE COURT:  But respectfully, and I'm very

8  grateful for all the work of probation within its realm,

9  this Court makes findings based entirely on evidence.

10 What the Probation Department submits, in a presentence

11 report, is manifestly not evidence.  I'm not considering

12 it as evidence when it helps the government, nor the

13 contrary, where it may help the defense.  Findings are

14 based on evidence.  And here we have the trial evidence.

15 So all right.

16      MR. AMABILE:  Your Honor, I believe that the

17 evidence, the trial evidence, was woefully inadequate to

18 support a proposition that there should be an

19 enhancement for organizer or leader with respect to

20 Billy Burke.

21      THE COURT:  Thank you.  Very well.

22      Upon the argument of counsel and the careful

23 consideration of the enhancements before the Court, the

24 Court finds, beyond a reasonable doubt, that both

25 Tavares and Burke ought be enhanced for abuse of a

1    position of public trust, but does not find that either

2    one of them, and as a matter of fact, were organizers or

3    leaders in this criminal enterprise.

4        We should remember that this exercise gives

5    practical effect to the opinion of the Supreme Court,

6    and I quote Justice Ginsburg in Cunningham v.

7    California, where, speaking for six members of this

8    court, that court, the Supreme Court, Justice Ginsburg

9    said:  "This court, the Supreme Court, has repeatedly

10   held that, under the Sixth Amendment, any fact that

11   exposes a defendant to a greater potential sentence must

12   be found by a jury, not a judge, and established beyond

13   a reasonable doubt, not merely by a preponderance of the

14   evidence."  That, in this Court's view, accurately

15   states the requirements of the Constitution.

16       So having settled those matters, we'll proceed in

17   my usual fashion to go through the first three steps of

18   sentencing, which are largely arithmetic.  I will do the

19   calculations as to each defendant, but first let me

20   inquire of them.  And no one objects if I put these

21   questions directly to the defendant?  If you do, tell

22   me.

23       Mr. O'Brien, have you had a chance to read the

24   presentence report that's been prepared in your case?

25       MR. O'BRIEN:  I have, your Honor.

1          THE COURT:  Have you talked it all over with your

2     attorneys?

3          MR. O'BRIEN:  I have.

4          THE COURT:  Do you believe you understand it?

5          MR. O'BRIEN:  I do, your Honor.

6          THE COURT:  Please be seated.

7          Nothing's been withheld from the presentence

8     report under the Rules of Criminal Procedure?

9          PROBATION OFFICER:  No, your Honor.

10          THE COURT:  Now, Ms. Tavares, have you had a

11     chance to read the presentence report that's been

12     prepared in your case?

13          MS. TAVARES:  Yes, your Honor.

14          THE COURT:  Have you talked it all over with your

15     attorneys?

16          MS. TAVARES:  Yes, your Honor.

17          THE COURT:  Do you believe you understand it?

18          MS. TAVARES:  I do, your Honor.

19          THE COURT:  Please be seated.

20          Nothing's been withheld from the presentence

21     report under the Rules of Criminal Procedure?

22          PROBATION OFFICER:  No, your Honor.

23          THE COURT:  And, Mr. Burke, have you had a chance

24     to read the presentence report that's been prepared in

25     your case?

1          MR. BURKE:  Yes, I have, your Honor.

2          THE COURT:  Have you talked it all over with your

3     attorneys?

4          MR. BURKE:  Yes, I have.

5          THE COURT:  Do you believe you understand it?

6          MR. BURKE:  Clearly, yes.

7          THE COURT:  Please be seated.

8          Nothing's been withheld from the presentence

9     report under the Rules of Criminal Procedure?

10         THE PROBATION OFFICER:  No, your Honor.

11         THE COURT:  All right.  The sentencing proceeds

12    under 18 United States Code, Section 3553(a).

13    Sentencing in this session of the court proceeds in four

14    steps.  The first three steps are largely arithmetic.

15    The fourth step, which we will address tomorrow, is the

16    most important and that is fairly and impartially and

17    adequately to fashion a sentence sensitive to the needs

18    of society and the specific conditions of each

19    defendant.

20         So the first three steps are as follows.  First, I

21    calculate the highest sentence that the Court could

22    impose without regard to any mitigating circumstances.

23    Second, I consult all of the publicly-available averages

24    for sentences of this sort.  I'm quick to say I don't

25    sentence from any averages, but I look at the averages

1    better to understand the weight I should give to the now

2    advisory sentencing guidelines.  Third, as is required

3    by the law, I accurately calculate the sentencing

4    guidelines.  They may be advisory, but the law requires

5    an accurate calculation of those guidelines.

6         If counsel would differ -- and now I'll go

7    defendant by defendant.  If counsel would differ with

8    any of the Court's calculations, I ask you to interrupt

9    me.  I will hear you and then try to resolve the matter.

10        And we'll start with Mr. Burke.

11        MR. BAILEY:  And, your Honor, just that assumes

12   our objection on the abuse of trust, of course.  We

13   don't need to rehash that, I would assume.  That that's

14   now preserved?

15        THE COURT:  But your objection that they're

16   estopped and you didn't --

17        MR. BAILEY:  On the abuse of trust.

18        THE COURT:  Well, I didn't say anything about

19   estoppel.  In light of the Court's finding, I need not

20   address it.  But so the record is clear, I express no

21   opinion on it either way.  By going ahead and making my

22   finding, I did not reject the argument that you,

23   Ms. Tavares, and Mr. Burke make, I haven't rejected it,

24   it's just moot in light of the Court's finding.

25        MR. BAILEY:  But I think that --

1          THE COURT:  But on the abuse of a position of

2    trust, of course your rights are saved.

3          MR. BAILEY:  Okay.  Thank you, your Honor.

4          THE COURT:  All right.  But starting with

5    Mr. O'Brien.

6          In order to get the highest sentence the law, the

7    Constitution will permit and in light of the Supreme

8    Court decisions, not just what I read, that, in our

9    quasi-determinate sentencing system, is the highest

10   sentence, the top of the guideline, properly calculated,

11   without regard to any mitigating circumstances.

12         So we'll start with O'Brien.  As to Counts 1 and

13   2, which are Group 1, the calculation is 19.  I add four

14   levels having found that he's an organizer or leader,

15   another two levels because of abuse of a position of

16   trust, that takes us to 25.

17         Counts 3 through 6 are mail fraud, the base

18   offense level is 7.  I add four levels because he -- I

19   find he's an organizer and leader, another 2 levels

20   because of the abuse of a position of trust, which gets

21   us to 13.

22         You take the highest of those two levels, the

23   highest is 25, the criminal history category is 1, so

24   the highest sentence that under the Constitution this

25   Court could impose is 71 months in prison.

1     If I look at the available databases of average

2  sentences there really is no, um -- the United States

3  Sentencing Commission, where I look first, has no

4  database of RICO sentences, but in this case mail fraud

5  seems to be the largest component, and if I look at the

6  average sentence -- and now again I'm not sentencing in

7  any way from averages, but just so we know what's done

8  with respect to this, the average sentence for fraud --

9  I get a lot of sentences from the sentencing commission,

10  but they group all different types of fraud, the average

11  sentence nationwide is 29 months.  The average sentence

12  in the First Circuit is 27 months.  The average sentence

13  in the District of Massachusetts is 36 months.

14     If you look at the publicly-available database

15  maintained originally by our Official Court Reporter,

16  Mr. Womack, and now continued by our Official Court

17  Reporter, Mr. Romanow, and you look at the sentences I

18  have imposed for mail fraud subsequent to Booker, there

19  aren't that many sentences but the average is 66 months.

20  Those are the averages.

21     MR. SINNIS:  Your Honor, since you asked us to

22  interrupt, the one thing I will say about that is, and

23  I've had this, for lack of a better word, "issue" with

24  your Honor's use of these statistics in that your Honor

25  described -- I think yourself admittedly is described as

a, you know, sentence-to-the-middle kind of judge.

THE COURT:  I have said that publicly and I affirm it.

MR. SINNIS:  Right.  And so my concern about these stats, and what I would ask your Honor to consider doing between today and tomorrow, is to try to develop -- and I don't know that I've been able to do that, but perhaps you could at least do it for this session, which is mail fraud with no monetary benefit, because the mail fraud guideline is predominantly a loss-driven guideline.  And so the numbers that your Honor just gave are presumably loss-driven.

THE COURT:  Well, let's put it on the record.  I have looked and I can tell, for my specific sentences, I have not had a mail fraud case where there was no loss calculation.  I'm well aware of that.  I think a court must be transparent in sentencing, that's why I mention these averages, because they're out there, people can see them, that's what actually happens to people who commit these crimes.  I don't know, because you can't tell from the sentencing commission, but I can tell from those sentences I have imposed and there is none where there was no monetary loss.

MR. SINNIS:  I appreciate that your Honor has looked at that.

1              (Ms. DeMaso leaves.)

2              THE COURT:  All right.

3              Now, my calculus of the sentencing guidelines, and

4     because there's no mitigating circumstances,

5     arithmetically are the guidelines properly calculated

6     with respect to Mr. O'Brien?  We'll ask the government.

7              MR. WYSHAK:  Yes, your Honor.

8              THE COURT:  And with the defense, arithmetically?

9              MR. SINNIS:  Arithmetically, yes, your Honor, and

10    I would just note my objection to your finding on the

11    abuse of a position of trust that you made.

12             THE COURT:  And your rights are saved.  And I

13    don't know that that's necessary.  But as to each of the

14    enhancements I found, your rights are saved.  Now,

15    turning to Ms. Tavares.

16             Ms. Tavares, because of the racketeering and

17    conspiracy, the base offense level is 19.  I add two

18    levels because of the abuse of a position of trust,

19    taking us to 21.  As to the mail fraud, the base offense

20    level is 7, two levels because of the abuse of a

21    position of trust, takes us to 9.  The highest is 21.

22    So a criminal history category of 1.  The highest

23    sentence I could impose constitutionally is 46 months.

24    I've recited the averages, because I'm looking to mail

25    fraud, and so I will simply ask Mr. Bailey,

1    arithmetically, are the guidelines properly calculated?

2         MR. BAILEY:  Your Honor, arithmetically they are,

3    although we did have a role in the offense, um --

4         THE COURT:  I will hear you.

5         MR. BAILEY:  Mr. Lanza is prepared to address

6    that, your Honor.

7         THE COURT:  Yes, I will hear you.

8         MR. LANZA:  Good afternoon, your Honor.

9         For the reasons that Mr. Bailey stated for finding

10   against an enhancement, we believe that a mitigating

11   role in the offense, um, that a downward departure is

12   appropriate in this case.

13        THE COURT:  Well, wait a minute.  I don't mean to

14   sandbag anyone.  If you think these calculations are

15   wrong and there should be a minimal role, I will hear

16   you.  It is appropriate tomorrow to ask for a -- I'm

17   setting a framework --

18        MR. LANZA:  I apologize.  I'm using the wrong

19   vernacular, your Honor.

20        THE COURT:  Right, it is.  And then I'm going to

21   say to the government, "Okay, this is the framework, are

22   you going to go forward or are we going to have another

23   trial and then we'll see where we are?"

24        So as to the framework, if you're going to argue

25   for a downward departure, that's tomorrow.

1          MR. LANZA:  No, your Honor.  I apologize.

2          THE COURT:  So in that framework, I will hear you.

3          MR. LANZA:  No, we're asking for a downward

4    adjustment --

5          THE COURT:  Thank you.

6          MR. LANZA:  -- pursuant to the United States

7    sentencing guidelines -- and I don't have it right in

8    front of me here.

9          Your Honor, Ms. Tavares simply passed names along,

10   her name was stamped on rejection letters, whether or

11   not that technically falls within the mail fraud

12   statute, I think is a separate issue of whether or not

13   she had a minor role in the greater offense, which is

14   this, as your Honor put it, um, was a large conspiracy,

15   a racketeering conspiracy involving mail fraud and

16   involving it with the legislature.

17         Your Honor, there was no evidence whatsoever --

18   and I'm sorry, your Honor, it was 3(b)(1.2)(B).

19         Your Honor, my client had no involvement with the

20   legislature.  The biggest piece of the government's

21   case, at least insofar as the racketeering charge is

22   concerned, involved bribes and gratuities with the

23   legislature.

24         THE COURT:  Well, there were no bribes.  We're

25   sticking to the verdict of the jury.  That wasn't the

1    biggest piece either in time or, um, what's driving this

2    is the mail fraud, the rigged hiring system.

3          MR. LANZA:  Well --

4          THE COURT:  That's the criminal enterprise here.

5    I didn't even admit any evidence of gratuities against

6    your client.

7          MR. LANZA:  Apologies, your Honor.

8          The purpose of the mail fraud is to curry favor

9    with the legislature.

10         THE COURT:  That's the government's theory and

11   vindicated by the jury verdict.

12         MR. LANZA:  But, your Honor, there was no evidence

13   establishing Ms. Tavares's involvement with the

14   legislature or whether or not she even knew that the

15   purpose of that was to influence the legislature.

16   Moreover as to --

17         THE COURT:  What do you think the purpose was?  I

18   mean you sat here and saw this.  It's not that these --

19   that many of these people were personal friends of

20   Mr. O'Brien, most of these people were largely unknown

21   to and of course unknown to Ms. Tavares and Mr. Burke.

22   But not all.  Certainly not all.  But most of them are

23   people whose names came from outside the department,

24   outside indeed the judiciary.

25         MR. LANZA:  But, your Honor, that -- just -- I

1    think that's an inference that you might want to draw,

2    but I think there is a difference between whether or not

3    that was proved beyond a reasonable doubt.

4         THE COURT:  Well, this -- proof beyond a

5    reasonable doubt goes to all those things that might

6    drive the sentence up.  I'm not as satisfied with that.

7    We don't need proof of -- we don't need any sort of

8    proof to go down so long as it commends itself to my

9    discretion.  But I'm saying as a matter of discretion,

10   how much sense does that make?

11        MR. LANZA:  Understood.  Your Honor, I would like

12   to focus on the acts that underlie the mail fraud

13   charges because that's what underlies the entire RICO

14   charges is the acts related to the mail fraud.

15        THE COURT:  Correct.

16        MR. LANZA:  And, your Honor, what the government

17   -- what we've heard over and over again is the passing

18   of names, her name stamped on rejection letters, and

19   fielding calls from people that were unhappy with the

20   process.  I respectfully submit, your Honor, that that

21   is a minor role in the overall and it deserves a

22   two-level downward adjustment.

23        THE COURT:  Thank you.  I understand the argument.

24   The Court rejects that argument.  There's no two-level

25   downward adjustment.

1         Let's turn now to Mr. Burke.  In Mr. Burke's case

2    it's only the base offense level for racketeering

3    conspiracy.  That's 19.  And like Ms. Tavares, I found a

4    two-level upward adjustment, that takes us to 21.  The

5    highest sentence under the Constitution that the Court

6    could impose is 46 months.

7         The Court -- I've mentioned the averages and no

8    need to recite them again.  The appropriate range -- and

9    I didn't say the appropriate range under the -- um, for

10   each one of these people.  Let's go back.  I was talking

11   about the top.  But just so we have the arithmetic

12   right.

13        With respect to -- and I'm going back now.  With

14   respect to Mr. O'Brien, the advice from the sentencing

15   guidelines is a sentence of not less than 57 nor more

16   than 71 months, probation for not less than 1 nor more

17   than 3 years, a fine of not less than 10,000 nor more

18   than $100,000, and a special assessment of $600.

19        With respect to Ms. Tavares, the appropriate range

20   is not -- as recommended anyway, is not less than 37 nor

21   more than 46 months, a period of supervised release of 1

22   to 3 years, a fine of 7,500 to $75,000, and a special

23   assessment of $600.

24        With respect to Mr. Burke, the range, as I've

25   calculated it, before hearing from Mr. Amabile, is 37 to

1    46 months, a supervised release of 1 to 3 years, a fine

2    of 7,500 to $75,000, and a special assessment of $100.

3         Mr. Amabile, you suggested that a downward

4    adjustment was appropriate and I'll hear you.

5         MR. AMABILE:  Well, first of all, we agree that

6    those are the correct calculations, your Honor.

7         THE COURT:  Arithmetically.

8         MR. AMABILE:  Arithmetically.

9         Your Honor, with respect to Billy Burke, I believe

10   there is a, um, grounds to depart downward for a minor

11   or minimal role.  There was no conviction of any

12   substantive mail fraud count and that was in spite of

13   the fact that the case was submitted to the jury on the

14   theory of foreseeability and that was rejected by the

15   jury.  So not only did he not engage in any conduct as a

16   principal, as an aider or an abettor, but the jury also

17   found that it wasn't proven that he, um, could

18   reasonably have foreseen any of the conduct, the mail

19   fraud conduct.

20        THE COURT:  Well, no.  You know, certainly damning

21   evidence as to him is that testimony of the statement

22   which I credit, I will tell you, "I wrote the book on

23   this stuff."  Now time has passed.  The statute of

24   limitations appropriately -- and I'm not sentencing for

25   anything that hasn't been proved, but when you say you

1    want a minimal role, it sounds -- it seems to me that

2    he's four-square in the conspiracy that the jury found,

3    and the calculus I've come up with reflects that.

4         MR. AMABILE:  Well, your Honor, respectfully

5    obviously you have discretion here.  I frankly think

6    that crediting Mr. Driscoll's testimony is a -- is

7    fraught with peril frankly under the circumstances.  The

8    man came in here under medication, he couldn't even

9    describe the proper decade, we don't know when, where,

10   how that alleged statement was made.  But looking at

11   simply what the jury found, there are two predicate acts

12   that Bill Burke was involved in on the judge's round

13   hiring panel and in neither of those is there any

14   evidence that he suggested to anyone that they should

15   change a score, alter a score, or anything of that

16   nature whatsoever.

17        So I would suggest to the Court that under these

18   circumstances the jury did find that he was a member of

19   a conspiracy, found that he couldn't foresee any of the

20   substantive mail fraud acts, and I think under these

21   circumstances, your Honor, that -- and I'm using your

22   discretion that it is appropriate to reduce his offense

23   level by either two or four points or three points.  If

24   it was 2, that would be fine, but I think it should be

25   4.  But I would ask the Court to reduce the offense

1  level under these circumstances for Billy Burke by a

2  minimum of two points.

3      THE COURT:  Thank you.  The Court declines to

4  reduce the guideline calculations already made on the

5  basis of a role in the offense.

6      Well, now we're -- as I see it we're at the end of

7  the matters I plan to deal with this afternoon, but

8  Mr. Amabile's motion on behalf of all the defendants

9  makes perfect sense.  The government knows the framework

10  now, knows that this is advisory, has read the

11  sentencing memoranda.

12      Are they prepared to dismiss the remaining charges

13  or do you want the second part?

14      MR. WYSHAK:  No, we will just file a motion to

15  dismiss the pending charges next week, your Honor.  So

16  we're prepared to go forward.

17      THE COURT:  And that's perfectly satisfactory.  I

18  take you at your word.

19      The fourth step, and most important step, we will

20  resume at 2:00 p.m. tomorrow afternoon to fashion an

21  individual sentence in each of these cases.

22      I have that civil matter, but you folks are all

23  excused.

24      MR. WYSHAK:  And, your Honor, may I?

25      THE COURT:  Yes.

1          MR. WYSHAK:  Mechanically, um, are you going to --

2          THE COURT:  Here's how I intend to do it.  That's

3     a perfectly good question.

4          Because these are individual sentences, I intend

5     to go in the order we've been going, to hear the

6     government as to Mr. O'Brien, to hear the defense as to

7     Mr. O'Brien.  Without going any further, to do the same

8     for Ms. Tavares and then to do the same for Mr. Burke.

9     Having done that, I intend to afford each of the

10    defendants their right to allocution.  Having done that,

11    I intend to impose sentence.

12         MR. WYSHAK:  Thank you.

13         THE COURT:  As I have read all these materials,

14    um, I think I am prepared for argument.  But I think

15    that's both fair and we'll give everyone their best

16    rights.

17         So good question and that's how I'm going to do it

18    tomorrow afternoon.

19         You folks stand excused and we'll go back to the

20    civil case.

21         (Adjourned, 4:00 p.m.)

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5     do hereby certify that the foregoing record is a true

6     and accurate transcription of my stenographic notes,

7     before Judge William G. Young, on Wednesday, November

8     12, 2014, to the best of my skill and ability.

9

10

11    /s/ Richard H. Romanow 06-30-15
      _____
12    RICHARD H. ROMANOW  Date

13

14

15

16

17

18

19

20

21

22

23

24

25