1              UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3                            No. 1:12-cr-40026-WGY

4

5

6   UNITED STATES OF AMERICA

7

8   vs.

9

10  JOHN J. O'BRIEN, et al

11

12

13                      * * * * * * * *

14

15                  For Hearing Before:
                   Judge William G. Young
16

17                  Sentencing (Continued.)

18

19                  United States District Court
                   District of Massachusetts (Boston)
20                 One Courthouse Way
                   Boston, Massachusetts 02210
21                 Thursday, November 13, 2014

22                      * * * * * * * *

23          REPORTER: RICHARD H. ROMANOW, RPR
                   Official Court Reporter
24              United States District Court
        One Courthouse Way, Room 5510, Boston, MA 02210
25                 bulldog@richromanow.com

1                    A P P E A R A N C E S

2

3    FRED M. WYSHAK, JR., ESQ.
     KARIN M. BELL, ESQ.
4    ROBERT A. FISHER, ESQ.
        United States Attorney's Office
5        J. Joseph Moakley U.S. Courthouse
         1 Courthouse Way, Suite 9200
6        Boston, Massachusetts 02210
         (617) 748-3954
7        Email: Fred.wyshak@usdoj.gov
         For the United States

8

9    STYLIANUS SINNIS, ESQ.
     WILLIAM W. FICK, ESQ.
10   CHRISTINE DeMASO, ESQ.
        Federal Public Defender Office
11       District of Massachusetts
         51 Sleeper Street, 5th Floor
12       Boston, Massachusetts 02210
         Email: stellio_sinnis@fd.org
13       For John J. O'Brien

14

     R. BRADFORD BAILEY, ESQ.
15   ADAMO LANZA, ESQ.
        Denner Pellegrino, LLP
16       Four Longfellow Place, Suite 3501
         Boston, Massachusetts 02114
17       Email: bbailey@dennerpellegrino.com
         For Elizabeth V. Tavares

18

19   JOHN A. AMABILE, ESQ.
     JAMES C. BRADBURY, ESQ.
20       Amabile & Burkly, P.C.
         380 Pleasant Street
21       Brockton, Massachusetts 02401
         Email: John.amabile@amabileburkly.com
22       For William H. Burke, III

23

24

25

```
 1          P R O C E E D I N G S
 2          (Begins, 2:00 p.m.)
 3          THE CLERK:  Now hearing 12-40026, the United
 4   States of America versus John J. O'Brien, et al.
 5          THE COURT:  Once again, for the record, I'll ask
 6   counsel to identify themselves.
 7          MR. WYSHAK:  Good afternoon, your Honor, Fred
 8   Wyshak, Rob Fisher, and Karen Bell, for the United
 9   States.
10          MR. FISHER:  Good afternoon.
11          MS. BELL:  Good afternoon.
12          MR. BAILEY:  Good afternoon, your Honor, Brad
13   Bailey and Adamo Lanza for Elizabeth Tavares.
14          MR. AMABILE:  Good afternoon, your Honor, John
15   Amabile and my partner, James Bradbury, we represent
16   Bill Burke.
17          MR. SINNIS:  Good afternoon, your Honor, Stellio
18   Sinnis, along with Ms. DeMaso and Mr. Fick, for
19   Mr. O'Brien.  Again Ms. DeMaso may have to leave, your
20   Honor, because her jury is still out.
21          THE COURT:  And of course she's excused.
22          I've explained the order of argument and so with
23   respect to Mr. O'Brien, we'll hear the government.
24          MR. WYSHAK:  Yes, your Honor.
25          Yesterday we obviously went through the guidelines
```

1    factors and today.  I'd like to address the 3553 factors

2    that are relevant in this case.

3         The first thing I'd like to talk about is the

4    nature and circumstances of this offense.  This is a

5    10-year long conspiracy.  It's not a single episode,

6    it's not an incident of aberrant behavior, it's a

7    deliberate course of conduct that was designed to evade

8    the requirements of the trial court to conduct a merit-

9    based hiring system.  The seriousness of this offense

10   cannot be overstated.  Public corruption undermines the

11   public's confidence in government, and when that

12   happens, we are all lost.

13        I'd like to provide the Court with some anecdotal

14   evidence that occurred during the course of the

15   investigation of this matter.  During the course of the

16   investigation the FBI agents and the prosecutors on this

17   case met with dozens, if not close to 100, applicants

18   for jobs with the probation department.  Many of these

19   people were young, just out of college, vivacious,

20   smart, worked hard to get a job in law enforcement, um,

21   and they were unable to get a job in probation as they

22   all realized, after attempting on several occasions,

23   because they didn't have the right political

24   connections.  This was particularly demoralizing for

25   these individuals, young people who will become and are

1    citizens of this Commonwealth.

2         THE COURT:  You say they realized it?

3         MR. WYSHAK:  Yes, they were told, after many

4    attempts to get a job, they were told by people in the

5    probation department, they were told by other people in

6    law enforcement that if you want to get a job you need

7    to find somebody who's got some political connections in

8    state government who can pick up the phone and make a

9    telephone call to Jack O'Brien.

10        You know, the practice not only demoralized people

11   outside the probation department who were trying to get

12   jobs, but it demoralized the people inside the probation

13   department who had to participate in what they viewed as

14   this corrupt hiring system.  I think that you heard

15   testimony from people like Ellen Slaney and Ed Dalton

16   and Rick O'Neil who were ashamed and embarrassed by what

17   they had to do.  I think John Cremens, who was

18   Mr. O'Brien's first deputy for many years testified the

19   rigged hiring system had a demoralizing effect on people

20   inside the probation department.  And this sort of gets

21   us to the character of the defendant.

22        Mr. O'Brien is a public servant.  He abandoned his

23   obligation to serve the public and instead sought to

24   serve the interests of his political friends and allies.

25   The defense argues, in their many submissions and

1  perhaps through the trial, that Mr. O'Brien was the

2  victim of a political culture that existed on Beacon

3  Hill.  Well, I suggest to the Court that when somebody

4  is asked to do something that is wrong, no matter what

5  their position, they have an option.

6      THE COURT:  Well, now, you're absolutely right and

7  it has been argued and conceivably may be argued today

8  that he's a victim of a political culture.  It seems to

9  me that the jury's very careful and nuanced verdict puts

10 paint to that argument.  He was no victim.  He wasn't a

11 victim at all.  He was the organizer and leader of this

12 massive and corrupt scheme.

13     At the same time doesn't this trial make clear

14 that there was a patronage culture within the

15 Massachusetts judiciary and how should I take that into

16 account?

17     MR. WYSHAK:  Well, I think -- as I was about to

18 say, first I do not disagree with you, your Honor, that

19 Mr. O'Brien paints himself as a victim and I agree with

20 you that he is not really a victim, but he paints

21 himself that way, and, you know, I am going to ask some

22 rhetorical questions which perhaps Mr. Sinnis or

23 Mr. O'Brien, if Mr. O'Brien chooses to speak, can

24 address.  But one of those questions is if he felt like

25 he was a victim of this culture, he had an option and an

1    option was to say "no," an option was to walk away.

2    It's not an excuse to engage in wrongdoing because of

3    pressure from third-parties, especially a man who's in a

4    position of trust and in a position, the high position

5    he was in.

6         And you're correct, there was a patronage culture

7    on Beacon Hill.  I think that there was testimony about

8    that, um, and I don't think anybody is denying that.

9    But similarly he's the responsible party here, he's the

10   Commissioner of the Department of Probation, the rules

11   are clear that he's to conduct a merit-based hiring

12   process.

13        THE COURT:  But granting everything that you say,

14   which your carefully supported evidence, and I come

15   again to the jury's verdict, supports, in this culture,

16   he's not a victim of it, but in light of the goals for

17   sentencing how do I factor in that in essence he's at

18   the end of an era here where for far too long we have

19   tolerated patronage in hiring?  The goals of sentencing

20   are punishment, general deterrence, specific deterrence,

21   and rehabilitation.  How does the facts -- inescapable

22   now that we've had the trial, how does the general

23   approach to things that, obtained over the period that

24   this rigged hiring scheme was in effect, how does that

25   factor in here?

1        MR. WYSHAK:  Well, I think it factors in, as I've

2   said, I agree the defendant was not a victim, he paints

3   himself as a victim, in fact he exploited this system

4   for his own benefit, and that's why I think Mr. O'Brien

5   crosses the line in return for, um, receiving authority

6   to make appointments, um, beneficial legislation.

7        He made a deal with Tom Finneran, a boyhood pal of

8   his, back in 2000, 2001, I think the evidence is, that

9   if he had the hiring authority, which is power, within

10  the state system, that he would service the patronage

11  system that Finneran was a proponent of.  If you may

12  recall there was testimony that Mr. Finneran was not

13  happy with the judiciary's responses to requests for

14  members of the legislature to hire their friends, people

15  who worked on their campaigns, and that is one of the

16  reasons that Mr. Finneran went to Mr. O'Brien and

17  switched that hiring authority.  And so Mr. O'Brien

18  exploits that system for his own benefit, for his own

19  personal relationships with members of the legislature,

20  to aggrandize power to himself.

21       One of the things that strikes me most about this

22  case is that there has been absolutely no acceptance of

23  responsibility here.  The defendant has claimed he had

24  no intent to defraud anybody, he knew -- everybody knew

25  how the system worked, including Judge Mulligan, so --

1          THE COURT:  Well, that's been his position.

2          MR. WYSHAK:  That's what he says.

3          THE COURT:  And the jury disagrees with that and

4     it seems to me their verdict is amply supported.

5          MR. WYSHAK:  And these are the questions that I

6     hope to hear answers to from Mr. Sinnis or Mr. O'Brien

7     himself.

8          I mean if his claim was true, which I don't

9     believe there is, why create this Byzantine interview

10     process, why pass names down?

11          THE COURT:  But really, fine, I mean asking your

12     rhetorical questions, but you're trying to persuade me

13     to impose what, given the guidelines, is a rather harsh

14     sentence.  Given the circumstances of this case, how

15     will that sentence serve the four statutorily set out

16     goals of a sentencing system?  That's what I need to

17     know.  Whatever you're hoping Mr. Sinnis may say, I'll

18     have some questions for him.  But how will it serve

19     those goals?

20          MR. WYSHAK:  Well, I think the most important goal

21     to be served here is the goal of general deterrence.

22          THE COURT:  General deterrence?  Do you think --

23     you know, one thing that I absolutely commend the

24     government for is bringing this case to trial.  Others

25     may differ with that.  I do not.  If ever there was a

1  case where the light of day of a full, careful, and

2  impartial trial is important to the progress of society,

3  this trial and the verdict of that jury is it.  And I

4  commend you.  Now having said that, I mean it's reported

5  that the Trial Court Administrator, Harry Spence, has

6  not, since the day of the trial, received one call, one

7  call from the legislature with respect to hiring.  So

8  the trial has served a purpose.

9        So do you truly think we're going to find other

10  people in the position of these three?

11       MR. WYSHAK:  I do think that the culture on Beacon

12  Hill still exists.  I think that, um, if this Court's

13  sentence does not speak loudly to that culture, it will

14  persist.  I suggest to the Court that if you really want

15  to look at whether or not the legislature has the

16  ability to reform itself, these so-called "ethical

17  reforms" which occurred on the heels of this scandal are

18  clearly just a Band-Aid approach to the problem.

19       THE COURT:  Well, why do you say that?  Look, I

20  really do try to be transparent.  One of my problems

21  here is this.  If I impose very harsh sentences, perhaps

22  that doesn't send the message that -- it's all too easy

23  then for to us say, "Well, we found these rogue, evil

24  individuals who have done all the things you say they've

25  done, and now, by imposing a harsh sentence, now the

1    problems solved."  I rather than the problem is more

2    nuanced than that and I'm not -- perhaps that makes it

3    too easy.  We think we've done it.  And you're

4    suggesting to me we haven't.  Well, I'm a little more

5    optimistic than you, I think there was something to this

6    trial and the verdict of the jury.

7           MR. WYSHAK:  I don't disagree with that, but, you

8    know, Mr. O'Brien sits here today -- today still loyal

9    to this discredited patronage system still saying, "I

10   didn't do anything wrong."

11          THE COURT:  But he has a right to appeal, I'm not

12   going to punish him --

13          MR. WYSHAK:  He has a right to appeal, but --

14          THE COURT:  I'm not going to punish him if he

15   doesn't beg for forgiveness or something.

16          MR. WYSHAK:  It's a factor that the Court should

17   take into consideration in sentencing the defendant,

18   whether or not he has accepted responsibility for his

19   crimes or whether he's still loyal to a corrupt and

20   discredited system.

21          THE COURT:  What if a person says, "I'm innocent,"

22   they're found guilty, and they still say, "I'm

23   innocent," do you think I should impose a more severe

24   sentence because of that fact?

25          MR. WYSHAK:  I think that a defendant's refusal to

1    accept responsibility and loyalty to a group of -- well,

2    an institution which is discredited and past its time is

3    something that the Court should consider in imposing

4    sentence in this case.  It just befuddles me how, um, he

5    sits there and denies any responsibility when the

6    objective facts are so apparent here.

7         And getting back to the character of this

8    individual.  And I'll talk about the letters in a

9    minute.  But I think one of the things that the Court

10   should take into consideration, in addition to

11   falsifying the documents and making false

12   certifications, what Mr. O'Brien did to insulate

13   himself, to take care of himself, is he created this

14   final interview panel, which he did not participate in,

15   and he put three other people in the position where they

16   had to falsify those final scores, and those were the

17   people who had to go to grievance proceedings and

18   arbitration proceedings and raise their right hand and

19   testify under oath falsely, so that he didn't have to do

20   it.  And that is the character of this man, a man who

21   exploited a corrupt system for his personal benefit and

22   then subjected others to jeopardy to protect himself.

23        And again, these --

24        THE COURT:  And the Court has so found and has

25   taken into account the enhancement that the sentencing

1   guidelines provide for that.  I have.  You're right.  I

2   am groping towards a perfect sentence and you say this

3   sentence is appropriate for general deterrence.

4         MR. WYSHAK:  I also will suggest to you, your

5   Honor, that the government has approached Mr. Sinnis on

6   more than one occasion, asked for Mr. O'Brien's

7   cooperation --

8         MR. SINNIS:  I'm going to object to this, your

9   Honor.

10        MR. WYSHAK:  I think it's relevant.

11        THE COURT:  Well, wait a minute.  Wait a minute.

12   Wait a minute.  I asked, at the beginning of the trial,

13   whether there was any plea offer and I was told there

14   was not, and I take it -- I mean I believed that.  I

15   mean you represented that to me.

16        MR. WYSHAK:  There was no discussion of a plea,

17   there was a discussion of cooperation.  And if there had

18   been cooperation --

19        MR. SINNIS:  Objection, your Honor.

20        THE COURT:  No, I'm going to hear him.  I'm going

21   to hear him.

22        MR. SINNIS:  Objection.

23        THE COURT:  But isn't that his right?

24        MR. WYSHAK:  It may be his right, but it's an

25   indicator of where Mr. O'Brien -- you believe that the

1    system has reformed itself or may be on the way to

2    reforming itself based upon these proceedings, yet one

3    of the primary actors here, I submit to you, is still a

4    true believer in that system, and if Jack O'Brien,

5    having sat through this trial for two or three months,

6    still believes that there's nothing wrong with what he

7    did and the way Beacon Hill operates, then we've gone

8    nowhere.

9         THE COURT:  Well, let me say it absolutely

10   straight to you.  Nobody is going to be sentenced in

11   this court for exercising a constitutional right.

12   Nobody is ever going to be punished for going to trial

13   and maintaining their innocence.

14        Now he is a convicted felon.  He's awaiting

15   sentence.  Your factual recitation as to what went on at

16   the trial, um, and Mr. Sinnis, if he's going to argue

17   it, ought have it in mind, I -- so far I think I accept

18   everything there.  I'm not so sure that equates to the

19   sentence that the government recommends.  And that's

20   why, in all candor, I'm asking.  You tell me "general

21   deterrence," that I understand and I must weigh very

22   seriously, but the fact that he won't cooperate because

23   you're seeking somebody else is not a factor in this

24   sentence and I make that absolutely clear.  I think it

25   would be unconstitutional if it was.  So I'm paying no

1   attention to that and I'm the one you're trying to

2   persuade.

3       MR. WYSHAK:  I think the Court has great liberty

4   in terms of what facts it may consider in determining

5   what an appropriate sentence is.

6       THE COURT:  You are right there, I am, and I'm

7   telling you I won't consider those.

8       MR. WYSHAK:  Okay.

9       THE COURT:  So I think I've got your argument.  If

10  there's more, briefly, I'll hear it.

11      MR. WYSHAK:  I'm not finished because I would like

12  to comment on the letters now.

13      THE COURT:  Briefly.

14      MR. WYSHAK:  I've been a prosecutor for a long

15  time and I've tried a lot of cases like this and I've

16  seen these kind of letters and I would just comment, um,

17  that it's not uncommon in cases such as these to see

18  stacks of letters.  People have many sides.  People have

19  the side that --

20      THE COURT:  And you recognize Mr. O'Brien has many

21  sides?

22      MR. WYSHAK:  Yeah.  And people can be good family,

23  members of the family, they can be respected in the

24  community, and then they can go to work every day and

25  commit crimes.  That's what happened here.  I have no

1    doubt that the people who have written letters, who know

2    Mr. O'Brien on a personal basis, truly believe what they

3    say, but they didn't go to work with him, they didn't

4    participate in this scheme, they didn't feel the

5    pressure in the workplace to abide by his wishes.

6    You'll note, that with the exception of Janet Mucci,

7    there's not one letter from any of the regional

8    administrators or other people who were required to

9    participate in this criminal activity at his behest.

10            I am a little surprised to -- and I think, you

11   know, again this goes back to the issue of general

12   deterrence, to see letters from some of the people who,

13   um, you know, are members of the law enforcement.  I

14   have to think that maybe they don't know all the facts

15   and details of this case.  I saw a letter from Bob Ryan,

16   who both you and I know, um, and one of the things he

17   doesn't tell the Court is that his wife, Colleen Ryan,

18   is Chief of Staff to State Representative Tom Petrolati.

19   So I just -- so I provide the Court with this

20   information, um, it's only because of the significance

21   of the letters and the volume, but I do believe that

22   this court is in a position to affect change.

23            I would like to --

24            THE COURT:  Well, is it the Court or is it the

25   verdict of the jury which speaks volumes to the actual

1   crimes here?

2        MR. WYSHAK:  It's a combination, your Honor.  It's

3   a combination.  If the jury comes forward with a verdict

4   finding the defendants guilty in this case and the Court

5   does not act on that verdict in a manner which gives it

6   the weight and importance that it deserves, it sends the

7   wrong message.

8        THE COURT:  That I agree with and thank you.

9        Mr. Sinnis?

10       MR. SINNIS:  Thank you, your Honor.

11       THE COURT:  Let me cut right to the chase here.

12  Your argument suggests that probation is an appropriate

13  sentence here.  I find that very difficult to accept.

14  Now you're trying to -- as I've said to Mr. Wyshak,

15  you're trying to persuade me here.

16       How, given the multiple counts of conviction, all

17  of which seem to me to have ample evidence to support

18  them, the fact that it's racketeering, with this

19  criminal enterprise, he's the organizer and leader, how

20  can you -- and I respect you as I respect Mr. Wyshak,

21  you're advocates for your respective clients, but I'm

22  having a great deal of trouble starting out there, and I

23  say that only to frame your argument.

24       MR. SINNIS:  And I think how I want to start then

25  is to answer that question which I think goes hand and

1   hand with your question of how do you take into account

2   the culture of patronage that has existed in

3   Massachusetts and what impact does that have on the

4   sentence or how does that get factored into the

5   sentence?  Which is, I think, the question you posed to

6   Mr. Wyshak.  And what I say about this is I think that

7   there are two related concepts here, one is the offense

8   conduct and then the other is the trial of this case,

9   and how do those two things affect the sentencing

10   factors that your Honor needs to consider?  And I start

11   with the offense conduct in this sense, and I think this

12   goes to your question of patronage and the culture of

13   it.

14        There have been high-profile public corruption

15   cases in this courthouse recently, Wilkerson, Turner,

16   DiMasi.  Those were not marginal behavior cases.  Okay?

17   Judge Wolf made that point at the DiMasi sentencing.  In

18   the sense that when you take money, when you take cash,

19   you clearly know that you are doing wrong.  There's

20   no -- that's a black and white line there.  That's like

21   going into a bank with a gun and robbing it.

22        THE COURT:  All right, I follow that.  And if

23   you're going to make something -- I mean here there's

24   lying repeatedly, suborning perjury, um, there is an

25   extensive longstanding scheme involving a number of

1  people to in essence corrupt the system and make it a

2  sham.  Mr. Wyshak says it better than I, but that is in

3  fact what's established here.

4       So the fact he didn't take money, I do take that

5  into account, Oh, I do, but all of those other crimes

6  are established here.

7       MR. SINNIS:  Well, first of all, I disagree with

8  that, and I think the jury's verdict, fairly read, says

9  that they did not agree with that.  If the jury agreed

10 with what your Honor just said, there would be no "not

11 guilties" in this case, there wouldn't have been the,

12 quote, unquote, "nuanced verdict" in this case.  If they

13 believed that this was unrelenting across the board,

14 there wouldn't have been a "not guilty" in various

15 hires.  There wouldn't have been the government

16 withdrawing certain hires from their going to the jury.

17      THE COURT:  The fact that there is a reasonable

18 doubt as to various of the charges shows how careful the

19 jury was.  You hardly can turn that into some

20 affirmative endorsement of those hires.

21      MR. SINNIS:  Well, I am operating under what I

22 believe is this Court's longstanding principle that

23 people are only sentenced for things that are proved

24 beyond a reasonable doubt.

25      THE COURT:  Absolutely right.

1      MR. SINNIS:  And if they're not proved beyond a

2 reasonable doubt, then I think it's inappropriate and

3 unconstitutional for the Court to make an assumption,

4 which is where the line gets crossed, an assumption that

5 every hire that Mr. O'Brien engaged in or every

6 promotion Mr. O'Brien engaged in was somehow not the

7 most qualified person.

8      THE COURT:  I have not made that assumption nor do

9 I make that assumption, but I'll tell you I am convinced

10 beyond a reasonable doubt that this was a rigged hiring

11 scheme, he was the organizer and leader of it, and over

12 the entire course of the indictment the system was

13 designed to further political patronage.

14      Now, the fact that there was a reasonable doubt as

15 to certain of these people may depend upon their

16 individual qualifications, it may depend on a variety of

17 factors, all of which the jury was allowed to consider,

18 but it doesn't turn into some affirmative endorsement of

19 Mr. O'Brien's conduct.

20      MR. SINNIS:  But if the scheming -- and I take

21 your Honor's point that it may well be a finding that --

22 in these people's qualifications, and what I'm saying is

23 I don't want this court to make assumptions about the

24 1100 other people who were hired and promoted in the

25 probation department based upon a finding that 12 of

1   them were not qualified or the most qualified persons

2   for that position.  But let me move on to try to answer

3   more directly your question.

4        So I think the answer to your question kind of

5   gets to a notice issue, and I don't mean that in any

6   defense-of-criminal-responsibility way, that's not what

7   I'm using the "notice" word for.  But you have this

8   culture, you have this culture of patronage in the court

9   system -- and not just in the court system, I'm sure in

10  other positions of state government as well.

11       THE COURT:  It's the court system we're concerned

12  with here and confine yourself to that.

13       MR. SINNIS:  Okay, so in the court system.  And I

14  think Judge Johnson's letter talks about that in his

15  letter in support of Ms. Tavares about the history here.

16  I think my point is how does that affect the sentences?

17  My point is that it should mitigate it and this is why I

18  say this.  I say that because if you're the first person

19  to cross -- to transgress a line that is now criminal,

20  the jury has spoken, it's criminal, what he did was

21  criminal -- and we're going to appeal that, we're

22  accepting it for today's purposes, but the jury has

23  decided that the line was crossed, that was a heretofore

24  unknown line in some ways in terms of patronage hiring.

25       And so the concept of deterrence and general

1    deterrence gets to the fact that the next person, if

2    there is, which I cannot imagine, and I'll get to that

3    later in my argument, that there will be another person

4    who now decides to hire based upon patronage in the

5    Massachusetts court system.  But if there is a next

6    person, that person is duly on notice and they deserve

7    the harsher punishment than the first three people who

8    were plucked out of this system and prosecuted for it.

9    And I think this goes to --

10             THE COURT:  Well, they were hardly -- wait a

11    minute.  They were hardly plucked out of this system.

12    He ran it.  The other people were co-conspirators.

13             MR. SINNIS:  A poor choice of words.

14             THE COURT:  Yes.

15             MR. SINNIS:  But this gets me back to the trial.

16    I think the trial in this case was exceedingly

17    important.  I agree 100 percent, your Honor.  I think

18    this case needed to be tried.  Okay?  It needed to be

19    tried because there were important legal principles,

20    constitutional principles.  And I think, in the grand

21    scheme of things, trying this case actually had an

22    impact on general deterrence.  I think if these three

23    individuals came in and pled guilty, the general

24    deterrent factor actually would have been less.  The

25    publicity, the daily publicity, the daily press about

1     this case served a general deterrent purpose.

2         I don't think there's a single person -- I think I

3     wrote this in my memorandum, that would want to be

4     sitting where Jack O'Brien is today, I don't think the

5     head of the MBTA, the DOT, or any of those people would

6     want to be here, and I can almost guarantee they're not

7     going to continue this process.  So I think the trial

8     mattered and I think it was an important trial to have.

9         And I want to get to this because Mr. Wyshak -- I

10    understand -- I think and I hope where your Honor's at,

11    but the concept --

12         THE COURT:  Well, I happen to agree with what you

13    said about the importance of the trial, and so, um,

14    getting to the sentence here?

15         MR. SINNIS:  Yes, because the trial, in and of

16    itself, acts as a general -- creates more of a general

17    deterrence in the population.

18         So you're looking at the factors of sentencing and

19    I think if we're having an honest and candid

20    conversation, the four factors listed in 3553(3)(a)(ii)

21    are the only ones that are applicable here are just

22    punishment and general deterrence, because I don't think

23    your Honor believes that Mr. O'Brien is going to commit

24    -- certainly not a similar offense, but I don't think

25    your Honor thinks he's going to commit any offense.

1          THE COURT:  Okay, so narrow it down, you're right,

2     those are the ones that I am most seriously grappling

3     with.

4          MR. SINNIS:  And I don't think general deterrence

5     has any more impact.  General deterrence wants to do two

6     things, it wants to send the message and it wants the

7     message received.  Well, the message has been sent and

8     how do you know the message has been received?  The

9     message has been received because the statute has been

10    changed, it's been amended in terms of how hiring can be

11    conducted, how recommendations can be handled, they're

12    put off to the very end now under the relevant statute.

13    The trial court manual has been amended to say that you

14    have to take a Civil Service exam, to say that you have

15    to put the recommendations in a lock box until the end

16    of the process and that then they become public so

17    everybody knows about them.

18          THE COURT:  What about just punishment?

19          MR. SINNIS:  I will get to just punishment in a

20    moment, your Honor.

21          So I think that has been served.

22          In terms of just punishment, your Honor -- well,

23    to look at this man now today and to say that he hasn't

24    been punished, I think would just not be taking a candid

25    view of the situation.  He has been stripped of his

 1    pension as of probably roughly 5:00 p.m. tonight or

 2    whenever sentence is imposed.  He has been personally

 3    destroyed and humbled.  He is a convicted felon, as your

 4    Honor indicated, which maybe that doesn't carry a lot of

 5    import or weight to a lot of the individuals that I

 6    represent or your Honor sentences, but I think it

 7    carries a lot of weight in this case.  I think it's a

 8    large factor.  His life is never going to be the same.

 9    He has been punished.

10         The question is -- the government says, "Send a

11    message," "Send a message," "Set an example."  You know,

12    I'm asking you to do the same thing.  We're asking you

13    to do the same thing.  But the message we're asking you

14    to send is that the criminal justice system is measured,

15    not vengeful, that the criminal justice system looks at

16    the entirety of a person, not simply the worst thing the

17    person's ever done, and that the criminal justice

18    system, when it's appropriate, as it is in this case,

19    the person is viewed with compassion.  Those are the

20    things that I think are important here today.

21         And I'll just say this, too.  To say that somehow

22    the way this case has been conducted, or Mr. O'Brien has

23    conducted himself during this case, shows a lack of

24    remorse, I think just undermines the Constitution.  He

25    has a right to try this case.  He didn't get up and

1    testify --

2         THE COURT:  I've said so.  I mean, in Judge

3    Selya's words, "Aren't you gilding the lilly?"  Unless

4    you don't believe me, I don't count any of those things

5    against him.

6         MR. SINNIS:  I do believe you.  But there's one

7    other thing I'd like to make on that point.  As your

8    Honor has said -- I've often heard your Honor say, at a

9    Rule 11 hearing, that "I will never punish you for going

10   to trial." "If you change your mind, I will not punish

11   you for going to trial."  And I'm asking you to be very

12   true to that word.  And I mean that in this sense, I

13   mean that in the sense of it's a little bit semantical

14   to say, "I will not punish you for going to trial, but I

15   will reward you by 3 points off if you plead guilty,"

16   because at that point one man's reward looks an awful

17   lot like another man's" --

18        THE COURT:  I recognize that but I've not held our

19   current system unconstitutional and I don't think it is

20   and that's as close as I can, in a plea colloquy, to

21   describing reality, and I try to live by that.

22        MR. SINNIS:  Well, I'm saying to actually not

23   punish him for going to trial, I think your Honor should

24   look at what the guideline would be if he didn't.

25        And I want to say a couple of brief things about

1    the guidelines.  I really don't think the RICO guideline

2    is where your Honor should be starting.  I think -- we

3    made this point in our papers and I just want to say

4    that if you look at the public corruption cases, they're

5    either under mail fraud or more often 2(c)(1.1) or

6    2(c)(1.2), which deal with bribery and gratuity.  And if

7    you -- and the probation department calculated his

8    guidelines under both mail fraud and gratuity.  And your

9    Honor has said repeatedly that this is what this case is

10   about.  And if you look at those guidelines, 1218 for

11   mail fraud, gratuity, 24 to 30 months, we would say

12   those are the relevant starting points.

13        The executive branch's charging decision should

14   not, in some way, infringe upon this court's discretion

15   in sentencing and I think by allowing the RICO guideline

16   to just stand without any type of, you know,

17   interpretation of whether that's really what should be

18   carrying the day here or carrying the water here I think

19   is, in some way, ceding back to the executive branch the

20   discussion of this court.

21        THE COURT:  No, now wait a minute.  We've been

22   through that.  We held a whole hearing yesterday

23   afternoon.  The guidelines are properly calculated.  If

24   you say that their application in this case, that he's

25   not within the heartland of the guidelines, and

```
 1   therefore a principled departure would be to look to the
 2   mail fraud guidelines, I understand that.
 3           MR. SINNIS:  That's what I'm saying.
 4           THE COURT:  That's what you're saying.  All right.
 5           MR. SINNIS:  And I'm saying that --
 6           THE COURT:  But to say I understand it doesn't
 7   mean I agree with it.  But I understand that.
 8           MR. SINNIS:  I understand.  And I'm saying that
 9   it's also supported by the RICO guideline itself.  The
10   introductory commentary to the RICO guideline states as
11   follows:  "Because of the jurisdictional nature of the
12   offenses included, this subpart covers a wide variety of
13   criminal conduct.  The offense level usually will be
14   determined by the offense level of the underlying
15   conduct."  And that simply makes sense because RICO is
16   so vast, it can be violent, it can about money, it can
17   be both, or it can be somewhat more mundane.  And so
18   what the sentencing commission has instructed is "Look
19   to the underlying guideline," and that's what we're
20   asking your Honor to do, look to the underlying
21   guideline.  And if you do that, then I think getting to
22   the sentence of probation is a much, um -- is much
23   closer.  And I'll just say that.
24           I have one or -- two other topic areas, if I may?
25           THE COURT:  Briefly, if you would.
```

1        MR. SINNIS:  One is the unwarranted disparity.  I

2   think that if you look at the cases that I've cited in

3   our brief, DiMasi, Wilkerson, Turner, those -- DiMasi is

4   kind of the high-water mark for public corruption cases

5   in this district.

6        THE COURT:  In terms of sentence?

7        MR. SINNIS:  Yes, in terms of sentence.  There was

8   an Anzalone, who was a Springfield housing chief who got

9   10 years, but I think the facts of that case are so far

10  removed from the facts of this case in terms of millions

11  of dollars in personal enrichment that they're not

12  relevant.  Those are the high-water marks.  But this

13  case is not that case.

14       The case that comes closest, the closest case in

15  the entire country is Sorich, right, I mean that's a

16  very analogous fact pattern, and the lead defendant in

17  that case got 46 months.  And I would just say that that

18  case, as I pointed out in our papers, is much more

19  egregious.  I mean you talk about a political culture of

20  patronage here in the Commonwealth, Chicago had thought

21  they were rid of it, they had federal decrees in place

22  that these people violated, they were signing

23  certifications that were much more clear, they were

24  basically saying "no political influence was

25  administered during this hiring process."  I stand here

1    today advocating to you that, if that was in place, if

2    Jack O'Brien's certifications said "politics played no

3    role in this" or there was a Shakman decree, he would

4    not have committed this offense.  That's not who he is.

5    Despite what Mr. Wyshak says, that is not who this man

6    is.  And I just want to end with who this man is.

7         You've seen the letters.  And I understand what

8    Mr. Wyshak says, in these types of cases you get a lot

9    of letters, but they are tremendously powerful.  And

10   it's not -- it is not just limited to people who knew

11   him in his personal life, it is people who knew him in

12   his professional life.  And I think there have been a

13   couple of falsehoods that just permeate into a case and

14   I think that happens in a lot of cases, especially cases

15   that get tried, and that is that this is somehow an evil

16   man or an uncaring man.  That is not true in his

17   personal life and frankly it wasn't true in his

18   professional life either.

19        He cared about the probation department.  He

20   actually wanted it to improve.  And I'll submit to you,

21   it did improve under him.  And I think there's a lot of

22   letters to support that.  He's a kind, caring man.  He

23   does not deserve to spend 70 months in prison, he

24   doesn't deserve to spend 60, 50, or 40.  I think this

25   case is a case where a nonjail sentence is appropriate.

1           THE COURT:  Thank you.

2           All right.  I'm going to turn to Ms. Tavares and

3    I'll hear the government.

4           MS. BELL:  Thank you, your Honor.

5           Your Honor, the government's recommending a

6    sentence of 46 months imprisonment for Ms. Tavares.

7           THE COURT:  Let me cut to the chase, just again to

8    sharpen it up.

9           One of the real problems I have in wrestling with

10   a fair and a just sentence to Ms. Tavares is that my

11   take on this is that Fran Wall and Pat Walsh were more

12   culpable, more culpable than she.  Now I fully

13   understand the executive's power to grant immunity and

14   normally immunity is granted so you can go up the

15   ladder.  I don't criticize it.  It's within the power of

16   the executive.  It's determinations that the executive

17   makes.  But when you come to sentence, I see them as

18   more culpable.  And the fair treatment of people with

19   roughly equivalent culpability is a significant aspect,

20   I think, of the duty that faces me.

21          So doesn't that drag down what would be an

22   appropriate sentence for her?

23          MS. BELL:  Well, I think the first point, your

24   Honor, is that we don't view Ms. Tavares as being less

25   culpable than Fran Wall and Pat Walsh, and you have to

```
 1   look at it this way.  Certainly I understand your
 2   Honor's concern, Fran Wall and Pat Walsh were culpable,
 3   they lied under oath at arbitration proceedings and
 4   they, um, essentially were in charge of this sham third-
 5   round interviewing process where they ranked people how
 6   they were told to rank them.
 7           THE COURT:  That's how I see it.
 8           MS. BELL:  I agree.  But then you have to consider
 9   -- I mean I think you have to consider what the evidence
10   showed that Ms. Tavares did.  All right?  Ms. Tavares
11   was above them --
12           THE COURT:  Well, she was above them in the
13   organizational structure.
14           MS. BELL:  And she was above them in her role in
15   the scheme.  This scheme could only work, in the entire
16   hiring process, from the first interview to the
17   rejection letters sent that appeared legitimate, whether
18   they called her the "air traffic controller" or the
19   "central commanding figure" in the scheme, she was
20   responsible for this entire implementation, not just one
21   part of it and not just the arbitration proceedings, but
22   all of it, she was the primary person who passed names
23   to these interviewing panels.  That without that the
24   scheme doesn't work because Mr. O'Brien can't hire
25   because these people were not the most qualified people.
```

1  So these people, if they were not passed on from first

2  to second to final round interview, Fran Wall and Pat

3  Walsh wouldn't even have had a chance to rank them

4  Number 1, Number 2, and Number 3.  So she's the primary

5  person responsible for all of that.

6       At any point in these two hearings --

7       THE COURT:  Do you think the evidence bears that

8  out?

9       MS. BELL:  I do.  I think what the evidence showed

10  is that at the very beginning of this conspiracy

11  Ms. Mucci was responsible for doing that and then there

12  was a period, I think where there was a hiring freeze,

13  so there was less of it going on.  But apart from the

14  very beginning when Ms. Mucci was doing it to some

15  extent, it really was Ms. Tavares.  If you think about

16  every regional administrator here, who did they get

17  their names from?  They got their names from Elizabeth

18  Tavares.  Fran Wall, he got his names from Elizabeth

19  Tavares.  If she wasn't passing those names to Fran

20  Wall, he wouldn't have been having to make up scores

21  and, um, falsify scoring sheets.

22       So within the context of the scheme she held a

23  position superior to Fran Wall and Pat Walsh and at any

24  point could have stopped it, at any point, and at no

25  point did she.

1          THE COURT:  Could she really have stopped it?

2          MS. BELL:  She absolutely could have, your Honor.

3     And I think important to that is the fact that

4     Ms. Tavares is an attorney, she's a lawyer, so she can't

5     hide behind, "Well, I didn't really think any of this

6     was wrong.  I didn't really understand what I was doing.

7     I didn't understand the goals of the scheme.  I was just

8     doing what Jack O'Brien was telling me to."  She's a

9     lawyer.  She worked for three years in the legal

10    department of the probation department.  She knew what

11    arbitration hearings were about, she understood the

12    significance of them, the testimony that went on there.

13    But despite that this is an individual who took names,

14    passed them on, knowing, knowing that the end result of

15    this was Fran Wall and Pat Walsh going into those

16    arbitration proceedings and lying about the very names

17    that she passed on, the very names that she was passing

18    on.

19          She knew that Fran Wall and Pat Walsh were having

20    to go into arbitration proceedings and lie under oath

21    and say "These candidates were hired based on merit."

22    This is a lawyer who knows this.  At the very least she

23    had an obligation, when she found that out, to stand up

24    to report it, to report the misconduct, to say to Jack

25    O'Brien, "Un-Un, this isn't going to fly, you can't tell

1   your employees to lie under oath."  That's at the very

2   least.  As First and Second Deputy Commissioner, she had

3   an obligation to the public that she served at that time

4   to stand up and do something about it.  Not only did she

5   do nothing about it, she continued to perpetuate fraud

6   by continuing to pass on these names.  That makes her

7   more culpable than Fran Wall and Pat Walsh.

8        Her attorneys in their sentencing memo tried to

9   say that they're not arguing the Nuremberg defense here,

10  but that's exactly what they're doing.  She tries to

11  blame everyone else, to blame Jack, to blame the

12  government for overreaching, for charging RICO instead

13  of just mail fraud, but at the end of the day this was a

14  well-informed attorney who was the second, Number 2 in

15  the probation department, the highest-ranking woman in

16  the Massachusetts Department of Probation, Number 2,

17  right under Jack O'Brien, and she's implementing all

18  levels of this scheme.

19       I want to make another point with that, too.  One

20  of the things she was responsible for was being -- was

21  signing the rejection letters.  There's been a lot made

22  of "It was a rote thing," "It didn't mean anything,"

23  "She just stamped her name in the end," but if you

24  actually look at these letters and read the letter, the

25  entire letter is a lie.  I'm going to read one.

1          "Thank you for interviewing for the position of

2     probation officer in the Plymouth division of the

3     Probate and Family Court.  Deputy Commissioners Fran

4     Wall and Ed McDermott were very impressed with your

5     qualifications."

6          No, they weren't, they were given your name in

7     advance -- they were given other names in advance and

8     they ranked them 1, 2, 3 because they were told to do

9     so.  They weren't impressed with anything.

10         "The selection of a final candidate was a

11    difficult process, Commissioner John J. O'Brien has made

12    the final decision."

13         There was nothing difficult about the process, the

14    process was a sham, the person had been preselected for

15    the job at the beginning.

16         "Although you were not chosen, I encourage you to

17    persist in your efforts."

18         "Persist in your efforts"?  Mr. Wyshak said we

19    talked to hundreds of people.  I personally have talked

20    to probably almost 100 people who have applied for jobs.

21         THE COURT:  And they said it was all based on

22    political patronage?

23         MS. BELL:  Excuse me?

24         THE COURT:  They said that they came to understand

25    it was based on political patronage?

1      MS. BELL:  Because sometimes they were told

2   directly, "If you want to get a job here, you go get

3   yourself a Senator or a State Rep who can support you."

4      And then:  "The interview committee enjoyed

5   talking with you and wish you the best in your career.

6   Sincerely, Elizabeth Tavares, First Deputy

7   Commissioner."

8      THE COURT:  Let me put to you the same question I

9   put to Mr. Wyshak with respect to Mr. O'Brien.

10      What of the recognized goals of sentencing are

11   served by the sentence that you propose?

12      MS. BELL:  Your Honor, I think that it reflects

13   the seriousness of the offense, I think that it promotes

14   respect for the law, and I think that it's a just

15   punishment.

16      I think that there's something to be said for, um

17   -- if an individual who commits a serious crime is not

18   punished severely, I don't think it promotes respect for

19   the law, I think the message that it sends to the

20   general public is, um -- "clearly the judge" -- "clearly

21   this wasn't looked at as a serious offense."  "Clearly

22   this person did not engage in serious misconduct because

23   if he or she had, the sentence would have reflected it."

24   So in this case I think there can be no question, this

25   was a massive fraud.

1          THE COURT:  Aren't you concerned, especially after

2     saying that this was pervasively understood that

3     political patronage was going on here, that a

4     particularly harsh sentence will send the message that

5     somehow we've taken care of it?  Rather that, um -- I

6     think Mr. Sinnis picked up on my thought, as an advocate

7     anyway, that we may be at the end of an era here.  And,

8     um, perhaps the sentence ought to recognize how

9     widespread this was.

10          MS. BELL:  Well, your Honor, I hope that we are at

11     the end of an era here.  I want to share the Court's

12     optimism.  I do think progress has been made.  Do I

13     think we're there yet?  No, I don't.  And I think we

14     have -- I think we probably have a ways to go and the

15     State probably has a ways to go.  But I do think

16     progress has been made.  But I still think that it's

17     important for this court to send a message that the

18     conduct in this case was significant, it was severe.

19          THE COURT:  Isn't that message sent by jail time

20     rather than the length of time?  Doesn't the fact that a

21     convicted felon is sent to prison, um, I have always

22     thought that that, the incarceration decision, was --

23     and the whole thing is my responsibility, is perhaps the

24     most difficult responsibility, and then the length of

25     time is obviously significant to the individual, and

1    it's significant to the public to some degree.  But much

2    like otherwise good people who don't pay their taxes,

3    the Justice Department's position, since tax-paying is

4    largely voluntary, we have to fill out our own returns,

5    um, presses for jail time.  And I've always thought that

6    made some sense so that people know, "If you don't pay,

7    you're going to jail."  But how long is a different

8    calculus.

9         So I'm asking you to support your specific

10   recommendation of how long?

11        MS. BELL:  I agree with the Court that certainly

12   the decision to incarcerate or not is -- goes a long way

13   towards sending a message as to how serious the offense

14   is, but in this particular case what really drives the

15   government's recommendation of 46 months is what we

16   perceive to be Ms. Tavares's significant role in this

17   offense.

18        THE COURT:  All right.  Thank you.

19        Mr. Bailey?

20        MR. BAILEY:  Yes, if it pleases the Court, your

21   Honor, in terms of 3553(a), it's sort of a goulash here

22   of who my client is, the nature of the offense and the

23   evidence against her, and the adequacy of punishment,

24   and I know this court will have some questions, but if

25   I'm mixing them all together it's hopefully in order to

1   present this message as articulately and considerate as

2   I can.

3        And I will just start by saying obviously we're

4   all experienced, we've all been through a lot of trials,

5   but I have to say that this outcome is one of the

6   toughest that I have ever dealt with as an attorney

7   given who I know Liz Tavares to be and how I have come

8   to know her, as a woman of grace and strength and

9   dignity and compassion.  And I appreciate very much this

10  court reiterating its policies that she is not going to

11  be punished for exercising her rights and following her

12  attorney's advice, because it is something we struggle

13  with as attorneys with this acceptance of responsibility

14  choice and also with sentencing memos that talk about

15  "no remorse."  I can tell you that there is no one more

16  remorseful than Elizabeth Tavares sitting at this table

17  for a variety of reasons that, um --

18       THE COURT:  Let me put it to you what I'm

19  wrestling with, which I raised with Ms. Bell.

20       Given the fact of conviction and the

21  well-warranted jury verdict, isn't jail time in order?

22  I don't mean to have you argue against your client.  I'm

23  obviously not suggesting that.  But you're trying to

24  persuade me and these are very severe crimes.

25       MR. BAILEY:  They are very severe crimes and, your

1    Honor, if I could just step back a moment and interject

2    something personally, it really does, I believe, answer

3    your questions.

4         I go back a very long time, as do many people,

5    before I was an Assistant U.S. Attorney here, I was an

6    Assistant DA in Middlesex County, I was in the

7    courtroom, I was there with Court Security Officers,

8    we're talking in the early '80s.  We all knew then --

9         THE COURT:  All you people stand up and say, "I go

10   back a very long time."  I can remember when all of you

11   started.

12        (Laughter.)

13        THE COURT:  Go ahead.

14        MR. BAILEY:  That makes me feel better.  Thank

15   you.

16        But we knew that the court security system, those

17   jobs, the trial court officers, had sponsorship from the

18   legislature.

19        THE COURT:  Well, I put that to Mr. Sinnis and he

20   gave me an answer, "How does that fit here?"  That

21   cannot be argued to exclude lying, suborning perjury,

22   the facts of conviction, which I tell you are absolutely

23   supported by that jury verdict.

24        MR. BAILEY:  I understand that.  And I'm getting

25   there.  And jumping forward to when I was sheriff,

1    people would come to me and say, "I want to be a trial

2    court officer," and I'd say, "I can't do anything,

3    you've got to go to the Speaker of the House."  That was

4    in the middle '90s.  This was the backdrop against which

5    this woman had her 30 years in the Department of

6    Probation.  We were all in criminal justice.  This is

7    what we just knew was there and existed.

8         Had she gotten up onto that witness stand -- and

9    this court very carefully did caution me, "I don't want

10   to hear a Nuremberg defense, Mr. Bailey," and I

11   understood that and I think we heeded that.  But had she

12   gotten up there and said, "I was just doing what

13   everybody else was doing," and the jury rejected that, I

14   might understand, but the fact is the testimony that

15   came out and the evidence that came out against our

16   client did not put her in any connection with the

17   legislators, with favors, that "I'm passing this along

18   for that reason."

19        THE COURT:  I wouldn't even let that go to the

20   jury.  She's guilty of racketeering and predicate acts

21   of mail fraud and individual counts of mail fraud.

22   That's what she's guilty of.  There's ample support for

23   that.  Ample support for that.  Now, file an appeal and

24   say you know that evidence was insufficient, but that's

25   not an argument to make here before the judge who

1    presided over the case.  My view is there's ample

2    support for it.

3         MR. BAILEY:  And let's examine what the jury found

4    her guilty of doing, passing along names of people that

5    were -- that the Commissioner wanted into the next

6    round.

7         THE COURT:  They found her guilty of conspiracy,

8    racketeering conspiracy, and predicate acts of mail

9    fraud, which under my charge meant she had to have the

10   knowing, willful joining in a conspiracy to give effect

11   to that fraudulent scheme to -- by lying to get people

12   jobs.  Now, she's guilty of that and my duty is to

13   impose a fair and just sentence for that.  That's what

14   I'm focusing on.

15        MR. BAILEY:  And, your Honor, you're correct that

16   this is not the Rule 29 nor is this the appeal focusing

17   on the evidence, but in considering the fact that she

18   stands convicted I think it is appropriate for this

19   Court to consider the underlying acts that were

20   presented to the jury, and I think that those acts were

21   passing along names from up high, allowing her name to

22   be stamped on rejection letters and on interview

23   packages.  I will not say that that's de minimis, your

24   Honor, because I think that that would be cutting

25   against me, but I would say that when you think about

1    racketeering and racketeering convictions and the

2    sentencing that is applicable to racketeering under the

3    guidelines, I would respectfully submit that those types

4    of sentences really don't adhere to the conduct that

5    this jury found her guilty of.  And I would ask this

6    court to keep that in mind.  And I think more than

7    anything, your Honor, is who live Tavares is.

8         First and foremost I can tell you who Liz Tavares

9    is from my own experience.  Yesterday at this very scary

10   proceeding where numbers are getting calculated and

11   sentencing exposure is happening, in the middle of all

12   of this she turned to me and asked me about something

13   personal I'm dealing with, not about what she was

14   dealing with.  That's something I want this court to

15   keep in mind.

16        When this trial started there was evidence about

17   the lunchroom at the Department of Probation and B.C.

18   football and Jack Cremens and everybody talking about

19   that.  I wanted to present evidence in cross-examination

20   regarding Ms. Tavares's sexuality and how incongruous it

21   would be that she would be a part of any of this.

22   Ms. Tavares told me, "Absolutely not, I will not be

23   labeled as a victim.  I don't want you to do that."

24   That says so much about her.

25        But what says a lot more is the testimony of Fran

1    Wall, your Honor.  Fran Wall, who said that he asked our

2    client to lie on his behalf in front of the Ware

3    Commission.

4         THE COURT:  Yes, now, I have that in mind and

5    you'll know that the government has supplied me with the

6    full statement.  Now, they have an answer to that and

7    they say, "While she was forthcoming in some respects,

8    her testimony was tailored to protect O'Brien and simply

9    cannot be squared with the jury verdict."  And, you

10   know, that's true.  So, yes, she was forthcoming in some

11   respects, but not all.

12        MR. BAILEY:  Well, the Court questions her at

13   Ware, your Honor, "Did you pass along names?"  And not

14   only did she say "Yes," she said, "Numerous times," and

15   that's specifically what Wall asked her not to do.  So

16   not only did he present testimony to the jury that she

17   said that she wouldn't do that, that she would tell the

18   truth, but we have the evidence that she did tell the

19   truth.  And I think the government's issue with that is,

20   "Well, she didn't say anything about legislators and who

21   she knew who were legislators," and I go back to that I

22   don't think there's any evidence that she interacted

23   with legislators.  And just --

24        THE COURT:  This Court will base no conclusion on

25   interaction with legislators.  I'm not persuaded of any

1   of that.

2        MR. BAILEY:  I -- thank you, your Honor.  I

3   appreciated what this court said about Wall and about

4   Walsh.  I think that that does, on some levels, I think,

5   or should inform the decision.  I think when Mr. Sinnis

6   talked about people being "plucked out," I understood

7   why the Court said what it said, but there were 33

8   so-called "unindicted co-conspirators" here and yet --

9        THE COURT:  Well, that, you know -- that was done,

10  at least from this Court's point of view, to aid the

11  government in its evidentiary presentation, and I think

12  appropriately, proactively, we sorted that out and

13  boiled it down.  And, um, I'm confident that in the main

14  my evidentiary rulings were correct and if not correct

15  were harmless.  I took the motions for a new trial very

16  seriously.

17       So the fact that they say they have 34 unindicted

18  co-conspirators is because, in this First Circuit, they

19  think they get some advantage under Petrozziello and

20  Campaglia, that's why they say it.  And it's one of the

21  unfortunate fall-outs of those federal First Circuit

22  cases is that it tends to crowd a trial judge.  If the

23  trial judge strictly goes along with that and allows

24  them to put in all this hearsay, then you come up to the

25  question of are you going to grant a mistrial or not?

 1   And of course judges are loathe to grant a mistrial.

 2   And in that way the government crowds and we see where

 3   we are.  I try not to do that, and I think in this case,

 4   successfully.  In one respect Ms. Bell called my bluff,

 5   and having done it, I made the preliminary finding in

 6   the government's favor, and I'm fully content with that.

 7   And so I'm not paying any attention to what they said at

 8   this stage because that was a pretrial evidentiary

 9   maneuver.

10          MR. BAILEY:  I understand.

11          THE COURT:  Why don't you sum up, Mr. Bailey.

12          MR. BAILEY:  Yes, your Honor.  A few more points.

13   One is this issue about her being a lawyer and how maybe

14   that she should be held to a higher standard than that.

15   I would note that there was testimony that there was a

16   law department at the Department of Probation with four

17   lawyers, and again if you look at it against the

18   backdrop of this entire period of time, I think there is

19   at least an understanding that this is -- what's the

20   word, "sanctioned," or this is -- well, nobody in the

21   legal department is doing anything.

22          But I do want to get to her unique family

23   circumstances because --

24          THE COURT:  Briefly.

25          MR. BAILEY:  -- we have asked you for a departure

1   on that or to take it all into account.

2          But that is her 89-year-old mother and her

3   91-year-old father who lives in the other half of her

4   house, um, suffering from a variety of maladies from

5   dementia to cancer to high blood pressure --

6          THE COURT:  You'll have in mind -- and I want you

7   to make your argument, but I have read every scrap of

8   paper that's been before the Court.  Everyone can be

9   confident I've read everything.  So how much you want to

10  argue is up to you.  But don't think I haven't read it.

11  Go ahead.

12         MR. BAILEY:  Thank you, your Honor.

13         English is their second language.  They depend on

14  her for their medical care, for their medications, for

15  getting to medical appointments.  She is literally their

16  life-line.

17         She also has a 14-year-old daughter, she and her

18  loyal and devoted spouse, Didi, who filed a letter here,

19  um, who is in her formative years.  Because of Didi's

20  business, which is a 12-to-14-hour business, on top of

21  the caring for her parents, Ms. Tavares is also the

22  primary caregiver to her daughter.  The impact of

23  incarceration on this entire family structure and unit

24  will be devastating.  There is no doubt in my mind a

25  jail sentence in this case may result in the last time

1    that Ms. Tavares may see her parents and also will

2    completely undermine the one thing, the one person they

3    have to help her -- to help them negotiate through this

4    very, very difficult system at a time when they need it

5    more than anything.

6        Your Honor, we have 40 letters from judges, from

7    professors, from people who know her, talking about her

8    character, her civic commitment --

9        THE COURT:  But isn't that much -- I don't mean to

10   denigrate it, but I don't know that that adds anything

11   to the argument in the sense that human beings are

12   multifaceted.  You can be sure I've read all of those

13   letters and will consider them.

14       Anything else?

15       MR. BAILEY:  Your Honor, we talk about deterrence

16   and I would reiterate something that was earlier said.

17   Ms. Tavares is losing her pension from 30 years, she's

18   losing her retirement, she will be stripped of her law

19   license and her fall-back situation.

20       Now, we talk about deterrence.  This is the

21   scariest place in Massachusetts, this courthouse.  The

22   fact that people are brought in here and brought before

23   your Honor and brought before a jury, the message that

24   that is sending and all that she has been punished

25   already, your Honor.  And, yes, we understand

1    deterrence.  I've also been in front of your Honor.  I

2    know you respect the guidelines, but I also know your

3    practice is to fashion sentences that are sufficient but

4    not greater than necessary.

5        And when we come to deterrence, I want to end by

6    quoting Abraham Lincoln, who said specifically, I

7    believe, on this topic:  "I've always found that mercy

8    bears richer fruit than strict justice."  I think those

9    words resonate in this case and particularly apply to my

10   client, Elizabeth Tavares.

11       Thank you, your Honor.

12       THE COURT:  Thank you.

13       Now, with respect to Mr. Burke, I'll hear the

14   government.

15       MS. BELL:  Your Honor, I apologize.  May I be

16   heard briefly on a deviation?

17       THE COURT:  No.

18       I'll hear you, whoever's going to argue with

19   respect to Mr. Burke.

20       MR. FISHER:  Thank you, your Honor, that would be

21   me.

22       We're also asking 46 months incarceration for

23   Mr. Burke.

24       THE COURT:  I --

25       MR. FISHER:  Sure.

1          THE COURT:  I didn't plan to fashion questions,

2    but I want you to address this question.  Here's a

3    problem I had with respect to Mr. Burke.

4          The statute under which he was convicted doesn't

5    even require an overt act, as the common law of

6    conspiracy does, it's racketeering conspiracy.  So --

7    and as I've said in the other cases, and you can rest

8    assured, I am firmly of the view that the jury's verdict

9    is amply supported by the evidence in this case.  The

10   verdict of guilty is amply supported.  But it leaves the

11   Court in something of a quandary because it is not clear

12   what he did.  It is clear that he conspired.  That is a

13   crime.  So he certainly had the shared intention for at

14   least two of the predicate acts related to one another

15   in support of the criminal enterprise.  All of that I

16   absolutely believe that the jury verdict is amply

17   supported and must be vindicated, but I'm not clear

18   where we go with that.  And I'll hear you.

19         MR. FISHER:  I think where we go is, um, is that

20   he, as I said yesterday, he was the Jack O'Brien out

21   west.  As you heard he was a -- rather a prolific

22   fundraiser for Tommy Petrolati, um, and in fact

23   Mr. Petrolati, his name came up in the Glenowitz hire.

24   Mr. Glenowitz, after he was promoted and got his badge

25   at Joe's Cafe with Mr. Burke and Mr. Petrolati and it

1  was the back and forth between, "Well, Mr. Glenowitz

2  saying Tom Petrolati," "No, thanks, Bill Burke."  And it

3  shows you what type of power player he was out west,

4  particularly in the Glenowitz hire, but I think also in

5  general with the Driscoll statement, "I wrote the book

6  on this stuff."

7       THE COURT:  But of course those specific things

8  are lawful.  Now, in light of the conviction and drawing

9  intendments in favor of the verdict, which it's my duty

10  and I do so unequivocally, I put a more culpable view on

11  that, yes, that's true.

12       MR. FISHER:  Well, and last night, in preparing

13  for this argument, um, I looked at one of our exhibits,

14  which was before your Honor at the trial, which was the

15  statement, the deposition that Mr. Burke gave to Paul

16  Ware when the SJC nominated him to be the investigator.

17  And there's -- and that drips with the knowledge that

18  Mr. Burke had of this conspiracy and his involvement in

19  it.  In fact, on Page 53 he says to the question, "If

20  names came from the Commissioner's office, at least

21  those names went back to the Commissioner's office, is

22  that correct?"  "I'd say 99 percent of them."  It also

23  shows his in-depth knowledge as a Deputy Commissioner

24  and he admits himself in this deposition that he was the

25  person out west that received the calls from State

1    Representatives, State Senators, and judges, for anybody

2    looking to get somebody hired in probation or promoted

3    within probation.

4        He says, in terms of Mr. Petrolati, question, "Is

5    it well-known that if you want to get a promotion within

6    the probation department, it's a good idea to support

7    Representative Petrolati?"  "Probably would help, could

8    help, yeah, any rep, any Senator.  I mean they're the

9    ones that give us the money."  That was directed at

10   Mr. Petrolati, Mr. Petrolati, whose name came up as

11   evidence from Mr. Glenowitz who was the hire that you

12   heard of, a promotion that you heard of during this

13   case, your Honor.  But it also, I think, informs the

14   Court on how deep he understood in terms of why

15   Mr. O'Brien and others at probation were giving these

16   jobs to members of the legislature.  And I think that

17   boils down to some of the questions you were asking AUSA

18   Wyshak in the beginning.

19       What motivated this was they realized that if they

20   fed this patronage beast, they got what they wanted in

21   return at the end of the year.  In fact there was

22   another quote in here I found particularly telling when

23   Mr. Burke, um, told Paul Ware, "I can assure you" --

24   this was of course in 2010 after the Globe Spotlight

25   Team, after it was well-publicized what had been

1   happening, what was being investigated by Mr. Ware, he

2   says to Mr. Ware, "I can assure you that if Jack O'Brien

3   were still Commissioner, there would be no layoffs this

4   year."  Well, of course he can assure that because Jack

5   O'Brien would give the legislature what they wanted in

6   terms of jobs and therefore whatever he asked for he

7   would get.  It made his life so much simpler.  Instead

8   of being like the other commissioners or cabinet

9   secretaries who had to go in before the legislature and

10  say, maybe with a Power Point, "This is how successful

11  we were this year, this is what my organization is

12  doing, this is what my agency is doing, and this is why

13  we need the money," like the Department of Children's

14  Services or the DHH.  All he had to do is go over and

15  say, "These are the jobs you got, these are the

16  individuals I hired," and therefore he got the money.

17  And that comes out crystal clear in this deposition.

18  Mr. Ware asked on Page 79, "You understood, didn't you,

19  that while it wasn't written down, the legislature was

20  funding probation generously because probation was

21  responding to legislative requests for hiring, among

22  other things, isn't that right?"  "I'd said, yeah."

23       This is somebody who knew the ins and outs of what

24  was going on and particularly telling is how he then

25  explained how it was, who you know and not what you

1    know, in terms of what was important within probation.

2    Question, "What was the process, as you understood it,

3    by which Commissioner O'Brien got funding for

4    probation?"  Answer, "He grew up with a lot of them, I

5    mean he grew up with Tommy Finneran.  Finneran

6    introduced him to a lot of people.  I mean it's

7    politics.  It's who you know."  And that's what we say

8    in our sentencing memo, that this all came down to, it

9    was who you know, and that's what --

10        THE COURT:  Yes, but you don't argue, do you, that

11   he should be sentenced for that, for that knowledge?  I

12   mean one of the things that this trial has demonstrated,

13   however optimistic or not one is about the future, it

14   has demonstrated beyond any doubt that political

15   patronage corrupts in service of judiciary staff.  All

16   right.  But he's guilty of a racketeering conspiracy to

17   commit mail fraud by the hiring of people and making

18   these fraudulent representations.  That's what he's

19   guilty of.  That's what he'll be sentenced on.  So his

20   knowledge of the extent of political patronage is surely

21   relevant, but don't think I'm going to sentence him

22   because of that.

23        MR. FISHER:  No, not just on that, your Honor, I

24   think that --

25        THE COURT:  Well, not just on that, I'm not going

1    to sentence him for that.

2        MR. FISHER:  I think that informs the Court when,

3    um, you look at the evidence that say Fran Wall

4    testified to, that every time he interviewed with

5    Mr. Burke, Mr. Burke would pass on names to him.  I

6    think that background informed this -- he was a Deputy

7    Commissioner, he wasn't just a regional administer or a

8    chief probation officer, he was a Deputy Commissioner,

9    and in his own words was the most important person out

10   west and in the words of other witnesses.

11       So when we have Fran Wall come in here and say,

12   "When I interviewed with Deputy Commissioner Burke, he

13   was the one who would have the names," I think then you

14   look back at his deposition and that informs you in fact

15   that he clearly understood what these names were being

16   used for.  In fact he said "99 percent of the time the

17   names would come on down from the Commissioner's Office

18   and we would pass them back up to the Commissioner's

19   Office, and then those are the individuals that are

20   hired."

21       THE COURT:  All true.  I mean all established, I

22   would say, by the jury verdict.  Yes.

23       MR. FISHER:  And then his involvement with the

24   Glenowitz hire, that's clearly -- because Glenowitz, as

25   we heard, was a bartender at Joe's and that is somewhere

where Bill Burke frequented.  He confirmed it in his
deposition again.  This is all corroborated.  The
information we heard from these individuals -- and I
know Mr. Driscoll is frequently attacked for not knowing
what decade it was, but everything he testified to about
Mr. Burke is corroborated in the deposition in
Mr. Burke's own words that this is the individual who
wrote the book, this is a Deputy Commissioner who knew
what was going on.  This is somebody who clearly
understood why the organization was to do what they were
doing, the details they followed to get it done, and
what they would get in return for it.  And he's someone
who acknowledges himself in the deposition that it
appears he benefitted from it.

He's the person that introduces Speaker DeLeo at a
reception for Representative Petrolati, a fundraiser,
where he admits he went out with other employees from
probation in the "beer wagon," as they call it, to
attend this fundraiser, and he states on the record at
the deposition, "Of course we will go to these
fundraisers, that is where the money comes from.  The
legislators, those are the people you want to impress
upon the fact that you're interested in them and
therefore they have an interest in you."  And this is a
Deputy Commissioner bringing employees out to this

1    fundraiser in a beer wagon that he owns for this event.

2    And I think the biggest take-away for me, when you're

3    talking about general deterrence, um, came from Mr. --

4         THE COURT:  And that is what you're basing your

5    recommendation on?

6         MR. FISHER:  Correct, your Honor.  And to quote

7    him from the deposition, um, towards the end Paul Ware

8    is asking about patronage within the system, within the

9    judiciary, but particularly within the Department of

10   Probation, and Mr. Burke says, "Well, listen, it's the

11   system and it will never change."  This is something

12   said in 2010, the summer of 2010, after the Spotlight

13   Team has already come out, a very embarrassing article

14   which leads to the resignation of Ms. Tavares and the

15   Commissioner, which causes the Supreme Judicial Court to

16   appoint Paul Ware to investigate probation.  And at that

17   stage he's subpoenaed in and he says to the lead

18   investigator, "This will never change."

19        The arrogance of that statement was, I think it is

20   eye-opening, and it calls for very strict general

21   deterrence in this.  The public is watching.  And

22   unfortunately, your Honor, that -- even in the summer of

23   2010 when the cover was blown on this and the news media

24   was already outside Jack O'Brien's house taking

25   statements from him and he was denying that patronage

1    had any influence over hiring, those were the statements

2    made by a Deputy Commissioner within the Department of

3    Probation.   I think that's very telling and that calls

4    for a 46-month sentence.

5         And one other thing I'd like to clear up at the

6    end of the record, your Honor.   I believe last week you

7    had asked me, um, if my office had intended on appealing

8    any of your rulings on enhancements.   Um, I answered

9    that question --

10        THE COURT:   Did I?

11        MR. FISHER:   Yeah, I understood we were talking

12   about enhancements involving Mr. O'Brien and I answered

13   "No."   In terms of any enhancements that we discussed

14   yesterday for Ms. Tavares --

15        THE COURT:   My memory is a little different.   I

16   was addressing the standard of proof.   And I'll tell you

17   what I think.   The standard of proof you have accepted

18   here is proof beyond a reasonable doubt.   I think that's

19   what the record supports.   And you agreed with that.

20        MR. FISHER:   Well, I -- and for me to be clear, I

21   accepted that for what the argument I was making about

22   Jack O'Brien.

23        THE COURT:   Well, I think you accepted it

24   generally, but the record is what it is.   And, um,

25   whether or not you're estopped from appealing is not for

1    me to say and be it at another forum.

2         MR. FISHER:  Your Honor, just for the record, I

3    actually don't even have the power to waive the

4    appellate rights for my office, so.

5         THE COURT:  Well, I don't -- I don't agree with

6    that.  When you appear in a court as an Assistant United

7    States Attorney, you are the United States, and if I ask

8    a question about the intention of the United States, you

9    speak for the United States.

10        But we're off the point here and I want to focus

11   on the point.  The record is what it is.  I've made my

12   findings on the basis that I have.  Those are the

13   findings I must be judged on.

14        MR. FISHER:  Thank you, your Honor.

15        Mr. Amabile?

16        MR. AMABILE:  Thank you, your Honor.

17        Your Honor, when I left the courthouse yesterday I

18   was thinking about what I should say today and I, um,

19   said goodbye to my distraught client and his bereaved

20   family and I happened to then go over and I had a --

21   I went to the bar at the Parker House for the-last-

22   hurrah and I was having frankly a glass of water and I

23   looked up and there are these smiling photographs of

24   Terese Murray and Robert DeLeo.  And it struck me, your

25   Honor, that one of the things that I want to drive home

1    is the lack of proportionality and disparate treatment

2    that is being applied by the United States against my

3    client in this particular case.  And I've looked at --

4         THE COURT:  Wait, wait, wait a minute here.  The

5    executive makes the determination against whom to

6    proceed.  I have always taken it ill for a judge, in the

7    third branch of government, to second guess that

8    determination.  The executive, at least of the head, is

9    an elected official.  If the people don't like the

10   choice with respect to prosecutions, they can decide

11   that.

12        Where I grapple with disparate treatment is the

13   people within the ambit of the investigation.  That's

14   why I mentioned Fran Wall and Pat Walsh.

15        MR. AMABILE:  That's correct, your Honor.

16        THE COURT:  But I simply am not going into

17   disparate treatment with respect to someone who was

18   indicted and someone arguably who was not.  It's not my

19   business.  I express no comment thereon.  The executive

20   has made its choices and I've said and will say again, I

21   think bringing this matter to trial has done an enormous

22   public service.

23        You go ahead.

24        MR. AMABILE:  Your Honor, I totally agree with the

25   statement that it is the executive decision on who to

1    bring to court and who to prosecute in a particular

2    case, but it's the Court's duty and obligation, in

3    fashioning a sentence that is the least severe that is

4    necessary to carry forth the purposes of sentencing --

5         THE COURT:  That's true.

6         MR. AMABILE:  -- to consider the treatment of all

7    people similarly situated and that certainly would

8    include the 30-some-odd people that the government

9    labeled as "unindicted co-conspirators."

10         THE COURT:  But I explained how I approached that,

11    I thought that was just an evidentiary ploy.

12         MR. AMABILE:  Well, but, your Honor, there are

13    certainly people who are involved in this case that were

14    not prosecuted that committed acts that are far more

15    egregious than what was proven at this trial as to my

16    client, William Burke.

17         THE COURT:  Fran Wall and Pat Walsh leap out at

18    me.

19         MR. AMABILE:  How about Ed Ryan?  How about

20    Mr. McDermott, a lawyer who coined the phrase,

21    "stretch-scoring."  You know, we want to talk about

22    lawyers.  Here is an individual -- and you talk about

23    disparate treatment, your Honor, Fran Wall and Pat

24    Walsh, who are way more culpable in this scenario than

25    Billy Burke, retired with their full pensions, they

1    suffered no consequence whatsoever.  Ed Ryan, who is

2    again somebody who in the scheme of things is way more

3    culpable than Billy Burke, is not only not prosecuted,

4    he is still a high public official in the probation

5    department.  And why is that important?  Because, you

6    know, the prosecution, the prosecutors pontificate about

7    how we have to send a message of deterrence.

8         THE COURT:  Well, it is their -- it's not for me

9    to second guess the fact, but Congress has given the

10   executive the power to grant immunity to aid in its

11   prosecutions.  When it does that, I don't quarrel with

12   it or have a problem with it, I simply have raised it

13   and I think you're right to argue it, I've raised it as

14   something I ought consider when I come to sentence

15   people before this court.

16        MR. AMABILE:  I think that's absolutely correct,

17   your Honor, and that's exactly what I'm saying.

18        Now, I listened to my colleague, Mr. Fisher, and

19   it was interesting but he spent no time talking about

20   the facts that were introduced in front of the jury and

21   instead read from a deposition transcript that was not

22   introduced in front of the jury.

23        THE COURT:  Now, I'm very strict on sentencing

24   people on the evidence, but you've got to understand

25   that in a sentencing hearing I'm allowed to consider

1    things that are not in evidence and so that was an

2    appropriate argument about where, within or outside, at

3    least below, the sentencing guidelines the Court ought

4    go.   That's an appropriate argument.

5            MR. AMABILE:   Well, your Honor, that's fine, but

6    your Honor has also indicated, and I absolutely take you

7    right at your word, that we're here to sentence for the

8    conduct that Billy Burke was convicted of and nothing

9    else.

10           THE COURT:   Absolutely right.

11           MR. AMABILE:   Now, your Honor, in terms of

12   analyzing the conduct of Billy Burke and the punishment

13   that he suffers, he's -- he had retired before any

14   charges were brought against him.   He has forfeited his

15   pension.   He's 71 years old.   He and his wife were

16   completely dependent financially on that pension.   He's

17   now a convicted felon.   And contrast that with these

18   other individuals who suffer no consequence at all.

19           Let's look at Ms. Ellen Slaney, who again engaged

20   in conduct, by her own admission, which was similar or

21   greater than that of Billy Burke.   She ends up as the

22   acting commissioner of probation and retires with a full

23   pension.   Ed Dalton, again the conduct that he admitted

24   to is identical or greater than that that was introduced

25   against Billy Burke, full pension, hired back as a

1    consultant.

2         So if you look at that, your Honor, what you're

3    looking at here is a situation where the government

4    vindictively is asking you to impose the maximum prison

5    sentence constitutionally permissible against a

6    71-year-old man while at the same time they hold all the

7    politicians and all of these other high-ranking

8    probation officials who engaged in similar or more

9    severe conduct --

10        THE COURT:  I'm not -- wait one minute.  I'm not

11   adopting any theory that politicians engaged in similar

12   conduct.  I mean that's one of the risks here.  We've

13   heard evidence about the criminal conduct of mail fraud

14   and giving improper gratuities -- well, mail fraud and

15   racketeering is all that pertains to your client.  So

16   I'm just not considering that.  That's not part of the

17   calculus.

18        MR. AMABILE:  Well, your Honor, in the context,

19   however, what you're talking about is punishing the

20   low-level bureaucrat, or middling-level bureaucrat,

21   while these other individuals, more powerful, who

22   benefitted substantially more, are held blameless and

23   immunized by the nature of this progression.

24        Now, your Honor, it is correct, and I would

25   suggest that we discussed this a little bit yesterday

1    and the sentencing guideline calculation that we arrived

2    at yesterday is legally correct, but again, as with

3    Mr. Sinnis, I would suggest to the Court that a fairer

4    more proportional way to look at the conduct of Billy

5    Burke is to look at the mail fraud guideline.  And if

6    you take as your base 7 and you add 2 points for

7    violating a position of public trust, which is something

8    frankly I as much as conceded yesterday, you're at a

9    level 9 and the sentence that's recommended there is

10   within a range where home confinement or probation would

11   be appropriate and the sentencing range is presumptively

12   from 4 to 10 months, if your Honor considered that as a

13   more appropriate measure of the conduct in this

14   particular case.

15        Your Honor, Billy Burke, when you look at the

16   factors under the statute, one of them is the

17   defendant's conduct, the defendant's lifetime, the

18   positive aspects of the defendant's background.  This is

19   an individual, your Honor, who has led an exemplary

20   life.  He was a probation officer for 37 years.  He

21   spent his entire life as a dedicated public servant.

22   He's a military veteran.  He's a strong member of the

23   community.  And this is not something that I'm just

24   making up.  Your Honor has all of these letters before

25   the court from people that really care about Billy Burke

 1     and people that really know Billy Burke.  The sitting

 2     District Attorney in the area that he resides.  Two very

 3     prominent judges from that area, Judge Porada, who ended

 4     up finishing out her career as a judge in the

 5     Massachusetts Appeals Court.  Judge Ryan, who was the

 6     Chief Justice of the North Hampton District Court who

 7     also was the elected District Attorney in that area.

 8     Numerous probation officials who've worked with Billy

 9     Burke have all come forward and told you about what a

10     great and exemplary individual Billy Burke is.

11            He was an incredible worker.  He grew up on a

12     farm.  He's worked hard his entire life, your Honor,

13     with his hands.  He was a worker and you heard this

14     during the testimony of the trial.  He was a worker.  He

15     was a supervisor that never asked anybody to do anything

16     he wouldn't do himself.  He went out on home visits.

17     Your Honor, one of the letters in there talks about a

18     probationer, a teenager who wouldn't go to school, he

19     got in his truck and drove over there and ran after the

20     kid.  And that kid wrote a letter, your Honor, he's now

21     in his 50s, two years after he got off probation Billy

22     Burke helped him get a job in a dairy and this guy

23     worked there for 50 years and he credits Billy Burke for

24     saving his life.  And that's just one out of hundreds of

25     examples.  Mike Ryan testified or wrote this letter

1    about how Billy Burke countless times took probationers

2    under his wing and got them employment, which is

3    somewhat of an ironic situation given these

4    circumstances under which he now finds himself

5    convicted.

6          Your Honor, if you look at the letters and the

7    testimonials, what you find out is that the people that

8    know Billy Burke love him the most.  These are the

9    people that he worked with.  He's loved by the people he

10   worked with.  He's loved by members, his neighbors, and

11   friends in his community, he's loved by his family, he's

12   loved by his lawyers.  Your Honor, I want to say to you

13   that Billy Burke, the idea of sending this 71-year-old

14   man to prison is unconscionable under the circumstances

15   of this case and I would suggest to this court that if

16   we are really looking at the statute that talks about a

17   sentence sufficient but not greater than necessary to

18   comply with the purposes of sentencing, that probation

19   or home confinement or some nonincarcerative sentence is

20   the appropriate sentence.

21         One last thing I would say, your Honor, is here's

22   my client at Age 71, he's been married for 47 years to

23   his wife, Maryanne, what is he doing now?  He's about

24   ready to lose his pension.  He has no Social Security.

25   No medical benefits.  So what's he doing?  71, he's

1    looking for a job.  And he's -- and I've submitted a

2    letter, he's found potential employment in a potato

3    farm.  So he's going back to what he did.  He's not

4    going to make hardly a fraction of what he made as a

5    probation officer or under his pension, but that's Billy

6    Burke.  For the rest of his life he'll work so that he

7    can put food on the table and support his wife as he has

8    his entire life.

9         Your Honor, it would be unconscionable to sentence

10   him to prison and I would ask the Court to fashion a

11   sentence focusing on the mail fraud guideline and giving

12   him the opportunity to finish out the rest of his senior

13   years working and supporting his family.

14        Thank you, your Honor.

15        THE COURT:  Thank you.

16        And we've come to the point in this proceeding

17   where each one of the three of you have the right, the

18   constitutional right to talk to me directly.  You do not

19   have to.  You are not required to.  But if you want to,

20   I will hear you now, and we'll go in the same order.

21        Mr. O'Brien, do you wish to speak?

22        MR. SINNIS:  He does not, your Honor, based on

23   advice of counsel.

24        THE COURT:  I understand.

25        Ms. Tavares, do you wish to say anything?

1          MS. TAVARES:  Yes, I do, your Honor.

2          THE COURT:  I'll hear you.

3          MS. TAVARES:  Good afternoon, your Honor.

4      The government suggests that I have no remorse.

5  No one has more remorse than I.  (Cries.)  I was forced

6  to leave a career that I loved and I worked so hard to

7  obtain.  I will lose my pension and my health insurance

8  for my family, after 30 years of dedicated service to

9  the trial court.  I will lose my ability to practice

10  law.  My social work license and my real estate license

11  are in jeopardy.  My convictions have tarnished the job

12  and career I loved.  And more importantly, I must live

13  with the agony that I've caused my family and friends.

14          (Pause.)

15          MS. TAVARES:  My daughter, who is 14, started her

16  first year of high school.  These years are typically

17  filled with hope and promise and now they're consumed

18  with the possibility that I may be sent to prison.  The

19  reality that I may not be home to wake her up in the

20  morning, make her breakfast and lunch, drive her to

21  school and pick her up at the end of the day, and that

22  I'll be there to help her with her homework or just have

23  daily conversations with the new experiences that high

24  school brings is indescribable, painful for both of us.

25          And as for my aging parents, who depend on me for

their care, they are 89 and 91, I can't even begin to
think how they'll adapt without me.  They will be
helpless if I am sent to prison.  Their heartache is
overwhelming.  As for my spouse, Didi, she is so
traumatized by the prosecution, she is defeated.

I gave my entire professional life to the Office
of the Commissioner of Probation.  As many of the
written letters of support for me, and we've talked
about here today, they have said that patronage in the
probation department of the trial court has been
persuasive -- has been a pervasive practice for so long
and perhaps beyond the capacity for anyone to change.

I stand before you today proclaiming that I wish I
had had the courage to try to change it.  I regret my
inaction and I'm deeply grieved that I didn't have the
wisdom to instead seek employment elsewhere.

For these inactions I will live the rest of my
life under the heavy burden I have placed on my family
and the struggles they now face.  I bear the
responsibility for my family's pain.  I bear the
responsibility for not being brave.  I plead with this
honorable court to spare my daughter of 14, my elderly
parents, and my loving spouse, for my lack of
judiciousness and courage.  I ask for leniency that you
allow me to remain with my family for their

 1  preservation, not mine.

 2          Thank you, your Honor.

 3          THE COURT:  Mr. Burke, do you wish to speak?

 4          MR. AMABILE:  Your Honor, Mr. Burke does not wish

 5  to speak at this time.

 6          THE COURT:  Very well.

 7          These sentences are imposed pursuant to 18 United

 8  States Code, Section 3553(a), the information from the

 9  United States Attorney, each of the defense counsel, the

10  probation office, and from Ms. Tavares.

11          Mr. John O'Brien, in consideration of the offenses

12  of which you stand convicted, the Court sentences you to

13  18 months in the custody of the United States Attorney

14  General.  The Court imposes upon you a fine of $25,000

15  and a special assessment of $600 as required by the law.

16  After you are released from confinement the Court

17  imposes upon you 1 year of supervised release with all

18  the general conditions of supervised release and such

19  special conditions as are appropriate where there is a

20  monetary assessment.

21          Ms. Elizabeth Tavares, the Court imposes upon you

22  3 months, 90 days, in the custody of the United States

23  Attorney General.  Thereafter the Court imposes upon you

24  1 year of supervised release.  The Court imposes a fine

25  of $10,000 and a special assessment of $600.  With all

1    the general conditions of supervised release and such

2    special conditions as are appropriate for a monetary

3    assessment.

4        Mr. William Burke, the Court places you on

5    probation for a period of one year.  The Court imposes a

6    fine on you of $10,000 and a special assessment of $100.

7    All the general conditions of probation will obtain and

8    such special conditions as are appropriate for a

9    monetary assessment.

10       These sentences are fair and just.  They are

11   sufficient but not greater than required to promote

12   respect for the criminal law and to achieve the

13   necessary objectives of sentencing.

14       The sentence on Mr. Burke and Ms. Tavares, they

15   are allowed to self-report, they may self-report on

16   Tuesday, the 12th of January, 2015.  All the present

17   conditions of release will obtain.

18       The sentences will not be further stayed pending

19   appeal.  Complex as this case was under the indictment,

20   it sorted itself out as it went on and in the main it is

21   a rather simple case.  The only -- simple in the law.

22   The only new legal aspect is the use of the gratuity

23   statute and even if that aspect of the case were to be

24   overturned, it would not overturn the conviction nor

25   would it affect the sentences.  So there's no reason to

1    stay it.

2        Each one of you is informed that you have the

3    right to appeal from any findings or rulings the Court

4    has made against you.  Should you appeal and should your

5    appeal be successful, in whole or in part, and the case

6    remanded, you'd be resentenced before another judge.

7        Now I need to explain these sentences.  To do so I

8    need to make some difficult remarks about the

9    Massachusetts judiciary and it breaks my heart to do so,

10   for it was there that I learned how to be a judge.  But

11   that does not relieve me of the duty, frankly and

12   honestly, to explain why I do what I do.

13       One of the problems here is that for far too long

14   we all have tolerated a culture of political patronage

15   in the hiring of judicial staff.  Recognizing that

16   obvious fact in no way undercuts the jury verdict.  What

17   you three stand convicted of -- well, what two of you

18   stand convicted of is lying, repeatedly lying,

19   facilitating the lies of others, suborning perjury, and

20   conspiring, all three of you, to do those things.

21   At the same time the fact that we've tolerated this

22   political patronage for so long is a form of sophistry,

23   hypocrisy, because we've said that, as far ago as my

24   service on the Superior Court, that we were hiring

25   people based on merit.  What I have to say goes not just

1   to probation staff, it goes to court officers --

2   And the sentences are my responsibility, entirely.  And

3   when I get to this point I'm speaking from no moral high

4   ground.

5        The federal judiciary has its share of sophistry

6   and hypocrisy and we've touched on it today.  This

7   business of sentencing people based on conduct of which

8   they were acquitted is, to me, utterly unacceptable and

9   reduces the moral authority of the criminal law.  It

10  also is true that in a system such as our federal

11  system, where 97 percent of offenders plead guilty, that

12  for us piously to say we're sentencing on fair

13  preponderance of the evidence when what we have before

14  us is manifestly not evidence but is a report of data

15  largely submitted by the government, demeans the whole

16  concept of evidence and factfinding.

17       But I want to say straight out, if I were to adopt

18  the harsh sentences proposed here, I believe I'm sending

19  precisely the wrong message, I'm suggesting that these

20  three are somehow rogue agents or, um, people completely

21  out of the pale, and tragically that's not so.  What we

22  have here, in this Court's considered judgment, is

23  fundamentally decent people utterly without a moral

24  compass at sea on a field, a wash of political

25  patronage, and old history is important.

1            John O'Brien didn't invent patronage hiring in the

2       Department of Probation.   There was a time when the

3       judges made the decisions and that time goes back to

4       when there were individual line items for each of the

5       individual courts, save for the Superior Court, which

6       gave it some immunity.   And it is clear that in that

7       time, going back to those times, which predate his

8       appointment, there were situations where to advantage

9       the budget of individual courts there were appointments

10      made to receive favorable treatment from the

11      Massachusetts legislature or individual senators and

12      representatives.   And then came a time when budgets were

13      centralized, a wise and important reform, and hiring was

14      likewise centralized in the case that's important to our

15      situation, in the office of probation, but what that had

16      the effect of was simply centralizing the patronage in

17      the hands of the House and Senate leadership.

18            Now for years it has been the responsibility of

19      every judicial officer, it's in the ethics of judicial

20      officers, to report crimes and misconduct, and I want to

21      pause here and point out and publicly thank those

22      justices of the District Court, the Probate and Family

23      Court, and the Superior Court who came in here and

24      called it what it was, a "sham," and a "travesty," and

25      as is required of every judicial officer they made

report of their conclusions.  And what happened to those

reports?  We have evidence in this case of a Chief

Justice of the Superior Court passing out names,

rejected by the appropriate justice, but that's evidence

in the court.

And after these years went by, as counsel properly

have pointed out, matters hit the paper, people

resigned, the Supreme Judicial Court launched an

investigation, and with patronage still up for grabs,

the Governor thought maybe he'll take it over and have

probation in the executive and only the quick work of

Chief Justice Ireland kept probation in the judiciary.

And then to their great credit, and I say this without

qualification, the legislature passed reform measures

designed to bring an end to this era of political

patronage.

Now if matters had rested there, the truth is that

we would be much less apprised of what was going on.

The United States Attorney and her staff are to be

commended for bringing this criminal action and for

pursuing it to trial.

Today every judge in Massachusetts must stand

ashamed and appalled at the extent of corruption within

the probation department of the Massachusetts judiciary.

But various things have been learned and there is no

1    going back.  Here is what this trial has taught us.

2        One, that patronage corrupts.  Whether it is

3    rendered illegal or not is immaterial, it corrupts.

4    It's dysfunctional.  Two, the reporting duties of every

5    judge don't stop with reporting it to the First Justice

6    of the Court or a Regional Administrative Justice of the

7    Court, they go on through the Chief Justice of the

8    Court, also to the Chief Justice for Administration and

9    Finance, and reporting any incident of apparent

10   patronage hiring to the Justices of the Supreme Judicial

11   Court of Massachusetts.  After this trial that's part

12   and parcel of the ethics of every judge.

13       And one other thing -- two other things, actually.

14   This trial establishes, as no other process could, that

15   a judiciary staff position is a thing of value under the

16   laws of the Commonwealth, and any -- not that it's

17   illegal to make suggestions by powerful legislators, by

18   the Governor, it's not improper to make suggestions of

19   qualified people for employment on judiciary staff, but

20   if that suggestion comes with any strings attached, now,

21   today, it will be recognized as solicitation of a bribe.

22       It is this court's belief that today the hiring of

23   -- the patronage hiring of staff within the

24   Massachusetts judiciary is over.  It's finished.  It's

25   done.  And how may I make that statement?  It's not

1    because of anything that I said, in part it's because of

2    the appropriate actions of the Massachusetts legislature

3    and the Massachusetts judiciary, but more than anything

4    else it's because the people themselves, acting through

5    a fully-informed jury, have demanded it.

6          That's the sentence of the Court.  We'll recess.

7          MR. SINNIS:  Two quick things, your Honor.  I

8    think you said Mr. Burke when you said "self-report

9    day."  I just want to be clear that you meant

10   Ms. Tavares and Mr. O'Brien.

11         THE COURT:  If I misspoke I did mean those are the

12   incarcerative sentences.

13         MR. SINNIS:  And I just want to make sure that

14   you're denying bail pending appeal, that's your final

15   order that would then be appealable?

16         THE COURT:  It is appealable.

17         MR. SINNIS:  Thank you.

18         THE COURT:  That's my order.

19         We'll recess.

20         (Ends, 4:00 p.m.)

21

22

23

24

25

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the foregoing record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Thursday, November 13, 2014, to the best of my skill and ability.

/s/ Richard H. Romanow 06-30-15
_____
RICHARD H. ROMANOW   Date